GOODWIN | PROCTER

John Moustakas
202.346.4236
jmoustakas@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
901 New York Avenue, N.W.
Washington, D.C.  20001
T: 202.346.4000
F: 202.346.4444

June 16, 2005

**Submitted *Ex Parte*[1]**

**By Hand**

Hon. Colleen Kollar-Kotelly
United States District Court
    for the District of Columbia
E. Barrett Prettyman Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

### Re:  Counsel's Report on Proposed Settlements of *Joseph S. Heard* v. *District of Columbia, et al.*, Civ. No. 02-296 (CKK), with District of Columbia and CCHPS

Dear Judge Kotelly:

On undersigned counsel's motion, this Court appointed Jonathan L. Stern, Esq. to serve as guardian *ad litem* for plaintiff, Joseph S. Heard.  In setting forth the reasons for that appointment, the Court explained that the "risk of erroneous deprivation for Mr. Heard resulting from the appointment of a guardian *ad litem* is quite minimal," because of, among other things, the Court's "obligation to review any settlement, if any, and make an independent finding that it is fair." *Memorandum Opinion* at 18 (December 9, 2004).  We write now to invoke this power and ask the Court to approve, as both fair and reasonable, two proposed settlements and execute the attached orders.

As we describe in greater detail below, Mr. Heard has received separate settlement offers from the District of Columbia and the Center for Correctional Health Policy and Studies, Inc. ("CCHPS") to resolve the claims against each of them and their named employees.  Subject to this Court's final approval, to resolve Mr. Heard's claims against the Defendant District of

---

[1]     Because any candid assessment of the offers necessarily involves a disclosure of attorney work product and attorney-client advice, and because Mr. Heard would be prejudiced by the disclosure and dissemination of such information to the defendants were the case not to be settled, this report is made as a private letter to the Court, rather than as a publicly-available court filing.  Counsel for both defendants have been notified of this fact, and neither objects.

GOODWIN PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 2

Columbia, a Stipulation of Consent Judgment has been signed by the District and Mr. Heard's guardian *ad litem*, Jonathan L. Stern. Likewise, a settlement agreement between CCHPS and Mr. Heard has also been provisionally executed. Courtesy copies of both these agreements have been attached as Exhibits A and B, respectively. The terms of Mr. Heard's settlement with CCHPS are confidential.[2] In short, we believe that both offers are fair and reasonable and should be approved by this Court. Courtesy copies of the proposed Entry of Consent Judgment and proposed Order Approving Settlement With CCHPS are attached as Exhibits D and E, respectively. We expect the guardian to submit his own report to the Court shortly as well.

## I. FACTUAL BACKGROUND

On or about November 15, 1998, having been previously barred from the premises, Joseph S. Heard was arrested for unlawful entry for entering a George Washington University law school building in the middle of the day. Mr. Heard is deaf, cannot speak, is functionally illiterate, borderline mentally retarded, mentally incompetent, and known to suffer from various psychological maladies. The Pretrial Services Report generated in connection with this arrest reported that Mr. Heard had "NO PENDING CASES." Mr. Heard was released on personal recognizance. The case – identified as M-16624-98 – was assigned to Judge John Campbell of the D.C. Superior Court. Unrelated to his criminal case, Mr. Heard was referred by a local law school legal clinic to the Hearing Impaired Unit at St. Elizabeths Hospital as a potential source of assistance for his multiple disabilities and he was voluntarily admitted there on November 19, 1998. Because he was not committed to St. Elizabeths, but was there on a voluntary basis unrelated to his criminal case, his release status in M-16624-98 did not change: he remained on personal recognizance.

On March 4, 1999, according to his misdemeanor court jacket, Mr. Heard was "ordered to have a competency screening on a walk-in basis at John Howard Pavilion" and signed notice to return to court on April 19, 1999. Mr. Heard still remained on personal recognizance. On April 15, 1999, his competency screening was completed, but the doctor was unable "to form an opinion as to his competency to stand trial because of the complex nature of his disabilities." As a result, Mr. Heard was told to return to court on June 7, 1999, before which additional psychological testing would be conducted to assess his competency. A June 3, 1999 report found Mr. Heard "incompetent because mental illness and cognitive limitations substantially impair his capacity to have a factual and rational understanding of the proceedings and to properly assist counsel." At his June 7, 1999 status hearing, Mr. Heard was ordered "committed to St. Elizabeths Hospital for appropriate treatment pursuant to D.C. Code § 24-301(a) until he is

---

[2]    While the Stipulation of Consent Judgment may be filed in the case docket as-is, we have attached as Exhibit C the courtesy copy of a motion to file under seal a copy of the settlement agreement with CCHPS in light of the parties' agreement to keep its terms confidential.

GOODWIN│PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 3

competent to stand trial." Therefore, from June 7, 1999 on, Mr. Heard was no longer on personal recognizance, but rather was being detained on the "criminal side" of St. Elizabeths – at John Howard Pavilion.

On July 16, 1999, a so-called "60-day examination" of Mr. Heard was ordered. That examination resulted in a September 9, 1999 report from Forensic Inpatient Services indicating that Mr. Heard remained incompetent and was "unlikely [to] regain competency in the foreseeable future." At a September 13, 1999 status hearing Judge Campbell adopted the opinion of Forensic Inpatient Services and gave the government one month to decide whether to seek civil commitment. When, on October 13, 1999, the government indicated that it had not sought civil commitment, Judge Campbell dismissed the case against Mr. Heard and signed an order directing his release from custody at St. Elizabeths Hospital. To that preprinted Release Order in M-16624-98 Judge Campbell added the handwritten note "In This Case Only."[3]  Thus, Mr. Heard's detention at St. Elizabeths – which began on June 7, 1999 – ended on October 13, 1999.

Recognizing that Mr. Heard had been released from custody in M-16624-98, and hence from St. Elizabeths, an employee of the D.C. Jail Records Office determined that, rather than releasing Mr. Heard from the cellblock as was the default procedure at the time, Mr. Heard should be sent to D.C. Jail to determine whether any warrants or holds in cases other than M-16624-98 required his continued detention. It is undisputed that, had they been consulted, the Superior Court computer system (CIS) and the police computer system (WALES) would have shown that Mr. Heard had no pending matters, as the Pretrial Services Report had shown. The D.C. Jail's computer system, however, erroneously showed as still pending a 1996 misdemeanor offense for Misdemeanor Sexual Abuse – Touching: M-412-96. It is undisputed that M-412-96 was not pending at the time, but had been dismissed on *June 4, 1996.* Based on the erroneous information that M-412-96 was still pending, Mr. Heard was illegally admitted into D.C. Jail on October 13, 1999 on a case that had been dismissed 40 months earlier.

D.C. Jail Records Office personnel purportedly noted a discrepancy in Mr. Heard's admission, but because of the late hour could not confirm with the Superior Court whether M-412-96 was actually pending or not. The discrepancy was left for a dayshift employee to investigate. It is undisputed that the dayshift employee – Althea Haynes – contacted a Superior Court official and learned that M-412-96 had been dismissed more than three (3) years earlier, in June 1996. Ms. Haynes' contemporaneous handwritten note on a jail computer printout listing M-412-96 as pending confirms the District knew as of October 14, 1999 that Mr. Heard did not

---

[3]     As we understand it, this phrase is employed as a prophylactic measure by some judges to avoid the erroneous release of defendants who might be held on other, unrelated charges; it is not used to signal that such other charges actually exist, however.

GOODWIN PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 4

belong in D.C. Jail. During the course of disciplinary proceedings against her, Ms. Haynes
claimed that she left Mr. Heard's file with a superior while the jail awaited a copy of the prior
release order from Superior Court staff.

The Superior Court official does not recall the communication with Ms. Haynes nor,
consequently, a request for production of the release order from the Court to the Jail. He
contends that such a request would have been sufficiently unusual that he likely would have
remembered it since jail staff was not typically authorized to make such requests of the court. In
any case, he asserts that, if he had been asked to find a copy of a release order and provide it to
the jail, he would have done so. The District does not take a position as to whether the release
order in M-412-96 was ever sent to the Records Office. It is undisputed, however, that
Ms. Haynes' note – which unequivocally indicated that there was no basis for holding Mr. Heard
at D.C. Jail – was placed into Mr. Heard's institutional file, which was thereafter mislaid and
improperly shipped to an off-site storage unit never to be seen again until days before
Mr. Heard's release in August 2001.

It is undisputed that Mr. Heard remained unlawfully imprisoned in D.C. Jail for 670 days.
It is undisputed that during those 670 days Mr. Heard was never once transported to court, never
received or made telephone calls, never received visitors, never received mail, and never
conferred with an attorney – and for good reason: other than jail staff, no one knew he was in
D.C. Jail. In short, any reasonable jail official paying any amount of attention would have
recognized that something about Mr. Heard's detention was amiss.

It is undisputed that Mr. Heard nominally had case managers and social workers assigned
to him at the D.C. Jail. These officials were required to advocate for Mr. Heard and serve his
needs, and to document the provision of such advocacy and services. It is undisputed that
Mr. Heard received little if any advocacy or services; indeed, his primary case manager did not
document a single encounter with Mr. Heard. She and his social worker have both admitted that
they were cognizant of the facts listed above that ought to have suggested that Mr. Heard did not
belong in the D.C. Jail. But neither called Mr. Heard's lawyer or the Court or ever obtained
Mr. Heard's institutional file in an attempt to investigate these tell-tale signs that Mr. Heard had
slipped through the cracks. If anyone had gotten that file she would have learned that Mr. Heard
was being illegally held. Instead, these "advocates" satisfied themselves by resorting to the jail's
notoriously flawed computer system which erroneously showed M-412-96 as a pending drug
charge, even though it was an assault charge dismissed 40 months earlier. Apart from failing to
figure out for themselves that Mr. Heard did not belong in D.C. Jail, none of these service
providers took any steps to make it possible for Mr. Heard, himself, to communicate that
information. By failing to assure his access to sign-language interpreter services or other
communication assistance, Mr. Heard was unable to communicate effectively the fact of his
unlawful imprisonment.

GOODWIN │ PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 5

During a portion of his unlawful imprisonment, the Mental Health Unit ("MHU") in which Mr. Heard was housed was operated by a court-appointed receiver. Among other things, the receiver's staff administered anti-psychotic drugs to Mr. Heard and drew blood from him. Thereafter, for another portion of Mr. Heard's unlawful imprisonment, CCHPS was awarded a contract to assume the receiver's responsibilities as an independent contractor to the D.C. Jail. CCHPS' staff, like the receiver's before it, also administered anti-psychotic drugs to Mr. Heard and drew blood from him. Neither staff ever communicated with Mr. Heard through a qualified sign-language interpreter. As a result, Mr. Heard's informed consent was never obtained with respect to any of the medications or treatments that the receiver or CCHPS administered during the long course of his illegal imprisonment.

The ultimate discovery of Mr. Heard's unlawful incarceration resulted not from efforts to investigate the unusual circumstances of his detention, but from fortuitous events relating to the federal designation of inmates. Specifically, for a considerable time, Mr. Heard was housed in the MHU at cellblock South 2 with other inmates.[4] On July 31, 2001, Mr. Heard's social worker, Joan Davage (then an employee of CCHPS), learned that all the inmates residing on South 2 were cleared for federal designations and would be leaving D.C. Jail in order to serve their sentences at various federal penitentiaries. Every inmate on South 2, other than Mr. Heard, was on the list to be transferred.

When this discrepancy was revealed, jail officials became suspicious that Mr. Heard may have been a "delayed release." Thus, on August 3, 2001 a District employee contacted Mr. Heard's lawyer for the very first time. As a result of that conversation, she learned what Ms. Haynes knew back on October 14, 1999: that M-412-96 had been long since dismissed and that, consequently, Mr. Heard was being unlawfully held in jail since there were no pending charges against him. Remarkably, it took another ten (10) days before Mr. Heard was actually released on August 13, 2001.

# REDACTED

---

[4]     Because of the closing of Lorton, inmates (*i.e.*, individuals serving sentences) were being housed at D.C. Jail during this time period. Given that inmates, and not pretrial detainees, were being kept at South 2, Mr. Heard's residency on that unit should have raised questions for the District since it claims to have believed that Mr. Heard was a *pretrial detainee* awaiting trial in M-412-96, not an inmate.

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 6

# REDACTED

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 7

# REDACTED

GOODWIN PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 8

# REDACTED

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 9

# REDACTED

GOODWIN PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 10

# REDACTED

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 11

# REDACTED

GOODWIN PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 12

# REDACTED

GOODWIN PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 13

1

**REDACTED**

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 14

# REDACTED

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 15

# REDACTED

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 16

# REDACTED

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 17

# REDACTED

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 18

# REDACTED

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 19

# REDACTED

GOODWIN PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 20

# REDACTED

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 21

# REDACTED

## IV.   CREATION OF SPECIAL NEEDS TRUST TO PROTECT
## MR. HEARD'S SETTLEMENT PROCEEDS

In order to ensure that Mr. Heard receives the greatest benefit from the settlements,
counsel recommends that the settlement proceeds be paid directly into a special needs trust to be
established for Mr. Heard's benefit. We first learned about the utility of these trusts from our
several discussions with local lawyers who practice in the area of disabilities law. Pursuant to 42
U.S.C. § 1396p(d)(4)(A), we will be asking this Court to create a special needs trust into which
the proceeds of the settlements will be paid.[12]  As we discuss further below, such a trust would
ensure that the substantial sums that Mr. Heard will receive under the settlements will be
managed by professionals with experience planning for the financial needs of disabled
individuals, that those sums will not be squandered by Mr. Heard or looted by others who might

---

# REDACTED

[12]      Federal law authorizes a parent, grandparent, guardian or *court* to create a special needs trust. Special
needs trusts are essential where the sudden availability of lump sum litigation awards could prevent a disabled
person from continuing to qualify for essential public medical benefits. To avoid any disqualification from benefits,
the funds used to create the trust must be paid directly to the trust and never come into the beneficiary's possession.
For this reason, the Court's establishment of the trust in connection with the resolution of this case is crucial.

GOODWIN | PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 22

attempt to take advantage of him, and that their distribution to or use by him of such sums is structured in a manner that ensures Mr. Heard never loses the government health benefits that he currently receives.

Because undersigned counsel lacks experience with special needs trusts, we worked to identify specialists with expertise in the creation and administration of such trusts in Florida, where Mr. Heard resides. We learned that Arc of the United States (formerly, the Association for Retarded Citizens) has considerable experience in the creation of such trusts for the population it serves. The national organization directed us to Arc of Florida. Through a series of referrals we were introduced to Richard LaBelle, a Florida disabilities lawyer for over 20 years who specializes in the creation and administration of special needs trusts. We believe Mr. LaBelle would be an ideal trustee for a special needs trust created for Mr. Heard's benefit. Mr. LaBelle – who is the father of a special needs child – has considerable experience acting as trustee to many special needs trusts. Indeed, he administers a large pooled-income trust for disabled individuals in Florida. He has been a court-approved expert on the topic of special needs trusts and speaks regularly about them. Biographical and background information about Mr. LaBelle is attached as Exhibit F hereto.

In his role as a special needs trustee, Mr. LaBelle often engages Tom Nurse and Kevin Manning to manage the trust assets and to supplement his own expertise in the field of special needs planning. Messrs. Manning and Nurse are financial services representatives with MetLife's MetDESK (MetLife's **D**ivision of **E**state Planning for **S**pecial **K**ids). Biographical information about Messrs. Nurse and Manning, and a short description of MetDESK, are attached as Exhibits G, H and I. (MetLife has $373.5 billion of assets under management as of September 30, 2004.)[13] Something of a misnomer, the MetDESK division specializes in financial planning for the financial needs not only of children, but also of other dependents with disabilities. Like a majority of all MetDESK representatives (and like Mr. LaBelle), both men have family members with special needs.

Extensively trained to keep pace with the constant changes in federal and state government benefits laws, future trends in special needs planning, and innovations in planning techniques, these professionals do more than manage money. Rather than spend trust assets on the purchase of certain benefits, they are often able to identify programs about which families are typically unaware and arrange for the benefits or services to be provided free of charge. The MetDESK representatives also keep abreast of developing technologies – often unknown to families – that can significantly improve a beneficiary's quality of life. For instance, Mr. Nurse

---

[13] MetDESK has working relationships with six leading disabilities advocacy groups: The Arc (formerly, the Association of Retarded Citizens); SNAP (Special Needs Advocates for Parents); NORD (National Association for Rare Disorders); ASA (Autism Society of America); NDSS (National Downs Syndrome Society); and UCP (United Cerebral Palsy).

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 23

has indicated great familiarity with the latest communication assistance technologies that could help Mr. Heard better enter mainstream society. He has also raised the possibility of cochlear implants and intensive post-implantation therapy that could make it possible for Mr. Heard to obtain a useful auditory understanding of his environment and help him to understand, and communicate by, speech.

A special needs trust would have several advantages for Mr. Heard over a simple cash payment to him, or payment in the form of an annuity purchased by the District. First, it would preserve Mr. Heard's federal medical benefits, which he could lose if the settlement proceeds were paid directly to him in cash or by the purchase of an annuity. Because of his multiple medical conditions, those benefits are critically important to Mr. Heard. And he would be highly unlikely to be able to purchase an individual health insurance policy, as such policies are typically underwritten. This is a critical advantage of the special needs trust for Mr. Heard, as it would be counterproductive for Mr. Heard to receive compensation for the injuries that he sustained by being unlawfully detained, but in the process lose the kind of comprehensive medical coverage that even a significant settlement may not be able to replicate over the course of his life.[14]

Second, the trust vehicle, itself, ensures that someone will actively look out for Mr. Heard's long-term interests, and will manage his money as effectively as possible, making certain that his needs are taken care of and that the proceeds are used to maximize his quality of life. Indeed, this would be the trustee's fiduciary duty. Left to his own devices, Mr. Heard's disabilities prevent him from appreciating the value of money, let alone the substantial sums that he would receive under the settlement. And Mr. Heard surely lacks the ability to properly invest the money in order to guarantee that monies are available for the remainder of his life.

Financial management by the trustee would not only be better than simply handing the money to Mr. Heard, but it would likely grow at a greater rate than the 2-3% annuity offered by the District. By contrast, we are told that the trustee could purchase Florida tax-free municipal bonds, which are a very conservative investment and which currently generate the post-tax equivalent of approximately 7% interest. Appropriate money management through a special needs trust would provide Mr. Heard with the greatest financial benefit from the settlement, even after deductions for management and trustee fees.[15]

---

[14]     The management of putative trust proceeds by trustee LaBelle and financial planners Nurse and Manning would also give Mr. Heard access to additional sources of government benefits, and bring to his attention programs for individuals with disabilities in which he is neither currently enrolled nor of which he is currently aware – programs and benefits about which these professionals have made it their business to be uniquely familiar.

[15]     As trustee of Mr. Heard's special needs trust, Mr. Labelle would charge a 1% fee per year. Within either his fiduciary discretion or pursuant to guidelines set forth in the trust documents, the trustee would be free to select an appropriate money manager. The fee for money management services depends on who the trustee opts to

GOODWIN | PROCTER

Beyond scheduled distributions to Mr. Heard – which will be the subject of a forthcoming trust agreement which we will ask the Court to approve – the fact that the trustee will be vested with the power to honor or deny funding requests from Mr. Heard does not render the trust unacceptable. To the contrary, it is precisely that power which makes the vehicle a legitimate special needs trust and which offers real assurance that the trust will remain viable to take care of Mr. Heard for the remainder of his lifetime. We are assured that the trustee adequately values the principle of self-determination not to take inflexible views about the propriety of requests for expenditures on items beyond those that would be characterized as necessities of life: such as lodging, clothing, food, communication-assistance technologies, etc. Rather, the trustee appreciates the impact on quality of life of many of the non-essentials that bring us enjoyment, including vacations, entertainment, books, music, etc. And he will balance these against the all-important reality of preserving enough of the corpus to insure Mr. Heard's long-term care and protection.

In addition to Mr. LaBelle's appointment as the trustee of a special needs trust for Mr. Heard we will ask the Court to create, we are recommending the appointment of a guardian for Mr. Heard in Florida. That appointment would be made in Florida, by a Florida court, pursuant to proceedings initiated by the trustee after he has been appointed.[16] As distinct from the current guardian *ad litem*, a Florida guardian would be an advocate for Mr. Heard and serve as his intermediary with the trustee. The presence of a guardian will ensure that Mr. Heard's needs are adequately communicated to the trustee and that a competent fiduciary is minding the trustee's handling of the trust and the interests of its sole beneficiary – Mr. Heard.

Although the guardian will be unable to overrule the trustee or make substantive decisions about the disposition of trust assets without the trustee's approval, she will be an important part of a system of checks and balances that assures the trustee continues to act in the best interests of Mr. Heard. For instance, the trust will contain an escape clause which will permit the trust to be dissolved, either in fact or by terminal distribution, should the vehicle no longer suit Mr. Heard's needs as its beneficiary. If circumstances trigger it, the guardian will be

---

engage. As we understand it, MetLife charges a .75% annual fee for the services of Messrs. Nurse and Manning in addition to incurred transaction fees.

[16]    The Court will recall that Mr. Heard's guardian *ad litem* in the District of Columbia, Jonathan L. Stern, agreed to serve in that capacity for the purpose of (1) serving as counsel's sounding board for certain strategic litigation decisions; (2) making certain decisions about the cases against the District and CCHPS; (3) evaluating settlement offers; and (4) deciding whether to accept an offer. Mr. Stern did not agree, nor was he asked, to serve as a conservator or in any other capacity with respect to husbanding the proceeds of any settlement for Mr. Heard's benefit. Because of Mr. Heard's significant cognitive deficiencies and other disabilities, it has long been understood that Mr. Heard would need a guardian in Florida to protect his interest in any settlement proceeds or other recovery realized.

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 25

in a position to invoke this clause if Mr. Heard is not. The guardian could also decide that while the trust still meets many of Mr. Heard's needs, the trustee no longer does. She would be empowered to challenge the trustee's conduct in court and even seek his removal and the appointment of a new trustee. In consultation with Mr. LaBelle, who strongly urges the appointment of a family member for this purpose wherever possible, we will seek in Florida the appointment of Mr. Heard's sister – Sandra Hayes – as his guardian for these purposes and as will be set forth in more detail in the forthcoming trust documents.

We have conferred with Mr. Heard's current guardian *ad litem*, Jonathan Stern, about the creation of a special needs trust to receive the proceeds of Mr. Heard's settlements and its management by a trustee who would insure that Mr. Heard's needs are met. Mr. Stern supports the creation of the trust, the appointment of Mr. LaBelle to administer it, as well as the subsequent appointment of Ms. Hayes as her brother's guardian in Florida.

To move forward from here, we propose the following course. First, we ask the Court to approve the settlements in this case. Once the settlements have been approved, the proposed trustee and any professionals he may choose to manage the trust proceeds, along with counsel for Mr. Heard, the proposed guardian, Ms. Hayes, and (possibly) Mr. Heard will confer about the structure, content, and terms of the trust. Thereafter, Mr. LaBelle will draft the trust documents. The trust will be submitted to the Court for review and approval, along with a motion seeking the appointment of Mr. LaBelle as trustee. Only if and when this Court approves and creates the special needs trust and appoints Mr. LaBelle (or some other qualified individual) as trustee, will the proceeds from the settlements to which Mr. Heard is entitled be deposited in the trust. Thereafter, Mr. Heard will begin receiving distributions as set forth by the trust. Unless there is a problem with the trust's funding, we do not expect to invoke the Court's jurisdiction further. Eventually, jurisdiction over the trust can be transferred from this Court to the United States District Court for the Central District of Florida if doing so is considered appropriate by this Court or the trustee.[17]

## V.    CONCLUSION

Insuring that a victory for Mr. Heard would not be merely a Pyrrhic one, counsel has long puzzled over how to handle the mechanics of a settlement or jury award to best provide for Mr. Heard and strike an appropriate balance between his protection and some modicum of self-determination. We feel that we have found the answer in the form of the special needs trust. It

---

[17]     In order to make sure that payments of the settlement proceeds do not disqualify Mr. Heard for medical benefits, it is crucial that a special needs trust be established and ready to receive those payments as soon as possible. Because of this Court's familiarity with the case, its subject matter jurisdiction, and the need to establish the structure for protecting Mr. Heard's assets in connection with settling the case, this Court's and approval of the special needs trust is crucial.

GOODWIN PROCTER

Hon. Colleen Kollar-Kotelly
June 16, 2005
Page 26

ensures that the settlement money will last, both because it safely will grow at a greater rate than an annuity purchased by the District and because the trustee's fiduciary obligations will protect against the assets being squandered or coming under the control of unscrupulous third parties. Most importantly, it protects against a loss of Mr. Heard's health care coverage and ensures steady improvement in his quality of life.

We are anxious that Mr. Heard be able to enjoy as soon as practicable the improved quality of life that the settlements make possible. The essential first step is approval of the settlements. We respectfully ask the Court to approve the settlements as fair and reasonable by entering the attached orders, copies of which have been provided to opposing counsel for the District and CCHPS. If there is any additional information that the Court requires, we will do our best to provide it promptly.

Sincerely,

John Moustakas