# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSEPH S. HEARD,                          )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )   No. 1:02CV00296 (CKK)
                                          )
                                          )
DISTRICT OF COLUMBIA                      )
GOVERNMENT, ET AL.                        )
                                          )
                    Defendants.           )
_____   )


## PLAINTIFF'S REPLY TO DEFENDANT DISTRICT OF COLUMBIA'S
## <u>OPPOSITION TO PLAINTIFF'S FEE PETITION</u>

John Moustakas (D.C. Bar No. 442076)
Paul R. Friedman (D.C. Bar No. 113852)
Adam M. Chud (D.C. Bar No. 468443)
Goodwin Procter LLP
901 New York Ave., N.W.
Washington, D.C. 20001
Tel.: (202) 346-4000
Fax: (202) 346-4444

*Counsel for Joseph S. Heard*

January 24, 2006

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

I.  THE EXCELLENT RESULTS ACHIEVED IN PROSECUTING MR. HEARD'S CIVIL RIGHTS CLAIMS ENTITLE HIM TO A FULLY COMPENSATORY FEE ....................................................................................................................3

II. THE FULLY COMPENSATORY FEE TO WHICH MR. HEARD IS ENTITLED IS THE ACTUAL COST OF VINDICATING HIS CONSTITUTIONAL RIGHTS ....................................................................................................6

   A.  Defendant Has Failed To Rebut Mr. Heard's Showing That His Attorneys' Hourly Rates Are Reasonable..............................................................................10

      1.  "Complex Federal Litigation" Is The Relevant Market For Legal Services.................................................................................................. 10

      2.  Plaintiff's Attorneys Have The Necessary Qualifications To Support Their Requested Billing Rates...................................................... 12

      3.  The Updated *Laffey* Index Is A More Appropriate Measure Of Reasonable Rates Than The USAO Matrix Defendant Proffers .............. 13

      4.  Recalculating Mr. Heard's Attorneys' Fees Under The USAO Matrix Would Undermine The Remedial Purposes Of §§ 1983 And 1988................................................................................................... 14

   B.  The Number Of Hours Spent Vindicating Mr. Heard's Constitutional Rights Was Reasonable..........................................................................................15

      1.  The So-Called "Block-Billed" Entries Should Be Paid In Full ............... 16

         a.  Entries Describing Related Tasks Are Not Block-Billed ............. 18

         b.  Block-Billing Does Not Impede This Court's Ability To Determine The Reasonableness Of Time Expended By Counsel ...................................................................................... 19

         c.  Block-Billing Is Immaterial Where Distinguishing Between Successful and Unsuccessful Claims Is Unnecessary.................. 21

         d.  Mr. Heard Has Sufficiently Cured The Block-Billing Objections ................................................................................... 25

      2.  Mr. Heard's Fee Petition Is Adequately Detailed .................................... 26

         a.  The Petition Is Not Replete With Vague Entries ........................... 26

                (i)      Defendant's Knowledge Erases Much Of The Alleged Vagueness .............................................................. 26

                (ii)     Surrounding Billing Entries And Documentation Clarify Any Remaining Vagueness .................................. 28

                (iii)    Defendant Ignores The Forest For The Trees ................... 30

        b.      Defendant's Attack On Internal Meetings Is Ill-Founded ............ 32

        c.      There Has Been No Excessive Billing For Ministerial Tasks ...................................................................................... 38

     3.     Plaintiff's Fees Are Not Cut Off As Of February 4, 2005 ....................... 38

     4.     Mr. Heard's Fees On Fees Are Reasonable .............................................. 42

        a.      The Time Spent Preparing The Fee Petition was Reasonable ................................................................................. 43

        b.      Defendant's "Fee Petition Billing" Chart Is Inaccurate And Unreliable ..................................................................................... 45

        c.      The Time Spent On The Petition Is Consistent With Other Complex Cases.............................................................................. 46

III.    PREDECESSOR COUNSEL SHOULD BE PAID FOR THEIR WORK ........................47

IV.    DEFENDANT'S CHALLENGES TO INCURRED COSTS ARE MERITLESS ............49

CONCLUSION ..........................................................................................................................51

## INTRODUCTION

In transforming a case on the verge of dismissal into a recovery of as much as $2.8 million, the prosecution of Mr. Heard's civil rights case was a tremendous success by any measure – both for Mr. Heard and for the vital public interests protected by § 1983.[1] Yet obtaining this excellent result was no small feat. Not only did the case present difficult issues and a high burden of proof for recovery, but defendant's obdurate and unyielding litigation required creative, sustained, and thorough work on Mr. Heard's behalf at every turn.

Now, having agreed to settle Mr. Heard's case by, among other things, agreeing to pay his reasonable attorney's fees (which Defendant knew prior to settlement would exceed $1 million[2]), Defendant has resumed that same scorched-earth litigation approach, seeking to slash Mr. Heard's fees by a breath-taking (and utterly unprecedented) 70% – amounting to over $700,000. Defendant's position, however, is patently meritless on its face: Mr. Heard achieved complete success on his claims, his fee petition established the reasonableness of his counsel's billing rates, and the petition was supported by detailed contemporaneous billing records, supporting declarations, and abundant caselaw.

Indeed, Defendant's arguments for seeking to have this Court axe Mr. Heard's fees are utterly unpersuasive. Defendant contends, first, that Plaintiff's fee petition mistakenly established the hourly rates for attorneys in complex federal litigation rather than for civil rights

---

[1]   "Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit does so not for himself alone but as a private attorney general, vindicating a policy that Congress considered of the highest importance." *City of Riverside* v. *Rivera*, 477 U.S. 561, 575 (1986) (internal quotations omitted).

[2]   In response to his inquiry on January 28, 2005, District of Columbia Attorney General Robert Spagnoletti was told that Mr. Heard's legal fees and costs were estimated to near $1 million at the time. See Moustakas Decl. at ¶ 200. At its request, Defendant was given a copy of Mr. Heard's billing records on March 1, 2005 that captured fees and costs through February 3, 2005, and a slightly updated version on May 20, 2005. See Declaration of Adam M. Chud ("Chud Decl.") at ¶¶ 18-19 (Exhibit O to Fee Petition). The early production of these bills was designed to facilitate Defendant's review, answer and resolve any resulting questions, and lead to non-litigation resolution of the fee issue. See *id.* at ¶ 18. But despite a promise to enter "good faith negotiations" over fees, Defendant never did. See *infra* n.25.

litigation, and that the below-market rates on the U.S. Attorney's Office's fee matrix ("USAO matrix") should therefore be used as a default. But this Court has already rejected that same argument, holding that there is no difference between civil rights litigation and other complex federal litigation. See *Covington* v. *District of Columbia*, 57 F.3d 1101 (D.C. Cir. 1995). Indeed, it is well settled that counsel who handle these matters are to be paid at their regular litigation rates in order to achieve the remedial purposes of §§ 1983 and 1988. See *Blum* v. *Stetson*, 465 U.S. 886, 896 n.11 (1984). Moreover, even if a matrix were to be applied, it should be the updated *Laffey* index that was prepared by Dr. Michael Kavanaugh and that this Court has applied in cases where prevailing rates were not established, not the U.S. Attorney's outdated and below-market grid. Under the updated *Laffey* index, virtually all of the rates charged by Mr. Heard's counsel are fully authorized and reasonable.

Second, Defendant asserts that the Court should further cut Mr. Heard's fees ***in half*** based on a limited number of "block billed" or otherwise supposedly vague time entries. Defendant does not, however, assert that Plaintiff's overall fees spent vindicating Mr. Heard's constitutional rights were excessive or unjustified; rather, it merely seeks a triumph of form over substance. In any event, Defendant's formalistic arguments are wrong. As to the relatively few supposedly "block billed" entries, courts have repeatedly held that daily billing is wholly proper and does not justify any reduction where, as here, the daily descriptions are detailed and all of the time relates to claims on which the plaintiff prevailed and is entitled to recovery. As to the other entries, the ambiguity perceived by Defendant is due not to the entries themselves, but primarily to the fact that counsel who prepared Defendant's fee challenges is new to the case and due to Defendant's attempt to examine each entry in isolation, rather than reviewing other entries that provide ample context in which to understand each entry. And, finally, as to Defendant's

2

argument that time spent in intra-office meetings is not compensable, that assertion is utterly contrary to the established practice of law and to the accompanying declarations making clear that the meetings at issue here in fact were necessary and proper.

Third, Defendant argues that Plaintiff is entitled to no fees for work after Defendant tendered its Rule 68 offer of judgment, which would have terminated Mr. Heard's right to recover fees as of that date. That argument is wrong because that offer was rejected. The parties' actual settlement embodied different terms that were far more favorable to Mr. Heard than was the Rule 68 Offer – including permitting for a very substantial recovery against other defendants.

Finally, Defendant argues that Mr. Heard's initial counsel, who invested some $140,000 in time into this case, should get *nothing*. But that argument is largely premised on the false hypothesis that counsel were fired. In fact, prior counsel properly arranged for their own replacement by a firm that had greater resources once Defendant's scorched-earth litigation approach became clear. The record reflects that those initial lawyers' fees were reasonable, and hence Mr. Heard is entitled to recover them under the express terms of the parties' settlement.

## I. THE EXCELLENT RESULTS ACHIEVED IN PROSECUTING MR. HEARD'S CIVIL RIGHTS CLAIMS ENTITLE HIM TO A FULLY COMPENSATORY FEE

The standard for imposing § 1983 liability upon a municipality (*e.g.*, *Monell* liability) is very demanding and, consequently, very few claims seeking to impose such liability succeed. See, *e.g.*, Richard H. Fallon, Jr., *The "Conservative" Paths of the Rehnquist Court's Federalism Decisions*, 69 U. Chi. L. Rev. 429, 463 (Spr. 2002) ("standards of municipal liability make it exceedingly difficult to prove that local governments are causally responsible, and thus directly liable, for wrongs committed by their officials"); see also *Robertson* v. *District of Columbia*, 2003 U.S. Dist. LEXIS 26517 at *32-33, 37 (D.D.C. Oct. 17, 2003) ("demanding" *Monell* standard not met where school children shackled and strip searched during class trip to D.C.

3

Jail).[3] As in *Robertson*, although Mr. Heard's case plainly involved egregious facts, the likelihood of proving a compensable civil rights claim was nevertheless far from clear. See Moustakas Decl. at ¶¶ 147-48 (Exhibit C to Fee Petition).[4]

Eschewing a conciliatory approach aimed at settlement, Defendant's obdurate approach – fighting every conceivable point – made the case ever more difficult to settle and significantly increased the costs of litigating it. See Moustakas Decl. at ¶¶ 147-159; 179-202.[5] As a result, Mr. Heard's original counsel – solo practitioners without significant resources to take on the sort of war of attrition portended by Defendant's behavior – withdrew in favor of counsel capable of making the financial investment and taking the concomitant risk necessary to neutralize Defendant's take-no-prisoners approach. See Supplemental Declaration of W. Thomas Stovall II ("Stovall Supp. Decl.") at ¶¶ 5-6 (Exhibit S to Fee Petition); Moustakas Decl. at ¶¶ 137-138.

Entering the case after jarring dismissals left only a small fraction of Mr. Heard's claims (and even those hanging by a thread), there was much work to be done to reconceptualize Mr. Heard's civil rights claims (see Memorandum Opinion at 7 (Sept. 29, 2003)),[6] and to resurrect his dismissed common law claims not only against a new series of individuals and CCHPS, but

---

[3]    Indeed, one commentator reports that "[m]ost judges shudder at the prospect of trying a Monell-type case because they are so complicated." Douglas L. Colbert, *Bifurcation of Civil Rights Defendants: Undermining Monell in Police Brutality Cases*, 44 Hast. L. J. 499, 561 & n.321 (March 1993) (quoting Judge Pratt (2d Cir.)).

[4]    The original memorandum in support of Mr. Heard's Fee Petition attaches Exhibits A through M. The Reply picks up from there, attaching Exhibits N through JJJ.

[5]    As the Supreme Court has reasoned: "[t]he government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *Rivera*, 477 U.S. at 580 n.11. See also *Copeland* v. *Marshall*, 641 F.2d 880, 904 (D.C. Cir. 1980) (*en banc*) ("The government's contentious litigation strategy forced the plaintiff to respond in kind."); *Rodriguez-Hernandez* v. *Miranda-Velez*, 132 F.3d 848, 860 (1st Cir. 1998) ("a litigant's staffing needs and preparation time will often 'vary in direct proportion to the ferocity of her adversaries' handing of the case'"); *Perkins* v. *New Orleans Athletic Club*, 429 F. Supp. 661, 667 (E.D. La. 1976) ("Those who elect a militant defense [are responsible for] the time and effort they extract from their opponents."); *O'Neill, Lysaght & Sun* v. *DEA*, 951 F. Supp. 1413, 1426 (C.D. Cal. 1996) ("The DEA cannot prolong the litigation through its own obdurate behavior and then protest that OL&S has spent too much time prosecuting the action.").

also against the District itself. See Moustakas Decl. at ¶¶ 133-159. With much hard work (*id*. at ¶¶ 11-131), Mr. Heard's case moved from a nominal pre-dismissal settlement offer by the District, to the verge of dismissal, to an unprecedented recovery of up to as much as $2.84 million.[7] See Gardner Decl. at ¶ 22 ("spectacular result"); Declaration of Jonathan L. Stern ("Stern Decl.") at ¶ 3 ("excellent outcome") (Exhibit Q to Fee Petition); Moustakas Decl. at ¶¶ 203-207 ("phenomenal" settlement) (quoting Peter Grenier).[8] As evidenced by the attention it received, the vindication of Mr. Heard's constitutional rights was important locally, nationally, and internationally.[9] See *Bolden* v. *J&R Inc.*, 135 F. Supp. 2d 177, 180 (D.D.C. 2001).

The Supreme Court has held that "the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988." *Hensley* v. *Eckerhart*, 461 U.S. 424, 440 (1983); *Farrar* v. *Hobby*, 506 U.S. 103, 114 (1992). Where "a plaintiff has obtained excellent results," as Mr. Heard has, "his attorney should recover a fully compensatory fee," that "encompass[es] all hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435; see *Rivera*, 477 U.S. at 575.[10] Defendant's shocking misconduct and Mr. Heard's terrible suffering at its hands threatens to get lost in an antiseptic discussion over

---

[6] See also Transcript of Aug. 4, 2005 Settlement Hearing ("Hrg. Tr.") at 41 (recognizing that reframing "kernel of a claim" required sophisticated analysis) (Exhibit W to Fee Petition); Moustakas Decl. at ¶¶ 135, 137; Declaration of Elizabeth Elaine Gardner ("Gardner Decl.") at ¶¶ 8-9 (Exhibit T to Fee Petition).

[7] Prior to deftly achieving dismissals of much of Mr. Heard's case, Defendant had offered a flat $500,000 to settle all claims arising out of Mr. Heard's detention at D.C. Jail. See Moustakas Decl. at ¶ 197. From that amount Mr. Heard would have to pay fees and costs. The settlement eventually reached in this case, which includes Defendant's promise to pay "reasonable attorneys' fees," should reach approximately $2.84 million – or $1.1 million (District damages) plus $640,000 (CCHPS damages and fees) plus $1.1 million (Mr. Heard's "reasonable" fees and costs incurred in vindicating his rights against the District).

[8] Opposing counsel described the amount as unprecedented for a single-party, nonfatality case. See *Counsel's Report on Proposed Settlements of Joseph S. Heard* v. *District of Columbia, et al., Civ. No. 02-296 (CKK), with District of Columbia and CCHPS* at 18 (docketed on Aug. 10, 2005) (hereinafter "Settlement Report").

[9] Both internet and LEXIS-NEXIS searches uncovered news articles about Mr. Heard's settlement from as far away as China and India, and from virtually every state in the nation. And, of course, the case received considerable media attention in the Washington, D.C. area.

fees. But an important corollary purpose of awarding a fully compensatory fee is to "bring[]
home to the [D]efendant[] the full social costs of [its] unconstitutional conduct, costs that include
litigation as well as the original damages." *Kirchoff* v. *Flynn*, 786 F.2d 320, 327 (7th Cir. 1986);
*see also Ramos* v. *Lamm*, 713 F.2d 546, 552 (10th Cir. 1983) (recognizing deterrent value of
"full value fee awards").

Because he achieved such marked success in this case and because the fees incurred were
necessary to the vindication of his constitutional rights (see Stern Decl. at ¶ 8), Mr. Heard is
entitled to the full amount of his fee request. See *Hensley*, 461 U.S. at 435; *Lightfoot* v. *Walker*,
826 F.2d 516, 525 (7th Cir. 1987) (exceptional results justify fully compensatory fee); *Skinner* v.
*Uphoff*, 324 F. Supp. 2d 1278, 1284 (D. Wyo. 2004) ("Plaintiffs prevailed on every claim and are
entitled to recover for all the time they are seeking.").

## II.    THE FULLY COMPENSATORY FEE TO WHICH MR. HEARD IS ENTITLED IS THE ACTUAL COST OF VINDICATING HIS CONSTITUTIONAL RIGHTS

The fully compensatory fee to which Mr. Heard is entitled is the product of the number of
hours counsel reasonably spent to obtain excellent results multiplied by a prevailing market rate.
*Hensley*, 461 U.S. at 433. Defendant has inverted this calculation by first picking the bargain
price it would like to pay for Mr. Heard's legal fees and casting about thereafter for snippets of
inapposite authority to help justify that goal. But his fees may not be capped at the amount of a
contingency fee as Defendant's reverse-engineered fee calculation seems to imply. See
*Blanchard* v. *Bergeron*, 489 U.S. 87, 96 (1989) ("The attorney's fee provided for in a contingent-
fee agreement is not a ceiling upon the fees recoverable under § 1988").[11]  It is not what a civil

---

[10]    Although the Supreme Court has recognized that in "cases of exceptional success an enhanced award may be justified" (*Hensley*, 461 U.S. at 435), Mr. Heard only seeks the actual costs and fees incurred by counsel.

[11]    Well before it ever analyzed Mr. Heard's fees, Defendant offered to pay legal fees equivalent to a contingency fee based on the $1.1 million settlement offer. See Supplemental Declaration of John Moustakas ("Moustakas Supp. Decl.") at ¶ 48 (Exhibit N to Fee Petition). And again, in July 2005, it explicitly linked Mr. Heard's fees to a 40%

rights violator wants to pay, but the fees its victim incurred in successfully prosecuting his meritorious claims, that governs § 1988. Thus, Congress has recognized that "if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must recover *what it costs them to vindicate these rights in court*." S. Rep. No. 94-1011, at 2 (1976) (*cited in Hensley*, 461 U.S. at 445) (emphasis added). And the courts have followed this direction. See, *e.g.*, *Rivera*, 477 U.S. at 575 (if a lack of resources causes constitutional rights to go "unvindicated," "the entire Nation, not just the individual, suffers"); *Gusman* v. *Unisys Corp.*, 986 F.2d 1146, 1149 (7th Cir. 1993) (using "opportunity cost as the measure of legal services" to ensure defendant is not rewarded).

Equating recovery of § 1988 fees with market practices, the Supreme Court explained that "[i]n computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, 'for all time reasonably expended on a matter.'" *Hensley*, 461 U.S. at 430 n.4; *Rivera*, 477 U.S. at 575. Counsel regarded Mr. Heard's case as it would any important matter of a fee-paying client. See Moustakas Decl. at ¶ 138. Moreover, the vast majority of counsel's time was task-billed – a level of detail the firm's fee-paying clients neither require nor routinely receive. In short, counsel did not include in Mr. Heard's bill any time that typically would be excluded from bills to paying clients and even excluded some time and costs that would ordinarily be passed on to such clients. Treated no differently than a fee-paying client, fees generated in vindicating Mr. Heard's constitutional rights should be recovered commensurate with market realities. See *Bolden*, 135 F. Supp. 2d at 180-81 (encouraging counsel to "spend the necessary amount of time to perform first-rate lawyering" routinely

contingency rate. See Exhibit II to Fee Petition. It is no coincidence that in October 2005, after the District had finished "spreadsheeting" the Invoice and when it prepared its Opposition, Defendant's calculation of reasonable fees and costs, based on the objections it now raises, happens to come in just below the contingency amount, effectively capping payment at that figure.

rendered to fee-paying clients); *Blum*, 465 U.S. at 895.[12] Otherwise, the promise of § 1988 would be frustrated.[13]

As required, Mr. Heard has already submitted "evidence supporting the hours worked and rates claimed" by counsel in prosecuting his civil rights claims. *Hensley*, 461 U.S. at 433. In support of the propriety of seeking recovery for counsel's usual and customary hourly rates, he submitted numerous affidavits and exhibits. The resulting lodestar yields attorneys' fees in the amount of $962,097, plus $71,013.36 in costs, for a total award of $1,032,842.61 (not including predecessor counsel's fees).[14]

Thereafter, the "burden of proceeding then shift[ed]" to Defendant. *NACV*, 675 F.2d at 1337-38.[15] Generic and conclusory claims do not suffice to meet that burden, and "[n]either broadly based, ill-aimed attacks, nor nit-picking claims" are sufficient. *Id.* Instead, Defendant was required to "submit the facts and detailed affidavits to show why [Mr. Heard's] request should be reduced or denied." *Id.*

---

[12] Congress has equated the payment of prevailing parties' counsel with the payment of similarly successful counsel of fee-paying clients. See, *e.g.*, *Missouri* v. *Jenkins*, 491 U.S. 274, 286 (1989); *Hensley*, 461 U.S. at 430 n.4; *Rivera*, 477 U.S. at 575. By that metric alone, any attempt to slash Mr. Heard's attorneys' fees by nearly 70% is wildly inconsistent with § 1988. Given the caliber of services it routinely provides, Goodwin Procter realizes 99% of their billings (not the 30% Defendant proposes). See Declaration of Michael L. Felty ("Felty Decl.") at ¶ 3 (Exhibit R hereto). Counsel's success here amplifies the propriety of awarding a fully compensatory fee.

[13] Enacted to "ensure 'effective access to the judicial process' for persons with civil rights grievances," a full recovery of attorneys' fees under § 1988 is essential to fulfillment of the civil rights statute's vital remedial purpose. *Hensley*, 461 U.S. at 429. Indeed, our Court of Appeals has recognized that § 1988 is "to be liberally applied because the 'private plaintiff is the chosen instrument of Congress to vindicate a policy that Congress considered of the highest priority.'" *Miller* v. *Staats*, 706 F.2d 336, 340 (D.C. Cir. 1983). Recognizing its potential to discourage the highly-skilled lawyers who, by dint of demand for their services, do not *need* to take on civil rights fee-shifting cases, courts have also shown little tolerance for protracted fee litigation as inimical to the purposes of § 1988. See, *e.g.*, *Nat'l Ass'n of Concerned Veterans (NACV)* v. *Sec'y of Defense*, 675 F.2d 1319, 1329 (D.C. Cir. 1982) ("attorneys must not be deterred from engaging in [civil rights] work by the prospect of protracted litigation over reasonable demands for compensation").

[14] As we are not its source, Defendant's tabulation of $1,006,606.25 in Goodwin Procter fees (see District's "Chronological" chart), is an utter mystery.

[15] Defendant's assertion that no burden of proceeding ever shifts to the defendant is wrong. The *Covington* case it cites says no such thing. And *American Petroleum* mistakenly invokes language ascribed to *NACV* that appears

8

Having sought and obtained a considerable enlargement of time to respond to the Fee

Petition solely on the basis of *lead counsel's* schedule (Hrg. Tr. at 58 (Exhibit W)), Defendant

curiously attempts to meet its burden principally through an assortment of deeply-flawed and

inaccurate accompanying charts prepared *not by lead counsel*, but by Defendant's latest in a

series of *eleven* lawyers assigned to this case, and an intern. Having only entered her appearance

on the day Defendant's Opposition was filed, new counsel had no prior connection to, or

experience with, this case; her only involvement was preparing the brief and charts with which

Defendant seeks to meet its burden. See Declaration of Shana L. Frost ("Frost Decl.") at ¶¶ 3, 5,

14. As we show below, counsel's unfamiliarity with Mr. Heard's case resulted in seriously-

flawed work product, including the unreliable and therefore useless charts, the rebuttal of which

further increased the amount of Mr. Heard's legal fees. See *NACV*, 675 F.2d at 1329. For

reasons detailed below, Defendant's charts should be rejected out of hand.[16] See, *e.g.*, *Cohen* v.

*Brown Univ.*, 2001 U.S. Dist. LEXIS 22438, at *36-37, 42 (D.R.I. Aug. 10, 2001) (rejecting as

"unreliable" defendant's analysis of Plaintiffs' time records); *Jane L.* v. *Bangerter*, 828 F. Supp.

1544, 1548 n.6 (D. Utah 1993).[17]

---

nowhere in that opinion. To the contrary, the only language in *NACV* addressing the topic confirms that the burden
of proceeding shifts.

[16] Not only are Defendant's proposed reductions in Mr. Heard's attorneys' fees without support, but its math is
wrong. See Chud Decl. at ¶ 48.

[17] While we have detailed each flaw in Defendant's charts (see Exhibits X, Y, Z, AA, BB, and CC), we have not
done the same for its Opposition brief since the mistakes in each of the very first three sentences amply demonstrate
Defendant's carelessness. Contrary to Defendant's assertion, Mr. Heard was *not* charged with disorderly conduct,
he was charged with unlawful entry (Sentence 1). Nor did he spend the next 11 months in St. Elizabeth's "because
his competency was at issue" (Sentence 2). In fact, Mr. Heard was not committed to St. Elizabeths Hospital to be
made competent until *June 7, 1999* (*not November 1998* as Defendant incorrectly asserts). And the charge against
him was not dismissed on *November 15, 1999*, but rather on *October 13, 1999*. The Opposition is riddled with
many other mistakes. These criticisms are not gratuitous, but offered as a reminder that both careless *and* careful
lawyering cost money – just in different ways. Moreover, the substantive, typographical, and citation mistakes
throughout Defendant's work product are an important reminder that careful lawyering is demanding, time-
consuming and, consequently, expensive. But when the stakes are high and the quality of lawyering is material,
expending energy and resources needed to bring about excellent results is always appropriate. *Bolden*, 135 F. Supp.
2d at 180-81. *Cf. Rivera*, 477 U.S. at 578-579 (rejecting a requirement of proportionality between fees and damages

**A.    Defendant Has Failed To Rebut Mr. Heard's Showing That His Attorneys' Hourly Rates are Reasonable**

Mr. Heard has established (1) his attorneys' billing practices, including their usual and customary billing rates; (2) the skill, experience, and reputation of his attorneys; and (3) the comparability of his attorneys' rates with the prevailing market rate for attorneys of similar caliber. In an attempt to rebut this showing, Defendant tries to redefine the relevant market by which to measure the hourly rates charged by Mr. Heard's attorneys, baselessly attacks counsel's skill and experience, and urges application of improper surrogate hourly rates. In so doing, Defendant recycles arguments long since rejected, ignores Circuit law, and abandons logic.

**1.    "Complex Federal Litigation" Is The Relevant Market For Legal Services**

Defendant's first argument is procedural. Unable to rebut the evidence that counsel's rates are consistent with the prevailing market for complex federal litigation (Fee Petition at 2-5), Defendant pretends that the relevant market is a different one – a market for civil rights litigation – and attacks Mr. Heard's failure to show consistency between his attorneys' hourly rates and the prevailing rate for that alleged submarket. Defendant then uses this manufactured transgression to justify substituting for counsel's usual and customary rates a hand-picked settlement matrix that would slash Plaintiff's recovery by 25%. Because Defendant's argument for applying the USAO matrix solely turns on a false predicate, it must fail.[18]

---

because Congress specifically enacted § 1988 to encourage the private prosecution of civil rights claims even where fees would *exceed* damages).

[18]    Defendant plainly misapprehends the nature of the USAO matrix, derived from the *Laffey* index. The original *Laffey* index was developed to assist in determining reasonable hourly rates for public-spirited attorneys who served underrepresented clients at below market rates. *Laffey* v. *N.W. Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983). It was not intended to replace the usual and customary rates of lawyers in private practice, so long as such fees are "'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Martini* v. *Fed. Nat'l Mortg. Ass'n*, 977 F. Supp. 482, 485 (D.D.C. 1997). Moreover, the USAO matrix does nothing more than set out hourly rates that the federal government has preemptively agreed are reasonable and thus will accept in settlement. It does not dictate what firms are permitted to charge, be paid, and claim as reasonable in a fee-shifting context. See *Adolph Coors Co.* v. *Truck Ins. Exch.*, 383 F. Supp. 2d 93, 97-98

For purposes of awarding fees under § 1988, there is no material difference between the market for civil rights litigation and the market for complex federal litigation. In enacting civil rights legislation, Congress expressly provided that "the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in *other types of equally complex federal litigation, such as antitrust.*" S. Rep. No. 94-1011, 94th Cong., 2d Sess. 6 (1976) (emphasis added). It thus explicitly equated *civil rights litigation* under § 1988 with *complex federal litigation.* The Supreme Court has continued to equate these markets. See, *e.g.*, *Rivera*, 477 U.S. at 575; *Blum*, 465 U.S. at 893. The reason for doing so is no mystery; it advances the policies that animate § 1988 by ensuring that civil rights cases are able to attract skilled private counsel. See *Blum*, 465 U.S. at 893-96; *Rivera*, 477 U.S. at 579.

Our Court of Appeals recognized this same rationale for equating civil rights litigation with complex federal litigation in *Covington*, 57 F.3d at 1111-12. In fact, Defendant's attempt in this case to distinguish the markets for civil rights and complex federal litigation is simply a reprise of the same argument it made in *Covington* – a fact Defendant neglects to mention. Since Defendant neither established that a civil rights market "actually exists independent of attorneys who handle other types of complex federal litigation," nor convinced the court that the rate in a hypothetical civil rights litigation submarket would be lower than the rate in the broader complex federal litigation market, its attempt to define the prevailing market narrowly was rejected. *Id.*[19] Its disharmony with ordinary principles of economics, likewise, supported rejecting Defendant's

---

(D.D.C. 2005) (Dickstein, Shapiro lawyers paid their usual and customary rates, not USAO matrix rates). There is also a logical flaw in Defendant's argument. In its view, because counsel did not present evidence of the prevailing market rate for "civil rights litigation," their rates should be set by the USAO matrix. But that matrix, derived from *Laffey*, was based upon the fees charged by highly-skilled lawyers in "**complex federal litigation**," the very market from which Mr. Heard draws his comparison. 572 F. Supp. at 372 (emphasis added).

[19] Although the District Court acknowledged that there might be a future occasion to reconsider Defendant's submarket theory, it would require "a future case in which the party opposing fees produces a more thorough

11

narrow definition of the relevant market. *Id.* at 1112 (citing *Student PIRG* v. *AT&T Bell Labs.*, 842 F.2d 1436, 1444 (3d Cir. 1988)).

Since there is no material difference between the prevailing rates for civil rights litigation and complex federal litigation, Mr. Heard's showing that counsel's rates fall within the prevailing hourly rates for complex federal litigation entitles him to recover attorneys' fees at counsel's usual and customary rates.

### 2. Plaintiff's Attorneys Have The Necessary Qualifications To Support Their Requested Billing Rates

Defendant's second ground for attacking the hourly rates claimed is based on the same faulty assumptions and brittle logic. Thus, without any supporting evidence or affidavits, Defendant attacks Mr. Moustakas, a former Assistant United States Attorney, for having too much *federal criminal litigation* experience and not enough *federal civil litigation* experience, and differently attacks Mr. Chud for having apparently too much *civil litigation* but not enough *civil rights litigation* experience.[20] These are the sorts of *ad hominem* and ill-aimed attacks that this Circuit has rejected out of hand. *NACV*, 675 F.2d at 1336.

Both lawyers are highly-qualified. Mr. Moustakas was specifically recommended by highly sophisticated lawyers to replace predecessor counsel *because of*, not in spite of, "his intimate knowledge of the DC criminal justice system and the DC government in general, and his outstanding reputation in the legal community for his investigative, research and oral advocacy skills." See Gardner Decl. at ¶¶ 15-16. His experience as an AUSA, therefore, cannot

---

evidentiary record." *Covington* v. *District of Columbia*, 839 F. Supp. 894, 898 (D.D.C. 1993). No such record having been produced here, there is no basis for revisiting the decision or its affirmance on appeal.

[20] Defendant curiously implies (at 10 n.2) that Mr. Heard's Petition artfully defined the relevant legal market to obscure Mr. Moustakas' "[l]ack of civil experience." As we showed by reference to caselaw, rather than *ad hominem* attack, *complex federal litigation* is the relevant legal market. And certainly white-collar and other criminal prosecutions at a busy, urban United States Attorney's Office surely qualifies as *complex federal litigation*. See Declaration of Michele A. Roberts ("Roberts Decl.") at ¶¶ 3-7 (Exhibit V hereto).

conceivably be counted as a strike against him in a case like this. Petty references to the recency of his registration for electronic filing in this court notwithstanding, Mr. Moustakas' experience as a civil litigator is likewise considerable and supported by the attached declarations. See *id.*; Aldock Decl. at ¶¶ 4-16; Roberts Decl. at ¶¶ 3-7; Moustakas Decl. at ¶ 5. Likewise, Mr. Chud's experience in complex federal litigation – including an $8 million verdict against the District for § 1983 violations committed against a commercial client – entitles him to bill and collect at his usual and customary rates. His reputation, experience and skill is comparable, if not superior, to that of other senior associates commanding such rates. See Aldock Decl. at ¶¶ 27-30; Moustakas Supp. Decl. at ¶ 3; Chud Decl. at ¶ 2.

### 3. The Updated *Laffey* Index Is A More Appropriate Measure Of Reasonable Rates Than The USAO Matrix Defendant Proffers

Since Mr. Heard is entitled to recover fees based on counsel's usual and customary rates, there is no need to resort to any indices to set the hourly rates for his lawyers' time. See, *e.g.*, *Adolph Coors*, 383 F. Supp. 2d at 97-98. Should the Court, nonetheless, wish to confirm Mr. Heard's evidence of relevant marketplace hourly rates in this community, it should rely on the updated *Laffey* index prepared by Dr. Michael Kavanaugh and submitted as Exhibit U to this Reply, rather than the alternative USAO matrix proffered by Defendant.

Recently, in cases requiring reliance on index rates, this Court adopted Dr. Kavanaugh's updated *Laffey* index, not the USAO matrix, as the correct current measure of prevailing market rates in the market for complex federal litigation. See *Salazar* v. *District of Columbia*, 123 F. Supp. 2d 8, 14 (D.D.C. 2000) (Kessler, J.); *Muldrow* v. *Re-Direct, Inc.*, 2005 U.S. Dist. LEXIS 25322 at *6 n.3 (D.D.C. Oct. 27, 2005) (Huvelle, J.) (applying Kavanaugh updated *Laffey* rates); *Brown* v. *Barnhart*, 2005 U.S. Dist. LEXIS 23212 at *2 (D.D.C. Oct. 12, 2005) (Sullivan, J.) (following *Salazar*). This Court has explained that Dr. Kavanaugh's updated *Laffey* index is a

better measure of reasonable hourly rates for legal services because it is derived directly from "the legal services component of the Consumer Price Index" rather than the more generalized category of "other goods and services" upon which the USAO matrix is based.[21] *Salazar*, 123 F. Supp. 2d at 14-15; Declaration of Dr. Michael Kavanaugh at ¶¶ 7-10 (Exhibit U).[22]

Having "failed to offer any reasoned, or expert, rebuttal" to Dr. Kavanaugh's analysis in *Salazar*, Defendant has no basis for resisting its application when an index rate is needed. Thus, if alternative rates are considered in this case, they should come from Dr. Kavanaugh's updated *Laffey* index. If these rates applied, the Fee Petition would be decreased by only $5,688.80 for the 218.8 of Mr. Chud's hours that exceeded the index rate by $26/hour. (No other rates did.)

### 4. Recalculating Mr. Heard's Attorneys' Fees Under The USAO Matrix Would Undermine The Remedial Purposes Of §§ 1983 And 1988

Section 1988 ensures that skilled counsel will help victims vindicate their civil rights and that victims will "recover what it costs them to vindicate these rights in court" (*Hensley*, 461 U.S. at 445 (citation omitted)), since "[l]itigation of this sort should not have to rely on the charity of counsel." *Copeland*, 641 F.2d at 898. Defendant transparently offers up the inferior USAO matrix because it would cut nearly **$210,000** of Mr. Heard's attorneys' fees. Unjustified and unfair, application of such significantly depressed rates is contrary to § 1988, would dissuade counsel from undertaking such matters, and should be rejected.

Both Congress and the courts have recognized the need for fee awards to be comparable to the fees obtained by lawyers in their private practices. See, *e.g.*, *Hensley*, 461 U.S. at 430 n.4,

---

[21] Although courts have occasionally applied the USAO matrix when plaintiff has not objected, we know of no case in which Dr. Kavanaugh's updated *Laffey* matrix has been rejected in favor of the USAO matrix.

[22] Dr. Kavanaugh's updated *Laffey* index has been accepted by other federal courts as well. See *ICO* v. *Honeywell Int'l*, 336 F. Supp. 2d 370, 387-88 (D.N.J. 2004), *aff'd* 426 F.3d 694, 709-710 (3d Cir. 2005); *PIRG* v. *Magnesium Elecktron, Inc.*, Civ. No. 89-3193, Slip op. 2, 10 (D.N.J. Dec. 28, 1995), *vacated on other grounds*, 123 F.3d 111 (3d Cir. 1997); *N.C. Alliance for Transp. Reform* v. *N.C. Dept. of Transp.*, 168 F. Supp. 2d 569, 579-580 (M.D.N.C. 2001).

434. "[I]f an attorney cannot expect [ ]his 'opportunity wage,' *i.e.*, 'the compensation he could obtain by representing paying clients,' courts will not be able to induce attorneys to take civil rights cases.'" *Tomazzoli* v. *Sheedy*, 804 F.2d 93, 96 (7th Cir. 1986).[23] Because the hours devoted to Mr. Heard's case would have been "bought" by other clients at the firm's usual and customary billing rates (Felty Decl. at ¶ 4), using the USAO matrix rates would undermine the very incentives that Congress has created to attract high-caliber counsel to these cases.

**B.      The Number Of Hours Spent Vindicating Mr. Heard's Constitutional Rights Was Reasonable**

The Supreme Court has recognized four bases for excluding hours from the lodestar calculation: (1) that the hours were spent on unsuccessful (and segregable) claims; (2) that the hours were excessive; (3) that the hours were redundant; or (4) that the hours were otherwise unnecessary. See *Hensley* 461 U.S. at 434. Defendant does not – and cannot – claim that any of the work done should be excluded for lack of success. Of the 2,765 hours spent litigating Mr. Heard's claims, in fact, Defendant challenges as excessive only 130 hours, all of it spent on the *Fee Petition. Nowhere else* in its Opposition does Defendant identify hours expended on Mr. Heard's case that were either excessive, redundant, or unnecessary.

Instead, Defendant asks this Court to slash Mr. Heard's fees by an astounding 50% to punish his lawyers for allegedly impermissible "block billing, vague entries, meetings of one, excessive meetings and ministerial time billed as lawyer time." What this *means* is that Defendant is either asking the Court to cut *every single time entry* by 50% – including all of the unchallenged ones – or that it is asking the Court to cut by *over 100%* every single one of those

---

[23]   This concept is also manifest in Congress' insistence that courts consider whether prosecution of a meritorious civil rights case by an attorney precluded employment on matters that would have brought counsel's usual and customary rates. See, *e.g.*, *Jones* v. *United States*, 505 F. Supp. 781, 786 (E.D. Tex. 1980) (employment on fee-shifting case precluded spending time on "more profitable cases"). Here, it certainly has. See Felty Decl. at ¶ 4.

entries that has been wrongly identified as falling into one of the challenged categories.[24] Either way, the request is unsupported and absolutely unprecedented.

### 1.    The So-Called "Block-Billed" Entries Should Be Paid In Full

Counsel kept contemporaneous time records in this case. Because it saves time and is standard in the legal services field, counsel ordinarily block-bill their time – that is, list in detail all the individual tasks performed for a single client on a single day and record the aggregate amount of time spent, rather than recording the time spent on each separate and distinct task. See, *e.g.*, *United States ex rel. John Doe I & John Doe II* v. *Pa. Blue Shield*, 54 F. Supp. 2d 410, 415 (M.D. Pa. 1999) ("Block billing is a common practice which itself saves time."). Counsel treated Mr. Heard's case no differently than the cases of their fee-paying clients, giving it the careful attention and dedication it was entitled to receive. In the spirit of treating Mr. Heard's case like that of any fee-paying client (*Hensley*, 461 U.S. at 430 n.4), time was occasionally recorded in that way, too: contemporaneously, descriptively, and in daily time-aggregated units. See *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) ("If counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not require more."). Thus, in entries amounting to about 30% of the legal fees incurred (or about $295,000), the time spent on Mr. Heard's case was contemporaneously recorded by counsel, and presented in Mr. Heard's Fee Petition, in block-billed form. (The remaining 70% was task-billed, with individual time designations for each individuated task.)

Though it promised to pay Mr. Heard's reasonable attorneys' fees (and though it does not explicitly challenge any of the block-billed entries as excessive, redundant, or otherwise

---

[24]    Quite apart from the substantive errors in Defendant's analysis, Defendant's charts double-count some entries and make multiple deductions for them. See Exhibits AA and BB to Fee Petition; Chud Decl. at ¶ 49.

unnecessary and never previously complained about this billing technique (see Chud Decl. at ¶¶ 18, 20)), Defendant wants to pay Mr. Heard **_zero_** for all of the meaningful and high-caliber legal work reflected in the block-billed entries.[25] Particularly in connection with a petition this detailed, a litigation this successful, and in the absence of any meaningful claim that counsel's work was excessive, such a request is draconian, unfair and meritless. That is why Defendant cannot muster a single comparable precedent to support its transparent and baseless request. Accompanied by a chart purporting to identify every abuse, Defendant's argument for eliminating all of Mr. Heard's block-billed entries is, as we now show, without merit.

For starters, there is no prohibition against block-billed time entries; prevailing parties routinely recover legal fees documented that way. See, *e.g.*, *Jemison* v. *Nat'l Baptist Convention*, 720 A.2d 275, 287 (D.C. 1998) ("Courts in the District of Columbia have never imposed a requirement of daily task-specific billing, even under statutes authorizing awards of 'reasonable' attorneys' fees."); *Trulock* v. *Hotel Victorville*, 92 F. App'x 433, 434 (9th Cir. 2004) ("[T]he Supreme Court has indicated that [block-billing] is not a basis for refusing to award attorneys' fees.") (citing *Hensley*, 461 U.S. at 437 n.12); see also *Bolden*, 135 F. Supp. 2d at 177-181.[26] In fact, in assessing the sufficiency of records submitted in support of a fee petition, our Court of Appeals has held that "[i]t is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." *Copeland*, 641 F.2d at 891. The record-keeping obligation under fee-shifting statutes

---

[25] In seeking to eliminate nearly $300,000 in block-billed entries without previously ever having raised an objection to block-billing, Defendant plainly sandbagged Mr. Heard. At its request, Mr. Heard's billing records were turned over to Defendant more than five months before his Fee Petition was filed on the understanding that Defendant would review the fees in connection with a promised negotiation over fees and identify any billing entries questioned or disputed. See Chud Decl. at ¶¶ 17-19.

[26] See also *Irish* v. *City of New York*, 2004 U.S. Dist. LEXIS 3770 at *22 (S.D.N.Y. Mar. 10, 2004); *Dunn* v. *Village of Put-In-Bay*, 2004 U.S. Dist. LEXIS 5618 at *5 (N.D. Ohio Mar. 9, 2004); *Pa. Blue Shield*, 54 F. Supp. 2d

---

17

generally has been understood to mean that billing records should specify, "for each attorney, the date, the hours expended, and the nature of the work done." *Cobell* v. *Norton*, 2005 US. Dist. LEXIS 34605 at \*47-48 (D.D.C. Dec. 19, 2005) (quoting *N.Y. State Ass'n of Retarded Children* v. *Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983)).

Indeed, in a passage from *Hensley* that Defendant studiously ignores, the Supreme Court echoed that sensible standard in making clear that it is enough to "identify the *general subject matter* of [the] time expenditures." 461 U.S. at 437 n.12 (emphasis added). *Accord Tran* v. *Tran*, 166 F. Supp. 2d 793, 800 (S.D.N.Y. 2001) ("Although attorneys must record the general nature of their work, they need not include detailed descriptions of the exact work performed."). These authorities, themselves, justify rejecting Defendant's argument in full since, by any fair reading, counsel's time records plainly "identify the general subject matter of his time expenditures." The Court should reject Defendant's attempt to renege on its promise to pay Mr. Heard's reasonable fees for at least the following four more reasons.

### a. Entries Describing Related Tasks Are Not Block-Billed

First, many of the entries Defendant labels as block-billed are not. Elevating form over substance, Defendant mechanistically deems any recorded tasks separated by semi-colons, but not separately billed, as block-billed entries. Thus, for example, it repeatedly attacks entries that fail to separately account for: (1) time spent researching and writing up the same legal issue;[27] (2) time spent reviewing material and taking notes thereon;[28] (3) time spent both preparing for

---

at 415; *Farfaras* v. *Citizens Bank & Trust Co. of Chicago*, 2005 U.S. Dist. LEXIS 7024 at \*4 (N.D. Ill. Apr. 15, 2005); *Pawell* v. *Metro. Pier & Exposition Auth.*, 2005 U.S. Dist. LEXIS 16472 at \*15-16 (N.D. Ill. Mar. 4, 2005).

[27] See, *e.g.*, Ms. Burkhardt's April 16, 2004 entry; Mr. Baird's June 4, 2004 entry; Mr. Fregiato's June 16, 2004 entry; Ms. Cho's July 29, 2004 entry; Mr. Hanks' October 5, 2004 entry. See Exhibit M.

[28] See, *e.g.*, Mr. Moustakas' May 12, 2004 entry; Mr. Moustakas' August 2, 2004 entry; Ms. Lee's January 7, 10, and 11, 2005 entries. See Exhibit M.

(or debriefing from) and participating in meetings or phone calls;[29] (4) time spent working on an issue and meeting with a colleague to discuss it;[30] and (5) time spent on related tasks on the same topic (*i.e.*, drafting a document and discussing its content with the client or a colleague).[31] Because the tasks in these examples (and other similar entries) are not discrete and unrelated, Defendant's characterization of them as block-billed is simply wrong.

> **b.  Block-Billing Does Not Impede This Court's Ability To Determine The Reasonableness Of Time Expended By Counsel**

Second, even for the minority of overall entries that are block-billed, no reduction (let alone full-scale elimination) is warranted because Mr. Heard's billing time records are sufficiently detailed to permit their reasonableness to be assessed. In another local civil rights case, Judge Kessler was asked to impose a blanket reduction of 50% on the fees sought by prevailing plaintiffs because, "instead of specifying the precise amount of time spent on each [particular] task, Plaintiffs' billing records include[d] several entries for blocks of time during which multiple tasks were completed." *Bolden*, 135 F. Supp. 2d at 181. But the Court denied the request outright, concluding that the records were "sufficiently detailed and descriptive" so as to obviate the need for it to segregate tasks to determine the reasonableness of the time spent.

The Court is well-positioned to assess the reasonableness of hours expended in the prosecution of Mr. Heard's civil rights claims given its general experience in assessing attorneys' fee applications and its specific familiarity with the instant litigation. See, *e.g.*, *Copeland*, 641 F.2d at 901 ("[T]he District Court Judge was intimately familiar with the barrage of pleadings,

---

[29]  See, *e.g.*, Mr. Wilshire's February 23, 2004 entry; Mr. Moustakas' April 13, 2004 entry; Mr. Moustakas' July 28, 2004 entry. See Exhibit M.

[30]  See, *e.g.*, Mr. Moustakas' December 13, 2004 entry; Mr. Hanks' December 1, 2004 entry; Mr. Hanks' January 12, 2005 entry; Mr. Fregiato's June 15, 2004 entry; Mr. Moustakas' July 6, 2004 entry. See Exhibit M.

[31]  See, *e.g.*, Mr. Moustakas' March 16, 2005 entry; Mr. Chud's April 29, 2005 entry; Mr. Moustakas' September 14, 2004 entry; Mr. Moustakas' May 20, 2005 entry; Mr. Friedman's September 27, 2004 entry; Mr. Chud's December 7, 2004 entry. See Exhibit M.

memoranda, documents filed, and he observed the proficiency of counsel in court.").[32] And

since it is unnecessary to know precisely how much time was spent on each task (*Copeland*, 641

F.2d at 891), the way to do that is to look at an entire daily block, compare the listed activities

and the aggregate time spent, and determine whether the hours reasonably correlate to all of the

activities performed. See *Pa. Blue Shield*, 54 F. Supp. 2d at 415.[33]

In this case, such a review reveals that the documentation of counsel's fees (including the

billing time records, the affidavits and declarations, the briefs, the exhibits and charts, and the

Settlement Report) is "sufficiently detailed and descriptive" to permit the Court to conclude that

the time expended prosecuting this case was reasonable. *Bolden*, 135 F. Supp. 2d at 181; *Tran*,

166 F. Supp. 2d at 800 (despite block-billing, "[i]n each entry the work [was] clearly defined and

reasonable, and, therefore, worthy of compensation").[34] In fact, Defendant's own examples (at

15-17) confirm that counsel's records are both reasonable and consistent "with the time one

would expect to expend on the activities disclosed in those entries." *Downey* v. *Coalition*

*Against Rape & Abuse, Inc.*, 2005 U.S. Dist. LEXIS 22986, at *20 (D.N.J. Sept. 30, 2005).[35]

---

[32] See also *Clarke* v. *Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992) ("In calculating the number of 'reasonable hours,' the court looks to 'its own familiarity with the case and its experience with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties.'"); *Brady* v. *Ft. Bend County*, 145 F.3d 691, 717 (5th Cir. 1998) (deferring to trial court's "familiarity" with case and "the quality of the attorneys' work"); *Irish*, 2004 U.S. Dist. LEXIS 3770 at *20 ("The Court may also use its knowledge of the case to assess the time entries.").

[33] Hardly controversial or difficult, this is precisely how paying clients assess the legal bills they are asked to pay. *Cf. Synthroid Mktg. Litig.*, 264 F.3d at 722.

[34] See also *Pawell*, 2005 U.S. Dist. LEXIS 16472, at *15-16 (rejecting objections to block-billed entries because the "billing records [were] of enough detail to support [the] requested award amount for the disputed items"); *Irish*, 2004 U.S. Dist. LEXIS 3770 at *22 (rejecting "general deduction" for block-billed entries); *Dunn*, 2004 U.S. Dist. LEXIS 5618, at *5 (block-billing was "reasonable" since court could tell "what was done, and determine whether doing it was necessary or useful"); *Farfaras*, 2005 U.S. Dist. LEXIS 7024, at *4 (rejecting block-billing objections because, after review of entries including date, nature of work, and total hours expended, "the billing statement [was] sufficiently detailed and unambiguous"); *Rodriguez*, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999).

[35] Mr. Friedman's August 3, 2004 Billing Entry lists 8 thoroughly detailed tasks which he spent, in the aggregate, 8.5 hours to complete. Similarly, his August 19, 2004 and September 7, 2004 billing entries list 6 thoroughly detailed tasks each on which he expended, in the aggregate, 9.5 hours and 6.5 hours, respectively. Defendant also attacks two of Mr. Moustakas' billing entries: a 7-hour day on September 8, 2004 during which he accomplished 6 tasks and a 4.7-hour day on January 21, 2005 during which he accomplished 8 tasks. Although Plaintiff's counsel

**c.    Block-Billing Is Immaterial Where Distinguishing Between
              Successful And Unsuccessful Claims Is Unnecessary**

Third, and perhaps most importantly, a reduction for block-billing would be inappropriate

here because *all* the lawyer time was expended on successful (and fully compensable) claims.

Block-billing is a problem when it prevents a court from adequately distinguishing the time spent

on successful claims (for which attorneys' fees should be *recovered*) from time spent on

unsuccessful claims (for which attorneys' fees should be *denied*). See, *e.g.*, *Tran*, 166 F. Supp.

2d at 800 ("The exact proportions the attorney spent on the two or more tasks is not crucial *if all*

*the tasks merit compensation*.") (emphasis added). Thus, the Supreme Court has instructed civil

rights lawyers that in cases of *only partial success,* the need to "identify the general subject

matter of [counsel's] time expenditures" will be essential to "determining how much time was

spent on particular claims." *Hensley*, 461 U.S. at 437 n.12 (citing *Nadeau* v. *Helgemoe*, 581

F.2d 275, 279 (1st Cir. 1978)). Three years later, the Supreme Court repeated that message and

extended its reasoning to excuse the block-billing of fees on *unsuccessful* claims so long as they

are "related to" successful ones and, thus, still subject to recovery under *Hensley*:

> "*Hensley* also stated that a fee applicant should 'maintain billing time records in a manner
> that will enable a reviewing court to identify distinct claims.' *Id*., at 437. Petitioners
> submit that the time records submitted by respondents' attorneys made it difficult for the
> District Court to identify and separate distinct claims. The District Court, however, does
> not appear to have shared this view. In any event, while it is true that some of the

---

have since "unblocked" this time (see *infra* at 25), the Court can easily see from the block-billed entries themselves
that the time spent on Mr. Heard's case on those days was reasonable. See, *e.g.*, *Pa. Blue Shield*, 54 F. Supp. 2d at
415. In other words, to use one of Defendant's examples, the question is: in the Court's experience, is it reasonable
to take 4.7 hours to (1) review correspondence file for evidence that Defendant was reneging on an agreement about
the length of Mr. Heard's IME; (2) engage in a telephone conference with opposing counsel with respect to a dispute
over the terms and conditions under which the IME would be conducted; (3) call chambers with opposing counsel to
explain to Court staff the need for a telephonic hearing; (4) participate in a telephonic hearing before the Court
concerning the terms and conditions of the upcoming IME; (5) review written terms and conditions for the IME; (6)
draft a letter to opposing counsel concerning the IME's terms and conditions; (7) have two or more telephone
conversations with Mr. Friedman about the IME; and (8) have another telephone conference with opposing counsel
regarding the timing of the IME? Even assuming, *arguendo*, these *related* tasks should have been separately billed,
the answer is emphatically yes — the Court can determine that the aggregate time spent on these tasks was
reasonable. The same is true throughout the billing records.

> disputed time records do not identify the precise claims worked on at the time, we find this lapse unimportant, in light of the District Court's finding that all of respondents' claims were interrelated." *Rivera*, 477 U.S. at 570 n.4.

If block-billing of entries relating to ***unsuccessful*** claims is excused where failed claims relate to successful claims (*Rivera*), block-billed entries of time spent solely on successful claims in this case cannot possibly be treated any worse. Following the Supreme Court's lead, other courts have refused to reduce block-billed time entries where, as in Mr. Heard's case, a party prevails on all claims. See, *e.g.*, *Tran*, 166 F. Supp. 2d at 800.[36] Since Mr. Heard's success was complete, there is no basis for reducing his fees for block-billing. See, *e.g.*, *Cohen*, 2001 U.S. Dist. LEXIS 22438 at *43 (noting that "the court does not face the task of trying to separate hours and expenses based on whether they pertain to successful versus unsuccessful claims").

Neither of the cases relied upon by Defendant support any reduction in Mr. Heard's fees, let alone the unprecedented elimination of ***all*** block-billed entries it seeks. Defendant says that *Jane L.* v. *Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995) upheld a 35% reduction of the plaintiff's requested hours ***because*** the plaintiff's counsel listed "imprecise time records [which] failed to document adequately how plaintiff's attorneys utilized large blocks of time." In fact, a careful reading of the trial court and appellate decisions reveals that the 35% reduction was imposed ***because*** the plaintiff's petition failed to exclude "excessive, redundant, or otherwise

---

[36] See also *Skinner*, 324 F. Supp. 2d at 1284 (no block-billing reduction because "plaintiffs ***prevailed on every claim***") (emphasis added); *Ursa Minor Ltd.* v. *AON Fin. Prods.*, 2001 U.S. Dist. LEXIS 7455, at *15 (S.D.N.Y. May 30, 2001) (rejecting challenge to block-billed entries because "as long as ***all*** of the ***work*** recorded in one entry ***is compensable,*** a court is capable of evaluating the application.") (emphasis added); *Scarborough* v. *Nicholson*, 19 Vet. App. 253, 266 (2005) (rejecting objections to block-billed entries because of "***tremendous success***" achieved) (emphasis added). Even cases that impose minor reductions for block-billing support Mr. Heard's analysis. See, *e.g.*, *Raton Gas Transmission Co.* v. *FERC*, 891 F.2d 323, 330-31 (D.C. Cir. 1989) (reducing fees by 25% where plaintiff prevailed on only two of four claims and his block-billing made it impossible to distinguish hours spent on successful claims from those spent on unsuccessful ones); *American Canoe Ass'n, Inc.* v. *EPA*, 138 F. Supp. 2d 722, 742 (E.D. Va. 2001) (10% reduction where block-billing prevented court from being able to distinguish between successful and unsuccessful (unrelated) claims); *McDonald* v. *NYSA-ILA Pension Plan*, 2002 U.S. Dist. LEXIS 1590 at *8 (S.D.N.Y. Aug. 27, 2002) (25% reduction for block-billed entries that hindered court's ability to "exclude the number of hours devoted to severable unsuccessful claims").

22

unnecessary hours" – the classic violation of *Hensley*'s teaching. *Jane L.*, 61 F.3d at 1510. With

respect to the plaintiff's billing records, the district court specifically found that "much of the

time is not compensable." 828 F. Supp. 2d at 1548.

In *Jane L.*, defendants challenged over 3,000 hours, a considerable portion of which were

spent on unsuccessful and/or uncovered claims. The court agreed that many of the hours could

not be recovered under § 1988. *Id.* at 1548 n.6. The court also concluded that the "requested

hours far exceed[ed] the hours that reasonably would be required by reasonably competent

attorneys in handling this litigation." *Id.* at 1551. The 35% reduction in *Jane L.* is not an

expression of a prohibition against block-billing. Instead, it merely confirms that when a

plaintiff's hours "far exceed[ ]" the time it was reasonable to spend and block billing makes it

impossible to distinguish compensable time from uncompensable time, some reduction of hours

is likely. As neither of these factors is present here, reliance on *Jane L.* is misplaced.

Defendant also cites *Role Models America, Inc.* v. *Brownlee*, 353 F.3d 962 (D.C. Cir.

2004) – where the Court of Appeals reduced by 50% a fee request under the Equal Access to

Justice Act – as support for slashing Mr. Heard's fee petition by the same amount.[37] In *Role

Models*, plaintiff requested roughly $350,000 in attorneys' fees and costs for a routine

administrative agency appeal that required the preparation of two briefs and an oral argument.

Defendant's reliance *Role Models* is misplaced for several reasons.

First, fees in *Role Models* (like *Jane L.*) were cut primarily because of excess:

---

[37] Though courts deciding attorneys' fees issues under various fee-shifting statutes often invoke *Hensley* (and other § 1988 cases), not all fee-shifting provisions are the same. The policies that animate them – and the congressional intent that each expresses – can have a significant impact on the recovery of fees. See, *e.g., Microsoft*, 297 F. Supp. 2d at 29 n.11 (distinguishing fee-shifting provision under Clayton Act from "the Independent Counsel statute's attorney's fee provision, under which courts are to 'grant reimbursement of attorneys' fees sparingly'"). Thus, even when citing and purporting to follow attorneys' fees cases decided under § 1988, a more restrictive interpretation of those precedents can often be gleaned from cases decided under the EAJA and other fee-shifting statutes, where the presumption in favor of recovery is not nearly as strong.

"The shortcomings in the time records are particularly serious because we have no idea what it was about this case that required an investment of over 1000 hours – nearly six months' worth of forty-hour weeks."

*Id.* at 972. Unlike Mr. Heard's case, in *Role Models* there was no discovery, no depositions, no interviewing of witnesses, no factual investigation, no preparation and filing of multiple pleadings, and no multiple defendants. *Id.* at 970. Nor was Mr. Heard's case the kind of uncomplicated, "garden-variety administrative law matter" the Court confronted in *Role Models*. *Id.* at 969. Like *Jane L.*, *Role Models* is principally about *over*billing, not *block*-billing.

Second, Mr. Heard's Invoice is vastly superior to *Role Models'* in detail. See Exhibit DD (*Role Models* Fee Petition). Taking Defendant's own example (at 15) proves this point. Mr. Friedman describes in detail his legal research: "legal research on DOJ consent decrees/orders re: deaf accommodations and case law re: undue burden and program disruption to determine what expert testimony may be required." By contrast, the *Role Models* attorneys provide no detail. See 353 F.3d at 971 ("review research"); Exhibit DD at 3 (7/2/02 Dodd entry) ("read research"); *id.* (7/3/02 Bonat entry) ("research and review documents"); *id.* at 5 (7/19/02 Dodd entry) ("research"). Similarly, our descriptions of teleconferences, meetings, and drafting are far more detailed than descriptions of the same tasks in *Role Models*.[38] And, unlike Mr. Heard's records, missing detail is not supplied by context or surrounding entries in *Role Models*. It is obvious that, rather than assuaging the court's instinctive concerns that significant overbilling had occurred in *Role Models*, these billing inadequacies amplified them.

---

[38] *Compare* Jan. 21, 2005 Moustakas Billing Entry ("telephone conference with opposing counsel regarding timing of IME") (cited at *Opposition* at 16-17), *with* Sept. 17, 2002 Richardson Billing Entry ("Telecon with R. Alexander") (cited at 353 F.3d at 971); *Compare* Aug. 3, 2004 Friedman Billing Entry ("Conf/w DMB re: same [*i.e.,* legal research on DOJ consent decrees/orders re: deaf accommodations and case law re: undue burden and program disruption to determine what expert testimony may be required.]") (cited at *Opposition* at 15), *with* Sept. 17, 2002 Richardson Billing Entry ("conference with J. Port, K. Dodd, C. Banat regarding research") (cited at 353 F.3d at 971).

Finally, because all of his claims were successful, Mr. Heard's fee petition does not compromise this Court's ability to distinguish between compensable and non-compensable hours. By contrast, lumped entries in the *Role Models* made it impossible to distinguish "time spent on bankruptcy matters, which [had] nothing to do with [the] appeal," and non-compensable tasks, like talking with the press, from time spent on matters for which fees could be recovered.

As the Court's ability to distinguish between time spent on successful and unsuccessful claims has not been impeded here, all of Defendant's block-billing criticisms should be rejected.

### d. Mr. Heard Has Sufficiently Cured The Block-Billing Objections

Finally, no block-billing reductions should be made in this case because, in an abundance of caution, each of the major timekeepers attacked for block-billing have provided the approximate amount of time spent on each contemporaneously-recorded, block-billed task within a reasonable degree of certainty. See Exhibit Z to Fee Petition; Declaration of Paul F. Friedman ("Friedman Decl.") at ¶ 8 (Exhibit P to Fee Petition); Moustakas Supp. Decl. at ¶¶ 10-13; Chud Decl. at ¶ 16. *Cf. Microsoft*, 297 F. Supp. 2d at 38, 44 (awarding fees based on records *not* kept contemporaneously, but reconstructed years later). By this work Mr. Heard does not intend to imply that his block-billed entries cannot otherwise be judged reasonable. For the reasons we have demonstrated, they certainly can be. Indeed, the Court should reject the block-billing attacks without ever resorting to Exhibit Z. The belt-and-suspenders effort to "unblock" our time was intended to further corroborate the reasonableness of the individual tasks we performed and to rebut the arbitrary and oftentimes nonsensical division of time assigned to our daily entries by Defendant. See Moustakas Supp. Decl. at ¶ 11; Friedman Decl. at ¶ 8; Chud Decl. at ¶ 50. For all of these reasons, the Court should take no deductions for block-billing.

## 2. Mr. Heard's Fee Petition Is Adequately Detailed

### a. The Petition Is Not Replete With Vague Entries

Defendant has submitted a chart purporting to identify as vague certain billing entries

amounting to $52,804.92 (or less than 5%) of the $962,097 billed by Goodwin Procter in this

case. Based on this **5%**, Defendant hyperbolically attacks Mr. Heard's Fee Petition (at 17) as

"***replete*** with vague entries" to bolster its request that all of his attorneys' fees be slashed by

**50%**. Moreover, Defendant insists (at 19) that "there is simply ***no way*** for [it] to discern the

nature of these charges." (Emphasis added.) More than merely hyperbolic, this claim is simply

untrue. To the contrary, because Defendant can tell from the billing records what counsel did,

Mr. Heard's petition meets the standards of detail and specificity required under § 1988.

Any problem understanding the entries is one of Defendant's creation, not the bills'

detail. As noted above, the objections in Defendant's chart come from counsel who first entered

her appearance on October 11, 2005 and who played no part whatever in the litigation of this

case. That ***some*** entries could appear unclear to a complete stranger to the litigation does not

make them unclear to this Defendant, which was always represented by experienced counsel.

Defendant's vagueness attacks on Mr. Heard's billing entries generally fail for one of two

reasons: either it ***knew*** or it ***known*** the general subject matter of the challenged entries through

the exercise of reasonable diligence.

### (i). Defendant's Knowledge Erases Much Of The Alleged Vagueness

First, Defendant's professed inability to discern the general subject matter of the entries

relating to calls, meetings and letters about which it has first-hand knowledge is simply

disingenuous. For example, Defendant's very first vagueness challenge is to a February 9, 2004

entry by Mr. Chud described as "meet w/Rezneck." See Def. Ex. 5.[39] For this and many other entries, Defendant complains that the billing entry "does not indicate subject matter of meeting." This is nonsense. Hosted by Defendant's own lead counsel Daniel Rezneck at Defendant's office, the meeting related to Defendant's production of initial discovery.[40] Similarly, Defendant challenges Mr. Chud's March 31, 2004 entry for "TC w/Rezneck and follow up." See *id.* Again, based on Mr. Rezneck's participation, Defendant knows the call was about getting its initial Rule 26 disclosures. For similar reasons, Defendant's attack on Mr. Chud's April 12, 2004 entry – "draft letter to Rezneck" – must also fail: Defendant got the letter. See *id.* As our own chart shows, Defendant's chart is replete with unreasonable attacks on billing entries that involve meetings with, letters and emails to, or telephone conversations with Defendant's own lawyers. Exhibit Y. Defendant challenges more than *forty* entries involving meetings, letters, and calls *with Mr. Rezneck alone.* Involved in the described work, Defendant cannot complain such entries are vague for failing to describe subject matter. See, *e.g.*, *Pascuiti* v. *New York Yankees*, 108 F. Supp. 2d 258, 270 (S.D.N.Y. 2000).

Here, rather than hiding behind its new lawyer's unfamiliarity with the case, Defendant could have easily discerned the subject matter of the challenged entries simply by talking with Mr. Rezneck or others and reviewing its own files. And it was duty bound to do so. See, *e.g.*, *Irish*, 2004 U.S. Dist. LEXIS 3770 at *21-22 ("The Court is mindful that there have been several counsel changes for defendants, but *before* challenging an entry as 'vague,' the current counsel has an obligation to review the defendants' own files."). If it had, Defendant could not have made such baseless challenges that forced Mr. Heard to incur the cost of a response.

---

[39] "Def. Ex." refers to exhibits attached to Defendant's Opposition.

[40] Apart from the fact that Mr. Rezneck's knowledge is imputed to it, Defendant also could have identified the subject matter of this entry by looking at the more detailed time entry for the *same day* by Mr. Moustakas: "preparation for and participation in meet and confer at Corp Counsel's Office and follow-up."

Defendant has similarly attacked entries relating to certain third parties. But Defendant knows or should know enough to understand these entries. For example, Defendant complains that Mr. Chud did not indicate the subject matter or purpose of a short phone call to Charlotte Brookings-Hudson on July 23, 2004, notwithstanding the fact that *Mr. Rezneck* suggested that Plaintiff place that call. See July 22, 2004 Letter from John Moustakas and Adam Chud to Daniel Rezneck at 3 (Exhibit HHH to Fee Petition). Defendant similarly complains about a short call on July 23, 2004 to "K. Bransom (OIG)." But no further information about the call was necessary since *Mr. Rezneck* directed counsel to obtain certain documents directly from Ms. Bransom, an official from the D.C. Office of Inspector General. See Chud Decl. at ¶ 14.

### (ii). Surrounding Billing Entries And Documentation Clarify Any Remaining Vagueness

Citing three inapposite cases in which unabated vagueness truly masked the subject matter of entries,[41] Defendant seeks a 50% reduction in Mr. Heard's fees. Because the vast majority of entries challenged as vague can be sufficiently clarified by reference to surrounding billing entries and other supporting materials, Defendant's argument should be rejected.

Though Defendant gives no examples of vague billings in its Opposition, the attacks it levels in its "Vague Billing Entries" chart are misplaced, as we show in point-by-point refutation in our own responsive chart.[42] See Exhibit Y. In short, Defendant unfairly labels entries

---

[41] *In re Sealed Case*, 890 F.2d 451 (D.C. Cir. 1989), deducted **10%** from the fee request for a *number* of reasons, including inadequate/vague billing descriptions. The only example of vagueness the court cited was a series of "telephone calls" for which no additional specification was given. *In re Meese*, 907 F.2d 1192, 1204 (D.C. Cir. 1990), cut fees by **10%**, among other reasons, because the billing records made "*no mention* … of the subject matter" of meetings, phone calls, and other undescribed work (emphasis added). Finally, in *Role Models*, 353 F.3d at 971, there were "generic entries" for "research" or "writing" or for time in meetings and on phone conferences with no additional detail. In all three cases, the court had no way of knowing what the subject matter of the tasks was and whether the tasks were, therefore, compensable.

[42] Defendant's chart arbitrarily selects only certain entries, stripping them from other relevant entries by the same or other attorneys on the same day that would help clarify the work that was being done on that day. This is yet another reason why its "Vague Billing Entries" chart should be disregarded and the Court should focus exclusively on the original detailed billing invoice from Plaintiff's counsel.

unintelligibly vague by purporting to read each in a self-contained vacuum, without regard for (or reference to) context or surrounding entries. Such an approach has no legal support; to the contrary, it has been widely held that billing records must be read in context, taking into account surrounding entries and other clarifying materials, including attorney affidavits. Judge Wisdom set forth the proper approach thusly:

> "The entries that the defendants single out, although vague when read in isolation, are not impermissibly vague when viewed in the context of the surrounding documentation. For example, the entry listed as 'notes of meeting' follows an entry for the same date identifying a three-hour meeting to discuss settlement with opposing counsel. The challenged entry obviously refers to the memorializing of the three-hour meeting. Taken in context, it is sufficient to identify the substance of the work done, and thus comports with the Supreme Court's observation that an attorney 'is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures.'"

*Berberena* v. *Coler*, 753 F.2d 629, 634 (7th Cir. 1985) (citations omitted). See also *Craig* v.

*Christ*, 1999 U.S. Dist. LEXIS 17548 at *51-52 (S.D. Ind. Sept. 10, 1999) ("Especially when read in context, with an eye on the calendar and the docket, the records provide a sufficient indication of the subject matter.").

Using its improper approach, Defendant attacks Mr. Chud's 15-minute billing entry for a "meeting w/Baird re research," for example, because it did not disclose the subject of the research. But the clarifying information was supplied by Mr. Baird's own billing entry for the same day. See June 1, 2004 Billing Entry of Mr. Baird (Exhibit M at 12) (research on "judicial estoppel"). Similarly, Defendant challenges a billing entry recorded by Mr. Moustakas for a 30-minute "Meeting w/AMC" (Adam Chud) that did not indicate the subject matter of meeting, even though Mr. Chud's time entry makes clear the meeting concerned his "30(b)(6) deposition and strategy memo." June 10, 2004 Billing Entry of Mr. Chud (Exhibit M at 13).[43]

---

[43] Sometimes Defendant even accuses counsel of unacceptably vague entries because of its own failure to read and understand the relationship between two sequential entries for a *single timekeeper* on the *very same day*. For

Particularly in light of the purposes of § 1988 and our own courts' admonition that it

should be liberally implemented (*Miller*, 706 F.2d at 340), Defendant was required to read Mr.

Heard's billing entries in context and in an effort to eliminate, not manufacture, vagueness. As

our responsive chart (Exhibit Y) shows, if it had done so, the vagueness it purported to find

would have disappeared, since the surrounding entries or supporting materials would have

reasonably cleared up any seeming ambiguity. See, *e.g.*, *USFL v. NFL*, 704 F. Supp. 474, 477

(S.D.N.Y. 1989). The same cannot be said of the entries derided in the cases cited by Defendant

(see *supra* n.42), and they are therefore plainly distinguishable. Because it failed to fairly read

Mr. Heard's petition and because the entries, when read in context, are sufficiently clear,

Defendant's requested reduction for vagueness should be denied.

### (iii).    Defendant Ignores The Forest For The Trees

Defendant's attack on purportedly vague time entries ignores the purposes of § 1988, its

liberal application, the role of success in awarding fees, and the courts' rejection of rigid

documentation requirements reflected in *Hensley*'s statement that it is enough that a plaintiff

identify the general subject matter areas on which counsel worked. 461 U.S. at 437 n.12.

Together, these principles support focusing on "the big picture presented by the fee application,"

not the minutia. *Rodriguez*, 84 F. Supp. 2d at 425. This Court adopts a similar focus:

> "the government may quibble over individual entries, claiming they are vague or unclear.
> However, *in the context of the entire application*, the entries enable this Court to make
> an independent, intelligent, and reasonable determination whether or not the hours
> claimed are justified." *McKenzie* v. *Kennickell*, 645 F. Supp. 437, 448 (D.D.C. 1986)
> (emphasis added).

---

example, Mr. Fregiato recorded 1.5 hours for: "Meeting with A. Chud regarding research; began research on ADA
claim." June 11, 2004 Billing Entry of Mr. Fregiato (Exhibit M at 13). Ignoring the clarifying *second entry* – which
establishes that the research was on Mr. Heard's ADA claim – Defendant surprisingly labels the *first entry* vague as
to the topic of Mr. Fregiato's research. Surely Mr. Heard is entitled to expect that, in the many months it had his
bills, Defendant would have drawn from these entries the reasonable conclusion that Messrs. Chud and Fregiato met
on June 11, 2004 to discuss Mr. Fregiato's ADA research – a fact confirmed by Mr. Chud. See Chud Decl. at ¶ 11.

And our courts assure that such focus is maintained by consistently rejecting nit-picking, objections and hyper-technical challenges. See, *e.g.*, *NACV*, 675 F.2d at 1337-38; *Holbrook* v. *District of Columbia*, 305 F. Supp. 2d 41, 46 (D.D.C. 2004). These decisions confirm that § 1988 was not meant to be an oppressive burden. *Craig*, 1999 U.S. Dist. LEXIS 17548, at *52. Rather, it was meant to create a sufficient picture of the work that counsel did so that courts, using their knowledge of the instant case and others, can reasonably assess the petition. See, *e.g.*, *USFL*, 704 F. Supp. at 477 ("Upon examination of the time sheets in context, given the Court's familiarity with the case and its 'own assessment of what is appropriate for the scope and complexity of the particular litigation,' most of the alleged vagueness evanesces.") (citation omitted); *Dunn*, 2004 U.S. Dist. LEXIS 5618, at *5 (descriptions should enable client or court "to know what was done, and determine whether doing it was necessary or useful").[44]

After establishing that Defendant cannot fairly count as vague those entries involving work about which its counsel is familiar and entries that can be clarified by resort to common sense, context, and the surrounding entries, very few of Defendant's challenges remain. Still, it quibbles over a small number of entries involving letters that are available for review or names of consultants or witnesses, along with a small number of brief phone calls to named persons, for which the subject matter is not given. These remaining objections should also be rejected. The time billed for these is usually very minimal – on the order of a few tenths of an hour – so that a response often would require more time than was challenged in the billing entry. See *October 22nd Coalition* v. *Safir*, 1999 U.S. Dist. LEXIS 5041, at *2 (S.D.N.Y. Feb. 4, 1999) (since

---

[44]  In *Cohen*, for example, the court examined a large number of time entries challenged on vagueness grounds and found that, in some instances, the subject matter was apparent from the entry itself; in other cases, from looking at other billing entries; and that for most of the remainder, from a variety of documents in the record, including plaintiff's counsel's affidavit and the court docket sheet. 2001 U.S. Dist. LEXIS 22438 at *47-48. Overall, the court found the records of the attorney to be detailed and informative and, measured against the standard of *Hensley*, they passed muster almost without exception. *Id*. at *49. The Court should find the same true here.

entries' level of specificity should be "proportional to the amount of time charged," description "work on the filing of papers" was sufficient to support a 3/4 hour charge).[45] When considered as part of the whole fee application – which we believe the Court will find uncommonly detailed – any small residuum of entries that may lack optimal detail does not impede this Court's ability to fairly judge Mr. Heard's request reasonable. See, e.g., *Clarke*, 960 F.2d at 1153.

To leave no doubt about his entries, Mr. Heard has specifically responded to each of Defendant's vagueness challenges, providing sufficient clarification where it could be helpful. See Exhibit Y.[46] No basis for finding any vagueness remaining, Defendant's challenges should be rejected in their entirety. See, e.g., *Lopez* v. *District of Columbia*, 383 F. Supp. 2d 18, 24 (D.D.C. 2005) (vagueness challenge defeated by clarifications in reply brief).

### b. Defendant's Attack On Internal Meetings Is Ill-Founded

Defendant apparently refuses to pay for *any* internal meetings. Complaining about duplicativeness, Defendant objects (at 20) to paying "the double hourly rates for conferences between the senior and junior lawyers" at meetings of *more than one* lawyer. At the same time, Defendant objects (at 19-20) to paying for meetings where *only one* lawyer has billed his time, though others attended. Defendant cannot have it both ways. Logically inconsistent, out-of-step with the realities of modern legal practice and precedent, and analytically flawed, *neither* of its separate arguments can prevail.

---

[45] See also *Pascuiti*, 108 F. Supp. at 270 ("Any lingering doubt about their reasonableness is assuaged by the fact that the vast majority of these entries are less than one hour, and many are less than half an hour."); *Cohen*, 2001 U.S. Dist. 22438, at *38 n.16 (unreasonable to expect biller to list "subject matter of every brief telephone call"). Moreover, because the remaining entries are consistent with the "level of [billing] detail that paying clients find satisfactory, challenges to them should likewise be rejected." *Synthroid Mktg. Litig.*, 264 F.3d at 722; *Pawell*, 2005 U.S. Dist. LEXIS 16472, at *14-15. The level of billing detail that accompanies Mr. Heard's Fee Petition at least meets the detail that the clients of Shea & Gardner and Goodwin Procter (and no doubt other private law firms) have typically found satisfactory. See Felty Decl. at ¶ 5.

[46] This exhibit is a modified version of Def. Ex. 5, with an extra column added, into which Plaintiff has entered remarks either explaining that Defendant already has the information it claims it is missing or responding to and clarifying the challenged entry.

First, Defendant makes a purely generic and conclusory attack (at 20) on the "amount (sic) of internal meetings in general." Its blanket assertion that internal meetings may not be billed by more than one person is not the law. See *Kennickell*, 645 F. Supp. at 450 (approving billing of internal meetings by more than one lawyer because they are "an essential part of effective litigation" and help to ensure "proper supervision and efficient staffing" of litigation).[47] Having failed to demonstrate their categorical disfavor, Defendant's attacks on internal meetings must be particularized. Goodwin Procter's billing records reflect that meetings were billed in the fashion customary for its fee-paying clients. Typically brief and narrowly tailored, the meetings billed as part of Mr. Heard's Fee Petition were important to the case, whether they concerned coordinating discovery, contemplating or case strategy, or other issues. See Moustakas Supp. Decl. at ¶ 4. Defendant does not claim otherwise, nor does it identify any meetings as excessive or unnecessary. Under governing standards, Defendant's naked assertion that "it should not be double-billed for the meetings between senior counsel and the more junior attorneys" fails. See *NACV*, 675 F.2d at 1337-38 ("It is not enough for an opposing party simply to state, for example, that the hours claimed are excessive"); *Norman* v. *Housing Auth.*, 836 F.2d 1292, 1301 (11th Cir. 1988) ("Generalized statements that the time spent was reasonable or unreasonable of course are not particularly helpful and not entitled to much weight.").

Second, inconsistent with its complaint about paying for *more than one* lawyer at a meeting, Defendant also complains (at 19) that often *only one* timekeeper bills for a meeting attended by others. Determined to litigate every possible angle, Defendant pretends that any

---

[47] See also *Rodriguez-Hernandez* v. *Miranda-Velez*, 132 F.3d 848, 860 (1st Cir. 1998) ("Careful preparation often requires collaboration and rehearsal."); *Catanzano* v. *Doar*, 378 F. Supp. 2d 309, 323 (W.D.N.Y. 2005) ("[T]ime spent in attorney conference is generally compensable for each participant. Conferences between attorneys are necessary, valuable, and often result in greater efficiency and less duplication of effort."); *Rodriguez*, 84 F. Supp. 2d at 426 (plaintiffs should not be penalized for "frequent intra-office conferences" since "[t]he practice of dividing work among various attorneys in a complex and lengthy case is a common [] practice").

missing time (whose value it calculates at $40,320.69, or 3.6% of the petition) was eliminated in an exercise of undocumented billing judgment that it cannot now review. See Moustakas Supp. Decl. at ¶¶ 5-7. As punishment for *decreasing* the fees sought from it, Defendant ironically asks that this $40,000 be eliminated from the petition. *Id.* at 19-20. Counterfactual and analytically flawed, this request should be denied.[48]

Many of the alleged failures by one timekeeper to record a meeting he had with another timekeeper turn out to result from Defendant's erroneous reading of the billing invoice. For example, on July 30, 2004 Mr. Friedman recorded: "conf w/Moustakas re certain factual assertions in medical records." Defendant's chart asserts that "Moustakas does not report or bill for this." Defendant is wrong. Moustakas' entry for the same day includes "Discussion w/PRF (Paul R. Friedman) re: Heard medical records." These entries obviously describe the same meeting. We cannot believe that Defendant is incapable of understanding that "a conference" about medical records and "a discussion" about medical records is the same thing.[49]

Similarly, a number of Defendant's challenges result from its failure to recognize obvious synonyms or to match up slightly different ways of describing the same task. For example, on July 2, 2004, Mr. Chud reported a "meeting re depositions." On the same date, Mr. Moustakas reported a "Meeting w/AMC re: upcoming discovery, Watson declaration." Although Defendant attacks Mr. Chud's entry for failing to identify the person with whom he met that day, these

---

[48] Defendant's chart titled "Internal Meeting With Only One Professional Billing" ("Internal Meetings Chart") is based upon the same flawed methodology and is as sloppy and inaccurate as the other charts it has provided to the Court and should, like those other charts, be disregarded. Our response to that chart – attached to this Reply as Exhibit X – addresses each mistake.

[49] Compounding its error by using an improper allocation system for block-billed entries (dividing the time spent by the number of tasks), Defendant incorrectly states in its chart that this discussion between Friedman and Moustakas consumed 1.4 hours, when it fact Mr. Moustakas' entry for the day clearly states that the discussion lasted only .3 hours. See Chud Decl. at ¶ 50; Moustakas Supp. Decl. at ¶ 11. This technique leads to obviously nonsensical results when, for example, a timekeeper records 8 hours time for drafting a brief and answering an email

entries plainly describe the same activity; the meeting was clearly with Mr. Moustakas. Refusing to equate a "meeting re: depositions" and "meeting re: upcoming discovery" is just part of Defendant's transparent scheme to reduce fees by any measure possible, however weak.[50]

Another simple explanation that Defendant refuses to acknowledge is that sometimes one attorney incorporated a meeting or call with another into the description of and accounting for his substantive (and often related) work for the day, while the other described the same meeting or call as a separate task. See Chud Decl. at ¶ 6; Moustakas Supp. Decl. at ¶ 7; Friedman Decl. at ¶ 31. For example, on March 24, 2004, Mr. Moustakas recorded an .3 hour for "meeting w/AMC re: Rule 26 initial disclosures and damages calculation." Defendant's chart asserts that "Chud does not report meeting w/ Moustakas." But Mr. Chud's time entry for the same day has him "[r]eview[ing] initial disclosure rule and draft[ing] initial disclosures." Since "initial disclosures" are required to include "a computation of any category of damages claimed," Fed. R. Civ. P. 26(a)(1)(C), it is easy to see that the subject matter Mr. Moustakas reported talking to Mr. Chud about was very same subject matter on which Mr. Chud reported working that day – initial disclosures. Despite this obvious corroboration (see also Chud Decl. at ¶ 7), Defendant improperly refused to draw the most reasonable inference that eliminates any vagueness.[51]

---

and Defendant ascribes 4 hours to each task. Indeed, the resulting incongruities are the main reason for the "unblocking" of our block-billed time. See id.

[50] If Defendant's preposterous position were right and these billing descriptions were insufficient to support recovery of attorneys' fees, the impact on the cost of preparing fee petitions and fee litigation would be incalculable. Each entry would have to be policed for and rewritten to achieve word-for-word accuracy. But this process would surely engender skepticism and requests for discovery about the process by which such uniformity was achieved, leading to the sort of "second major litigation" the courts have sought to prevent. Hensley, 461 U.S. at 437.

[51] Similarly, Mr. Moustakas listed a meeting with Mr. Chud on March 24, 2004 "re document requests" and billed .4 hours for that meeting. Defendant's chart insists that "Chud does not report meeting w/Moustakas." But Mr. Chud's entry for the same day records one hour's work described as: "revise interrogatories and document requests." Again, it is reasonably obvious that Mr. Chud folded his meeting with Mr. Moustakas on the topic of document requests into his substantive work that same day in his description of work on the same topic: revising interrogatories and document requests. As confirmed in Mr. Chud's declaration, this was in fact what happened. See Chud Decl. at ¶ 7.

Many of the entries that Defendant attacks involve between 1/10 and 3/10 of an hour. [52]

For instance, on August 6, 2004, Mr. Chud spent 8/10 of an hour total on separate telephone calls with opposing counsel (4/10), Mr. Friedman (2/10), and Mr. Moustakas (2/10). This was the only time Mr. Chud billed to Mr. Heard's case that day. By contrast, on that day Mr. Moustakas spent 12 hours preparing for and deposing the Department of Corrections' lead investigator and Mr. Friedman spent 6 hours reviewing St. Elizabeths' medical records. Defendant attacks Mr. Chud's entries for separate calls with Messrs. Moustakas and Friedman because neither colleague recorded his call with Mr. Chud. Given their deep involvement in other work on Mr. Heard's case that day, that neither Mr. Friedman's nor Mr. Moustakas' billing entries separately describe a 12-minute call is completely understandable. [53] On virtually exact facts, the *Cohen* court rejected billing criticisms like Defendant's and explained:

> "it does not surprise the court that on days when [one of plaintiff's counsel] was performing a variety of tasks, among them preparing for and conducting lengthy depositions, that she might not have thought that a conference with [other counsel] which lasted on .3 hours ... or even 1.0 ... merited a specific description." 2001 US. Dist. LEXIS 22438 at *63-64.

Recognizing the realities of legal practice, *Cohen* found minor time discrepancies "explainable by one of the attorneys being too busy to record [a] conference at the time and forgetting to do so later." *Id*. at *65. See, *e.g.*, Moustakas Supp. Decl. at ¶¶ 6-8. Thus, it rejected the request for a reduction due to alleged inconsistencies between the records of co-counsel. *Id*. at *65-66. [54]

---

[52] All told, Defendant's so-called "Meetings of One" chart contains 12 entries involving 1/10 of an hour, 10 entries involving 2/10 of an hour, and 10 entries involving 3/10 of an hour.

[53] Obviously, there are two explanations for these kinds of disparities: first, that among the hundreds of hours billed to the case, a timekeeper has chosen to lie about a singular, short call or meeting that never occurred but which he falsely records, or second, that the timekeeper busily at work on other aspects of the same case or on another case, simply failed to take the time (or forgot) to bill the brief contact with their colleague. The second is obviously the far more reasonable inference and the one we ask the Court to draw.

[54] Defendant attacks a Jan. 6, 2005 entry made by Mr. Hanks for a 12-minute meeting with Mr. Chud. That the billing description for research projects he was assigned by Mr. Chud is incredibly detailed, that the work was actually done by Mr. Hanks, and that the work resulted from a verifiable discovery dispute Mr. Chud was having

Assuming that entries listing teleconferences with only one Goodwin timekeeper indicate a missing Goodwin colleague, Defendant also wrongly attacks a number of calls with third parties. Occasionally, third parties were not identified either on the belief that that level of specificity was unnecessary or, more typically, out of caution to protect confidential information while the case was still in active litigation. See, *e.g.*, *Craig*, 1999 U.S. Dist. LEXIS 17548, at *52 ("experienced counsel know that they cannot guarantee the confidentiality of billing records and prepare their time entries in light of the risk that the records might be disclosed to opponents at a time when a detailed entry would provide tactical intelligence"). Telephone calls made by Mr. Moustakas on June 10, July 20, and July 28, 2004, all fit into that category. To a Justice Department contact, a prominent civil rights lawyer, and counsel in another "overdetention" case, respectively, the calls were reported so as to protect the identities of each individual from whom confidential information was sought.[55] Thus, these attacks must also be rejected.

Every meeting, conference, or phone call claimed took place, whether or not each participant recorded it. See Moustakas Supp. Decl. at ¶ 5; Friedman Decl. at ¶ 33; Chud Decl. at ¶ 6. Where a meeting or call took place, and one or more other participants truly neglected to record their time, Defendant has already received a windfall. That windfall is certainly no basis for further reductions. See *Cohen*, 2001 U.S. Dist. LEXIS 22438 at *65-66.

---

with Defendant's counsel all corroborate the truth of the entry Defendant speciously seeks to eliminate. The same is true of a Jan. 11, 2006 entry by Mr. Moustakas reporting a 12-minute call with Mr. Friedman on a topic that related to work Mr. Friedman was engaged in on a "hot topic" at the time. Still, Defendant seeks to eliminate Mr. Moustakas' time because Mr. Friedman did not record the call. Many other similar examples are to be found in Defendant's chart and each should be rejected.

[55] Similarly, Mr. Friedman lists no other Goodwin participant in his July 28, July 29 and August 2, 2004 teleconferences with possible deafness experts because his calls were with those experts, not Messrs. Moustakas or Chud, or any other Goodwin colleagues.

## c.     There Has Been No Excessive Billing For Ministerial Tasks

Though counting him "an outstanding member of the bar," Defendant accuses Mr. Friedman (at 10) of billing $8,904.56 (or 24.7 hours) for work that could have been performed by paralegals or secretaries just as well. In response to Defendant's attack, Mr. Friedman has submitted a sworn declaration that addresses each task Defendant has challenged. See Exhibit P to Fee Petition at ¶¶ 9-15. The flawed methodology used by Defendant (*supra* n.49), coupled with its misunderstanding of the work performed, produces a badly distorted picture of what actually occurred. When the actual time expended is considered for the entries Defendant has attacked (often 1/10 or 2/10 of an hour rather than the one or two hours invented by Defendant), as well as the sound reasons why Mr. Friedman in the exercise of his professional judgment felt it was more efficient for him to undertake the challenged task himself rather than to assign it to a paralegal or secretary, it is clear that Defendant's criticism lacks merit.

## 3.     Plaintiff's Fees Are Not Cut Off As Of February 4, 2005

Looking for another way to renege on its offer to pay Mr. Heard's reasonable attorneys' fees, Defendant contends (at 23-24) that, other than fees associated with the fee petition, Mr. Heard's attorneys' fees were cut off as of February 4, 2005 – the day after its ineffectual Offer of Judgment was made. Mr. Heard fully addressed this argument in the opening brief. Unable to rebut the facts or law set forth therein, Defendant simply ignores both, remarkably making its own argument without any reference to Mr. Heard's arguments. Cobbled together from made-up facts and misstatements of law, this self-serving claim should be rejected.

On February 3, 2005, the one and only Rule 68 Offer of Judgment made in this case was served on counsel for Mr. Heard. See Exhibit GG to Fee Petition. Among other things, as a condition of receiving $1.1 million to resolve the case, it required that all claims against CCHPS and its employees ("the CCHPS Defendants") be dismissed. Because dismissal of the CCHPS

38

Defendants was an unacceptable term, Plaintiff's counsel repeatedly informed Defendant that the February 3, 2005 Rule 68 Offer of Judgment could not be accepted. Moustakas Supp. Decl. at ¶¶ 18, 26, 28-30. Although Mr. Heard repeatedly asked for a new Rule 68 Offer of Judgment, expressly excluding the CCHPS Defendants, Defendant never issued one. *Id.* at ¶¶ 28, 34. Though Defendant asserts otherwise, it is indisputable that: (1) Mr. Heard never accepted the February 3, 2005 Rule 68 Offer of Judgment; and (2) no other Rule 68 Judgment was ever made, let alone accepted for Mr. Heard.[56]

That the February 3, 2005 Rule 68 Offer of Judgment was not accepted is confirmed by at least three irrefutable facts. First, the Offer of Judgment required the dismissal of the CCHPS Defendants in exchange for Defendant's $1.1 million payment – and that condition was never met.[57] See Moustakas Supp. Decl. at ¶¶ 18, 21-24, 27-28. Second, on the day the last and final extension to the Rule 68 Offer of Judgment expired, Mr. Heard unequivocally rejected the Offer of Judgment. See Exhibit BBB to Fee Petition (March 18, 2005 Letter from John Moustakas to

---

[56] Notably, Defendant does *not* contend that its Rule 68 Offer of Judgment cuts off Mr. Heard's fees because "the judgment finally obtained by the offeree is not more favorable than the offer." Fed. R. Civ. P. 68. That argument is foreclosed by two facts. First, the subsequent non-Rule 68 settlement of the case by consent judgment in June 2005 superseded the Offer of Judgment and its ability to cut off fees because Rule 68 does not apply where an Offer of Judgment is followed by settlement, rather than trial. See *Hutchison* v. *Wells*, 719 F. Supp. 1435, 1444 (S.D. Ind. 1989). See also *Advisory Comm. on Civil Rules*, 102 F.R.D. 433 (Rule 68 taxes plaintiff with "costs if he should recover no more *after trial* than would have been received" had he accepted Offer of Judgment). Second, even if the subsequent settlement had not superseded and nullified the Offer of Judgment, the Offer of Judgment could not have operated to cut off Mr. Heard's attorneys' fees since his ultimate recovery plus pre-offer fees (roughly $2.6 million for all claims) was significantly greater than the amount of the Offer of Judgment plus pre-offer fees (about $1.9 million for all claims). See, *e.g.*, *Mintzmyer* v. *Babbitt*, 1996 U.S. Dist. LEXIS 7263, at *8 n.2 (D.D.C. May 28, 1996) (plaintiff may collect post-offer fees if the sum of the judgment from trial and the pre-offer fees and costs is *greater* than the Rule 68 Offer of Judgment); *Marryslow* v. *Flynn*, 986 F.2d 689, 692 (4th Cir. 1993) (same).

[57] To the extent Defendant's argument presumes a Rule 68 Offer of Judgment can be conditionally accepted, subject to the rejection of some of its written terms, or subject to the inclusion of other terms not written in the offer, Defendant is dead wrong and fundamentally misapprehends Rule 68. See, *e.g.*, *Grosvenor* v. *Brienen*, 801 F.2d 944, 948-49 (7th Cir. 1986) (While "parties can clarify or eliminate ambiguous or unacceptable terms or conditions of [an ordinary settlement] offer[,] [t]his is not the case, however, with a Rule 68 offer of judgment.").

Robert Deberardinis). See Moustakas Supp. Decl. at ¶¶ 28-30.[58] A rejected offer of judgment is deemed withdrawn. See *Grosvenor*, 801 F.2d at 948. Finally, months after the Rule 68 Offer of Judgment expired, the case was settled on June 15, 2005 by a Consent Judgment, not a Rule 68 Offer of Judgment.

Since Defendant's contention is wholly premised on its demonstrably false assertion that Mr. Heard accepted its Offer of Judgment, it is near impossible to make heads or tails of the remainder of its argument. But two points suggest that Defendant may be trying to suggest that the June 15, 2005 Stipulation for Entry of Consent Judgment was a Rule 68 Offer of Judgment: (1) its reference to acceptance of the Offer of Judgment in June 2005 and (2) its false suggestion (at 23, 24) that the Rule 68 Offer of Judgment remained open until June 2005.

To qualify as a Rule 68 Offer of Judgment, an offer to resolve litigation must meet certain formalities. See, *e.g., Clark* v. *Sims*, 28 F.3d 420, 423-24 (4th Cir. 1994). Among other things, it must be drafted by a Defendant and submitted to a Plaintiff, not *vice versa*. See, *e.g. Delta Air Lines, Inc.* v. *August*, 450 U.S. 346, 350 (1981). It must be in writing. *Grosvenor*, 801 F.2d at 948. And it must be served in accordance with Fed. R. Civ. P. 5. Other than the February 3, 2005 Offer of Judgment, no document in the course of this litigation – including the Stipulation for Entry of Consent Judgment – meets the necessary requirements. Thus, there simply was no other Offer of Judgment.[59]

Moreover, the Rule 68 Offer of Judgment was not extended through June 2005, but rather was withdrawn on March 18, 2005, the date it expressly lapsed and was rejected. Statements to

---

[58] All the laborious negotiations between March 18, 2005 and June 15, 2005 were settlement negotiations and they culminated in nothing more than a settlement agreement. See Moustakas Supp. Decl. at ¶¶ 28-39.

[59] Subject to edits by Defendant, the Consent Judgment was (1) drafted by Plaintiff, (2) never served by Defendant in accordance with Fed. R. Civ. P. 5, and (3) not styled as an "Offer of Judgment." See Chud Decl. at ¶ 32. Even if the Consent Judgment were a Rule 68 Offer of Judgment (and it is not), it would only operate to cut off fees as of

the contrary in Mr. Deberardinis' declaration – including his insistence that Mr. Stern obtained

an extension of time in "late May"– are simply mistaken. See Moustakas Supp. Decl. at ¶¶ 25,

31; Stern Decl. at ¶ 4; Exhibit ZZ. The last of three brief, and documented, time extensions

expired on March 18, 2005. Although Plaintiff sought an additional extension on March 16,

2005, Defendant summarily rejected that request. See Exhibit AAA (request); Exhibit JJJ

(rejection).[60] In fact, Defendant expressly refused to grant any further extensions beyond the

March 18, 2005 deadline. See Moustakas Supp. Decl. at ¶¶ 26-27.

The first extension was granted "with the proviso that if the offer of judgment was

accepted that plaintiff's petition for attorney's fees would not include time for services rendered

after February 3, 2005." See Deberardinis Decl. at ¶ 4; see also Feb. 16, 2005 e-mail from

Robert Deberardinis to John Moustakas (Exhibit JJ hereto). Presumably, Defendant invokes this

language (at 23) in hopes of suggesting that the ultimate settlement of the case triggered this

proviso and a considerable (and unintended) limit on Mr. Heard's legal fees. As we now show,

such hope is not well-placed.

Mr. Heard did not agree, as Defendant contends (at 24), "that his petition for attorney's

fees would be cut off as of February 4, 2005." Instead, as Mr. Deberardinis' Declaration makes

clear, Defendant agreed to grant an extension of time "with the proviso that *if the offer of

judgment was ultimately accepted* plaintiff's petition for attorney's fees would not include time

---

that date after it was accepted, June 16, 2005, *not* February 4, 2005, as Defendant contends in an effort to avoid
repaying fees it caused Mr. Heard to incur.

[60] The first extension (expiring March 3, 2005), the second extension (expiring March 11, 2005), and the third
extension (expiring March 18, 2005) were not designed to facilitate consideration of the February 3, 2005 Offer of
Judgment, which included the unacceptable condition of dismissing the CCHPS Defendants, but rather were aimed
at giving Defendant sufficient time to (1) seek approval for issuing a new Rule 68 Offer of Judgment that would cut
out the CCHPS Defendants, as Mr. Heard had requested; and (2) review counsel's billing records so that its offer to
pay "reasonable fees" could be quantified. See Moustakas Supp. Decl. at ¶¶ 20-22, 25.

for services rendered after February 3, 2005."[61] Since neither _the_ February 3, 2005 Offer of

Judgment nor _any_ other Rule 68 Offer of Judgment was ever accepted, the condition triggering a

retroactive limitation of fees never occurred.[62]

### 4. Mr. Heard's "Fees On Fees" Are Reasonable

Mindful that litigation over attorneys' fees should be avoided wherever possible

(_Hensley_, 461 U.S. at 437; _NACV_, 675 F.2d at 1324), Mr. Heard has persistently attempted to

engage Defendant in fee negotiations. See Moustakas Decl. at ¶¶ 208-212; Chud Decl. at ¶¶ 17-

25. It is well-settled that a prevailing party is entitled to payment of the attorneys' fees – often

called "fees on fees" – he incurs to recover his fees. See, _e.g._, _Noxell Corp._ v. _Firehouse No. 1_

_Bar-B-Que Restaurant_, 771 F.2d 521, 528 (D.C. Cir. 1985) (The "matter is settled in this circuit.

Hours reasonably devoted to a request for fees are compensable."). Defendant does not contest

this right. Instead, attempting to create an untenable Catch-22, Defendant chastises Mr. Heard

for spending too much time defending the very fees it tries, at the same time, to cut by 70%.

---

[61] An additional fact corroborates this conclusion. Although Defendant attempted to make it a condition of settling the case during negotiations over the Stipulation for Entry of Consent Judgment, Mr. Heard refused to accept a condition that would cut off his attorneys' fees as of February 4, 2005. At a stalemate, the parties agreed to disagree and to let the Court resolve the question. In short, Defendant reserved the right to contend that payment of fees beyond February 3, 2005 would be "inconsistent with the _offer of judgment_." Having previously undertaken the above-referenced analysis of the Offer of Judgment's nullity, Mr. Heard rejected that characterization, recognizing that the Offer of Judgment was not an impediment to recovery of all his attorneys' fees. He thus explicitly reserved the right to receive all fees and costs to which he was entitled under §§ 1988 and 12205 through the date of any final award of fees and costs. See Exhibit A at ¶ 1. That the Court was intended to resolve this dispute is confirmed by the omission of any integration clause in the Consent Judgment. Dead long before the Consent Judgment was a glimmer in anyone's eye, the rejected Offer of Judgment can have no impact on the ultimate settlement of the case. Thus, Defendant's attempt to invoke it as a limitation on Mr. Heard's attorneys' fees should be denied.

[62] Apart from lacking any legal support, cutting off fees as of February 2005 in the absence of unequivocal evidence that Mr. Heard so intended would be unfair, inconsistent with Mr. Heard's intent, and damaging to the purposes of § 1988. Mr. Heard agreed to give up fees in the event that either one of two short extensions resulted in an acceptable Offer of Judgment. He did not agree to assume his own fees going forward forever thereafter. Particularly where Defendant's ever-changing positions about the form in which the case would be settled and escalating requests for inclusion in such proposals both necessitated successive rounds of legal research to protect his interests (Chud Decl. at ¶¶ 27-32; Moustakas Decl. at ¶ 201; Moustakas Supp. Decl. at ¶¶ 40-52), sticking Mr. Heard with those fees would be unfair and contrary to his express refusal in the Consent Judgment to acknowledge or accede to such a limitation. See Exhibit A at ¶ 1. Defendant knows it is not entitled to limit fees as of February

Hardly excessive, the work on this petition actually **under**estimated Defendant's capacity

for manufacturing unfounded objections since Mr. Heard had been led to believe Defendant had

no meaningful objections to his petition beyond vague criticisms of time spent on research and

internal meetings. See Chud Decl. at ¶¶ 18, 20; Exhibit XX & Exhibit MM. But the dimensions

and virulence of Defendant's attack on fees prove that counsel was right to expend considerable

effort on the Fee Petition. As with the amount of time spent litigating the case generally, it has

been Defendant's obdurate and unyielding approach that increased the expense of litigating both

the case and the motion for fees. Defendant should not be heard now to complain about the

consequences its past conduct brought about. See *supra* n.5; Moustakas Decl. at ¶¶ 179-202.

As we now show: (a) the hours spent preparing all the components of the Fee Petition

were reasonable and necessary to ensure a full recovery of attorneys' fees for the successful

prosecution of Mr. Heard's civil rights claims; (b) Defendant's chart purporting to attack the

billing of Mr. Heard's Fee Petition is inaccurate and unreliable; and (c) other cases have awarded

a larger ratio of fee petition fees than Mr. Heard seeks. For these reasons, Mr. Heard's "fees on

fees" should be awarded in full.

### a. The Time Spent Preparing The Fee Petition Was Reasonable

Asserting that Mr. Heard's lawyers should have taken only 120 hours to prepare the fee

petition, Defendant glibly contends (at 12) that the hours spent on the Fee Petition were

excessive since Mr. Heard's "brief itself is less than 10 pages long." This argument is silly and

superficial. Our brief could be short only because of the highly-detailed and carefully-prepared

declarations and accompanying materials that were drafted to support it. If size is determinative,

then the relevant measure is the 89 pages that comprise the thoroughly constructed Fee Petition,

---

4, 2005. That is why it has not quantified the fees and costs associated with this category and taken them into
account in its summary of its objections. Opp. at 26.

and another 168 pages in detailed billing descriptions, all designed to facilitate an assessment of the reasonableness of Mr. Heard's request for § 1988 fees and costs. Providing *no evidence* to support it, Defendant also incorrectly asserts (at 12) that little work was required in order to demonstrate the reasonableness of Goodwin Procter's billing rates because "[i]nformation as to the billing rates of major law firms is readily available." In fact, the opposite is true: it proved very difficult to obtain reliable information about the billing rates of major law firms. See Friedman Decl. at ¶ 25.

Defendant also criticizes Mr. Heard's Fee Petition for failing to group the time entries for work on the petition "by the nature of the activity or stage of the case." But there is no requirement to do so. And here, where counsel performed over 100 separate tasks recounted in considerable detail (Moustakas Decl. at ¶¶ 11-131), such compartmentalization would have been extremely time-consuming and unnecessary.

Likewise, Defendant's unsupported claim that 42.2 hours of conference time on the Fee Petition was excessive should be rejected. Conclusory allegations that time spent was excessive should not be countenanced. See, *e.g.*, *Holbrook*, 305 F. Supp. 2d at 46; *Lucas*, 63 F. Supp. 2d at 1057-58. Moreover, Defendant again seems to have its facts wrong; we count only 23.4 hours of internal or external meetings, phone conferences, or time spent on e-mails related to the fee petition. Those entries are in *italics* on the chart attached at Exhibit CC hereto. In any case, no less so here, internal meetings were an important component of Mr. Heard's effective legal representation. Reasonable and appropriate, time spent to ensure efficiencies in preparing the Petition, to exercise billing judgment, and to confer about the most effective means of presenting Mr. Heard's arguments, was not excessive.[63]  See Moustakas Supp. Decl. at ¶¶ 4, 16.

---

[63] In support of its argument concerning "conference time," Defendant oddly complains that Mr. Moustakas spent more than two days to prepare his initial declaration. This time spent was not recorded as conference time.

## b.    Defendant's "Fee Petition Billing" Chart Is Inaccurate

For reasons we have previously described, Defendant's "Fee Petition Billing" chart, like all of Defendant's charts, is methodologically unsound and unreliable. See Friedman Decl. at ¶¶ 16-24. Though it purports to identify (at 12) *only* entries for work on the petition, the chart contains many entries for other work, for example: "review motion to stay, (sic) consideration of discovery motions, (sic) & extend time for reply brief" (Friedman, 2/14/05); "conference with Moustakas re: discovery" (Chud, 2/15/05); "talk w/cud (sic) re: analyzed structured settlement" (Friedman, 2/15/05); "office conference re: Dr. Aldock (sic) & settlement developments" (Moustakas, 2/17/05); "conference re: settlement w/Friedman, Aldock, Chud" (Moustakas 2/17/05); and "conference w/cud (sic) re: annuiity (sic) & offer of judgment" (Friedman, 2/18/05).  (Bolded entries in Exhibit CC identify work that Defendant wrongly counts as work on the Fee Petition.)  When those entries are removed from Defendant's chart, *the total amount recorded for work on the fee petition drops by over 22%* – from Defendant's claim on its chart that $123,909.50 was charged to fee petition preparation, to only $96,196.00.  That figure reflects the number of hours actually spent preparing the Fee Petition and its attachments.[64]

Defendant's chart should evoke great skepticism.  Although Defendant purports to list the hours spent on the Fee Petition by category and claims (at 12 n.6) that "[t]hese figures were obtained by extracting the data in each invoice entry related to the fee petition, assigning the data to a category and then adding the figures," its analysis can be neither trusted nor verified.  Its categorizations have been proven unreliable and, because there is no record of how it decided

---

Moreover, given the breadth, detail and significance of that declaration, it is hardly surprising it took time to draft and edit.  Defendant identifies nothing in it that was excessive or that should have been omitted.

[64]    Again, the sloppiness of Defendant's work product, however, confuses the issue a bit:  while Defendant's *chart* alleges that Plaintiff's counsel billed $123,909.50 for work on the fee petition, its *brief* claims that only $108,829.70 was billed.  We cannot begin to guess what caused this inconsistency.  Suffice it to say that Defendant's failure to get even its own numbers straight is further evidence of its unreliable work product.

which tasks fell into which categories, these judgments are unverifiable.[65] Defendant's chart is

also unreliable because it disregards the actual billing descriptions written by Mr. Heard's

counsel, in favor of its own inexplicably rewritten, truncated, and misspelled surrogates which

often give the false impression that the original records are less detailed than they in fact are.

See Friedman Decl. at ¶¶ 18, 21.[66] For these reasons, the Court should reject and disregard

Defendant's "Fee Petition Billing" chart.

**c.     The Time Spent On The Petition Is Consistent With Other Complex Cases**

Fee Petitions are not one-size-fits-all. Here, the expenditures on the Fee Petition – like

the litigation itself – were a function of the complexities of the case and the issues raised. In that

light, the ratio of hours spent on the Fee Petition to hours expended on the case as a whole was

not excessive. In *Microsoft*, this Court approved an award of fees for work on the fee petition

that was 12.4% of plaintiff's total fees. 297 F. Supp. 2d at 49. See also *Am. Petroleum Inst.* v.

*EPA*, 72 F.3d 907, 916 (D.C. Cir. 1996) (8.8% of fees incurred in preparation of petition). Here,

the fees sought for work on the Fee Petition amount to only 8.7% of all fees. A reasonable ratio,

the cost of producing the Fee Petition should be recovered in full.

---

[65]   That the Oppositions ascribes (at 12) exactly **$24,229** to the **58 hours** allegedly spent on "Preparation of affidavits and declarations" and the **same $24,229** for **53 hours** allegedly spent on "Preparation of Brief" suggests at least some mistake. The problem is determining how deep the mistakes go. Under similar circumstances, one court rejected a defendant's charts out-of-hand. See *Cohen*, 2001 U.S. Dist. LEXIS 22438, at *31-37.

[66]   Defendant's "Description" of the billing entries is only its take on those entries, not the actual time records themselves. For example, Defendant *rewrote* Mr. Friedman's February 15, 2005 Billing Entry from "Talk with Mr. R. Boggs regarding experience of civil rights lawyers with reasonable rates determination (.2)" to "talk w/Boggs re: civil rights lawyers." Doing so not only shortens the entry, it strips out the description of the call's purpose and, thereby, inappropriately implies that the entry did not describe the subject matter of the work. Likewise that same day, Defendant *rewrote* "research regarding Laffey rates (5.7) (review Kavanaugh Laffey Matrix; Salazar; McDonnell, Bolden, Covington II, and fee motion in 2922 Sherman Ave. Tenants)" as "review Kavanaugh Laffey Matrix." That made-up description omits much of the work done, including the reading of four cases and a fee petition in a fifth. This abridgement of the original entries in a manner that introduces many grammatical errors and eliminates important content is a problem with every one of Defendant's charts.

For all of these reasons, the time spent preparing the fee petition was reasonable, and the Court should order Defendant to pay the fees incurred to perform that work.

## III.    PREDECESSOR COUNSEL SHOULD BE PAID FOR THEIR WORK

Defendant does not dispute that W. Thomas Stovall II and Othello G. Jones, Jr. represented Mr. Heard for 28 months from August 16, 2001 until December 31, 2003. Nor does it dispute that their billing rates for that period were reasonable. Finally, it is beyond dispute that while former counsel represented Mr. Heard, they actively investigated and litigated the case. See Exhs. E and F to Fee Petition (Declarations of W. Thomas Stovall II and Othello G. Jones Jr., respectively); see also Gardner Decl. at ¶ 21; Moustakas Decl. at ¶ 132. Falsely claiming that former counsel were fired, Defendant asks this Court to set the fair market value of their work at *zero*. Because such a result would undermine the important purposes of § 1988 and unjustly enrich Defendant, its self-serving proposal to escape liability for a considerable component of Mr. Heard's attorneys' fees should be rejected.

It is undisputed that, as a matter of law, where a prevailing party is entitled to attorneys' fees and costs he may recover for those expended by former as well as current counsel. Defendant does not contend otherwise. Defendant instead advances two arguments for refusing to pay attorneys Stovall and Jones: (1) that they were "fired from the case for good cause," and (2) that counsel's billing records are insufficiently documented. Each argument fails.

Former counsel were not fired. Rather, when the pretense that Defendant might treat Mr. Heard fairly was laid bare and Defendant's intent to bitterly contest every point exposed, Messrs. Stovall and Jones – as well as other lawyers working in conjunction with them – concluded that new counsel with better resources and more relevant trial experience (and an intimate knowledge of the local criminal justice system and inmate processing) would better serve Mr. Heard's

needs. See Stovall Supp. Decl. at ¶¶ 5-8 (Exhibit S); see also Gardner Decl. at ¶¶ 8-10. With the help of the legal aid community, current counsel were identified as ideal successors. See Stovall Supp. Decl. at ¶¶ 6-8; Gardner Decl. at ¶¶ 9-16. Convinced that current counsel would bring a formidable combination of high-caliber legal work and deep and relevant jury trial experience, and that the firm had adequate resources to match Defendant's top-notch legal representation stride-for-stride and to better withstand its militant approach to the litigation,[67] Messrs. Stovall and Jones recommended that Mr. Moustakas and his firm be retained to assume responsibility for the remainder of the litigation. See Gardner Decl. at ¶¶ 15-20; Stovall Supp. Decl. at ¶ 8.

Second, Defendant asks this Court to punish Mr. Heard – by eliminating some $140,000 of his attorneys' fees – because of deficiencies in former counsel's billing records and practices. But such a punitive result is inconsistent with § 1988. Courts have held that even "where documentation is inadequate, the district court is not relieved of its obligation to award a reasonable fee," and it should rely on its own experience in determining what are reasonable hours and reasonable fees. See *Slimfold Mfg. Co.* v. *Kinkead Indus. Inc.*, 932 F.2d 1453, 1459 (Fed. Cir. 1991); *Copeland*, 641 F.2d at 901. In fact, in *New York* v. *Microsoft Corp.*, 297 F. Supp. 2d 15, 28 (D.D.C. 2003), this Court rejected as draconian the very sanction Defendant seeks. There, the Court refused to ignore the demonstrable fact that counsel had obviously done a great deal of work – despite a lack of contemporaneous documentation. Indeed, the court awarded fees on the basis of affidavits like those provided here. *Id.* at 42-44.

As in *Microsoft*, there is no allegation here that former counsel's time estimates are "grossly and intolerably exaggerated" or that their affidavits were submitted in bad faith. *Id.* at

---

[67] Defendant originally assigned Daniel Rezneck – one of the most distinguished practicing lawyers in the area – to serve as lead counsel in defending Mr. Heard's lawsuit. See Moustakas Decl. at ¶ 159 (summarizing background). His selection signaled Defendant's intent to litigate the case aggressively and do everything to limit Mr. Heard's

48

42. Defendant has not challenged Mr. Stovall's testimony that his contemporaneous billing records were destroyed by a computer virus. See Stovall Decl. at ¶¶ 11-12. Mr. Jones – who apparently did not keep contemporaneous billing records in the first place – summarily divided his work by category (Jones Decl. at ¶ 7), a practice Defendant has purported (at 12-13) to find acceptable. That the work Messrs. Stovall and Jones claim to have performed (only about 11 and 14 hours per month, respectively) was actually done is not seriously contested. And it was of considerable utility to Mr. Heard's case. See Gardner Decl. at ¶ 21; Moustakas Decl. at ¶ 132.

Based on the account of what former counsel did, the duration of the representation, and the uncontested affidavits, the Court can review both the reasonableness of the hours former counsel spent and the rate they charged to determine the reasonable fee for their work.[68] Because their rate is modest and the amount of work considerable, the Court should find that, notwithstanding any billing flaws, former counsel fairly earned the $140,000 they seek.[69]

## IV. DEFENDANT'S CHALLENGES TO INCURRED COSTS ARE MERITLESS

Defendant makes several challenges to particular invoiced costs, most of which are essentially questions about particular items rather than arguments that the expenses not be paid. As we explain below and in the attached declarations, all of the enumerated costs were legitimately incurred by Mr. Heard and should be reimbursed.

---

recovery. A brilliant legal strategist, Mr. Rezneck effectively carved up Mr. Heard's initial complaint and threatened to stymie what little remained thereafter.

[68] Defendant suggests (at 8 n.1) that if the Court awards Stovall and Jones anything, it should be $16,000: $4,000 for the Complaint, $4,000 for filing and opposing Defendant's motion to dismiss, $4,000 for reviewing records, and $4,000 for conducting interviews. Pulled from thin air, these numbers plainly fail to meet Circuit authority for the quantum of evidence to reduce fees. *NACV*, 675 F.2d at 1337-38. Based on its own experience, the Court can easily see that former counsel certainly expended more than 80 hours – or a preposterous **1.5** hours per month each – during the 28 months they represented Mr. Heard.

[69] If any reduction is to be made, it should be modest. In *Action on Smoking & Health* v. *Civil Aeronautics Board*, 724 F.2d 211 (D.C. Cir. 1984), a one-third reduction of fees was affirmed where counsel *both* failed to keep contemporaneous time records *and* sought to recover for hours that were "*patently excessive*." 724 F.2d at 221-22

Photocopies. Defendant argues (at 24) that photocopies were billed at a rate of 12 cents per page, but proposes to pay only 5 cents per page because "some firms treat photocopying as a profit center." Neither Shea & Gardner nor Goodwin Procter has. Copy reimbursements at both firms covered only a fraction of actual copying costs, which include the cost of paper and maintaining copy machines, as well as staff to operate them. See Felty Decl. at ¶ 6. If copying were sent to an outside copy service instead, it would have resulted in overall higher copy costs. See id. For these reasons, Defendant's unsupported factual assertion concerning photocopy charges is wrong and Mr. Heard is entitled to recover those charges.[70]

Facsimiles. Defendant makes a similar argument concerning facsimiles, claiming (at 24) that they were billed at a rate of $1.40 per page, which should be reduced to only 5 cents per page. Claiming without support that "counsel is seeking [to] make a profit on faxes," Defendant is wrong. Neither Shea & Gardner nor Goodwin Procter made any profit on facsimiles. See Felty Decl. at ¶ 7. To recover the actual costs of maintaining facsimile machines and the staff costs of operating them, Shea & Gardner charged $.50 per outbound page and Goodwin charges $1.00 per page outbound plus $1.00 for each transmittal. See id. Those are the rates that were billed in this case.[71] Thus, Mr. Heard's facsimile charges should be reimbursed.

Assistance with structured settlement. This $1,875 charge was incurred when counsel and Mr. Heard's guardian *ad litem* were considering whether to accept Defendant's settlement

---

(emphasis added). Since there is no claim of excessive billing here, any reduction should be significantly smaller than that taken in *Action on Smoking*.

[70] The rates charged are reasonable as a matter of law. While Defendant cites no authority capping copy costs at $.05 per page, courts have awarded copy costs well above those sought here. *E.g.*, *Falor* v. *Livingston County Cmty. Mental Health*, 2003 U.S. Dist. LEXIS 24501, at *14 (W.D. Mich. Oct. 20, 2003) (awarding $.20 per page); *Gorelangton* v. *City of Reno*, 638 F. Supp. 1426, 1434 (D. Nev. 1986) (awarding $.25 per page).

[71] Defendant's $.05 per page proposal is not supported by any authority. *E.g.*, *Wirtz* v. *Kansas Farm Bureau Servs., Inc.*, 355 F. Supp. 2d 1190, 1207 (D. Kan. 2005) (permitting $1.00 per page and $2.00 one-time charge per fax for long distance connection); *Cadena* v. *Pacesetter Corp.*, 1999 U.S. Dist. LEXIS 9923, at *22 (D. Kan. Apr. 27, 1999) (awarding $1.00 per page); see also Chud Decl. at ¶ 47.

50

offer in various forms of annuities. See Exhibit III hereto. Dr. Richard Lurito, an economic damages and annuities expert, was retained in order to perform a small amount of work to assess the true financial value of Defendant's proposals, and to advise us regarding counterproposals. Because this assessment was necessary to ensure that the settlement would provide Mr. Heard with lifelong financial stability (a goal favorably recognized by this Court), it is properly assessed to Defendant now.

Defendant's other challenges to Mr. Heard's request for costs are not so much arguments as they are questions concerning individual expenses on the Invoice. Having satisfactorily answered each question in the accompanying declaration, Mr. Heard is entitled to recover his $71,013.36 in costs. See Chud Decl. at ¶¶ 33-46.

## CONCLUSION

For all of the reasons set forth above, Plaintiff, Joseph S. Heard, respectfully requests that this Court award him fees in the amount of $1,103,697.00 and costs in the amount of $71,013.36 for a total award of $1,174,710.36.[72]

Respectfully submitted,

John Moustakas (D.C. Bar No. 442076)
Paul R. Friedman (D.C. Bar No. 113852)
Adam M. Chud (D.C. Bar No. 468443)
Goodwin Procter LLP
901 New York Ave., N.W.
Washington, D.C. 20001
Tel.: (202) 346-4000
*Counsel for Joseph S. Heard*

Dated: January 24, 2006

LIBW/1539572.7

---

[72] Mr. Heard continues to reserve his right to submit a supplemental petition for fees incurred in connection with preparing this Reply.

51