UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSEPH S. HEARD,

    Plaintiff,

    v.

DISTRICT OF COLUMBIA, *et al.*,

    Defendants.

Civil Action No. 02-296 (CKK)

**MEMORANDUM OPINION**
(September 5, 2006)

Currently before the Court is Plaintiff Joseph S. Heard's Motion for Attorney's Fees and

Costs Pursuant to Federal Rule of Civil Procedure 54(d) against Defendant District of Columbia

(hereinafter, "the District").  Following the August 4, 2005 Consent Judgment of $1.1 million,

plus reasonable costs, including reasonable attorney's fees, entered by this Court against the

District,[1] Plaintiff now seeks an award of $962,097.00 in attorney's fees for his current counsel,

Goodwin Procter LLP; $61,200.00 for his former counsel, W. Thomas Stovall II; $80,400.00 for

his former counsel, Othello G. Jones, Jr.; and $71,013.36 in costs.  *See* Pl.'s Mot. for Attn'y's

Fees at 7.  The District has entered a partial opposition to this request, contending that Plaintiff's

fee request is excessive and rife with internal problems.  According to the District, Plaintiff's

former counsel are entitled to no attorney's fees, and his present counsel are entitled to – at best –

---

[1] Plaintiff has entered into separate settlements with the other named Defendants, including the Center for Correctional Health and Policy Studies, Inc. ("CCHPS") and Quest Diagnostics (standing in for its former employee, named Defendant Dianne Zigler).  Plaintiff has an unopposed motion, currently pending, for approval to disburse funds that seeks to provide another $213,333.00 to Plaintiff's current counsel, Goodwin Procter LLP, from the settlement funds received from Defendant CCHPS.

$440,000.  *See* D.C.'s Opp'n at 26.

Upon the completion of the relevant briefing, the Court referred Plaintiff's Motion for

Attorney's Fees to Magistrate Judge Alan Kay for a Report and Recommendation pursuant to

Federal Rule of Civil Procedure 72(b), 28 U.S.C. § 636(b)(1)(B), and Local Rule of Civil

Procedure 72.3(a).  On June 16, 2006, Magistrate Judge Kay issued his Report and

Recommendation, which concluded that (1) Plaintiff was entitled to the entire $71,013.36 in

costs; but that (2) Goodwin Procter LLP was entitled to only $577,258.20 in attorney's fees; (3)

Stovall was entitled to only $15,300.00 in attorney's fees; and (4) Jones was entitled to only

$20,100.00 in attorney's fees.  Plaintiff has filed an Objection to Magistrate Judge Kay's Report

and Recommendation on Plaintiff's Fee Petition, to which the District has submitted an

Opposition, and Plaintiff has entered a Reply.[2]  Upon a searching examination of all pertinent

filings, the attached exhibits, the relevant case law, and the entire record herein, the Court –

pursuant to its considerable discretion and studied reflection – shall (1) adopt Magistrate Judge

Kay's recommendations with respect to both costs and the awards granted Plaintiff's former

counsel, Stovall and Jones; and (2) adopt-in-part Magistrate Judge Kay's recommendations with

respect to Goodwin Procter.  Instead, the Court concludes that attorney's fees in the amount of

$889,267.30 for Goodwin Procter against the District is both reasonable and appropriate.

## I: BACKGROUND

On November 15, 1998, Plaintiff Joseph S. Heard – "a deaf man who has no verbal

skills" and who "is unable to communicate effectively through reading, writing, or lip-reading,"

---

[2] The District did not file its own, separate Objection to any of Magistrate Judge Kay's findings within the ten (10) day limitations period.

Second Am. Compl. ¶¶ 5, 36 – was arrested and charged with unlawful entry of a George Washington University building in case M-16624-98. *Id.* ¶ 37. On June 7, 1999, Plaintiff was committed to St. Elizabeth's Hospital because of concerns over his mental competency. However, on October 13, 1999, Judge John Campbell of the District of Columbia Superior Court ordered M-16624-98 dismissed and directed that Plaintiff be released from custody. *Id.* ¶ 38. Sometime after his court appearance on October 13, 1999, as was the practice, Plaintiff was transported to the D.C. Jail, a facility operated by the District, accompanied by no paperwork other than the release order signed by Judge Campbell. *Id.* ¶ 39.

However, rather than release Plaintiff, employees of the D.C. Jail held him in order to determine whether, in addition to the dismissed charges in M-16624-98, he had any pending charges that would require his preventive detention. *Id.* ¶ 41. On October 14, 1999, a D.C. jail clerk confirmed that Plaintiff had no charges currently pending against him, which she noted in his file. *Id.* ¶ 42. Unfortunately, this finding did not lead to Plaintiff's release, as no employee followed up to make sure that Plaintiff's release was effectuated. *Id.* ¶ 43. For the next 669 days, a period of approximately 22 months, Plaintiff was unlawfully held at the D.C. Jail and subjected to a variety of medical testing and treatment without his informed consent. *Id.* ¶ 44. Plaintiff's dire situation was exacerbated by the D.C. Department of Corrections' dysfunctional record-keeping system, policy flaws, and missed – or ignored – chances to correct the error, as well as his own inability to communicate, which was a result of his disabilities and second-grade level reading ability and the District's failure to provide him with a certified sign language interpreter. *Id.* ¶ 49.

Finally, in July 2001, the mistake behind Plaintiff's detention was uncovered when inmates in his mental health unit were scheduled to be transferred to other facilities and his name was not on the list.  On August 12, 2001, Plaintiff was finally released from his solitary cell in the D.C. Jail.  After obtaining representation, Plaintiff brought this suit on February 15, 2002. *See generally* Compl.  However, due to certain deficiencies in Plaintiff's constitutional claims as pleaded, apparent concessions made by Plaintiff's counsel, the subsuming effect of a Section 1983 action, and the applicable statute of limitations, the Court was forced to dismiss 8 out of the original 11 counts contained within Plaintiff's Complaint.  *See Heard v. Dist. of Columbia*, Civ. A. No. 02-296 (D.D.C. Sept. 29, 2003) (dismissing counts I-IV, V, VII-XI of the Complaint, as well as Defendant D.C. Department of Corrections).  Following the dismissal of a majority of Plaintiff's Complaint, Plaintiff's original counsel in this litigation – W. Thomas Stovall, II, and Othello G. Jones, Jr. – stepped aside and John Moustakas, Michele Roberts, and Adam Chud of Shea & Gardner LLP (now Goodwin Procter LLP) entered an appearance on behalf of Plaintiff in December 2003.  Paul Friedman of Shea & Gardner also entered an appearance in this matter on behalf of Plaintiff on July 30, 2004.

Plaintiff's new counsel were able to reconceptualize his civil rights claims, leading to a Second Amended Complaint wherein Plaintiff asserted violations of the Civil Rights Act of 1871, 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"); and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ("Rehabilitation Act").  Following the August 2004 filing of Plaintiff's Second Amended Complaint and the commencement of the discovery phase of this litigation, both the District and Plaintiff's new counsel engaged in a nearly year-long legal campaign that can best be described

4

by the phrase "scorched earth."  A highly contested series of motions was filed over issues

including, *inter alia*:

- Is Plaintiff mentally competent?  Is Plaintiff in need of the appointment of a guardian *ad litem*?  If Plaintiff is not competent, how could Plaintiff verify his responses to the District's interrogatories?

- Are Plaintiff's responses to the District's interrogatories and requests for documents sufficient, or should further information be compelled?

- Is the District required to provide the Plaintiff with documents relating to the changes made to the District's policies and practices following Plaintiff's release from illegal detention?  Should the District be required to provide the names of inmates it knows were over-detained or released early over the past 25 years?  Should the District be required to provide information relating to the sanctioning or disciplining of Department of Correction employees for any over-detentions or early releases?  Should the District be required to provide information relating to the sanctioning or disciplining of D.C. Jail employees for actions with respect to health, safety, and food services at the D.C. Jail?  Should the District be compelled to provide information identifying persons who participated in and were briefed about the investigation of Plaintiff's incarceration?  Should the District be forced to provide information relating to any audit or investigation into the status of its inmate file system conducted over the last 25 years?

- Can the District renege on its informal Tolling Agreement with Plaintiff, which would have allowed the Plaintiff additional time within the relevant statute of limitations period to investigate and name the "John Doe" Defendants listed in his Second Amended Complaint?

- Should discovery be temporarily stayed to facilitate settlement discussions?  If so, for how long should the stay be in effect?  Once in effect, should the temporary discovery stay be lifted?

- Should Plaintiff's deposition subpoena directed to the Mayor of the District of Columbia be quashed and a protective order granted?  Should the Mayor be compelled to accept service of Plaintiff's Opposition to such a motion?

- Should Plaintiff's claims for injunctive and declaratory relief be dismissed due to a lack of jurisdiction?

- Should mediation be continued or abandoned?  Should discovery once again be stayed for mediation?

- Should any award to Plaintiff be "set-off" for the alleged "value" of the services Plaintiff received at the D.C. Jail during his incarceration?

- Should default judgment be entered against certain defendants?

In addition to motions surrounding these issues, the parties were simply unable to agree to the simplest extension of time, with every motion that sought to extend the time to file any document bitterly contested by the non-moving party.  Along with the flurry of motions exchanged between the parties, discovery also commenced in full during this period, as Plaintiff took 11 depositions and made preparations for many more, including Federal Rule of Civil Procedure 30(b)(6) witnesses, Mayor Williams, Deputy Mayor Kellums, and several Records Office and Jail employees.

Finally, after numerous mediation sessions, which involved yeoman's work by Magistrate Judge Kay and the critical presence of Plaintiff's guardian *ad litem* Jonathan L. Stern, Plaintiff and the District were able reach the broad contours of a settlement by February 2005.  However, due to much vacillation on the part of the District and continued negotiation around the details, the parties were unable to fully stipulate to a consent judgment until June 16, 2005.  Following the settlement in principle of Plaintiff's action against the District, and his contemporaneous agreement with the District's co-defendant CCHPS, counsel for Plaintiff then engaged in highly innovative legal work on behalf of Plaintiff.  Realizing (1) the need to protect and maintain the substantial financial award due Plaintiff, and (2) the real need to ensure that Plaintiff would receive adequate care in the future so that he could maximize his abilities and minimize the impact of his disabilities upon his lifestyle, Plaintiff's counsel consulted with a series of special needs trust attorneys, investment advisors, and potential trustees and/or guardians.  As a result of

this investigation, Plaintiff's counsel were able to propose to the Court a Special Needs Trust for

Plaintiff that would both guard and protect his award and ensure proper care for Plaintiff.

On August 4, 2005, the Court held an extended hearing during which it approved

Plaintiff's Consent Judgment against the District of Columbia for $1.1 million, plus reasonable

costs, including reasonable attorney's fees, as well as Plaintiff's separate settlement with

CCHPS.  After a series of further discussions, the Court on September 26, 2005 approved the

Special Needs Trust set up by Plaintiff's counsel on his behalf.  However, given that Plaintiff and

the District were unable to resolve the extent of the "reasonable attorney's fees" owed Plaintiff,

despite much negotiation and exchange of documents around this issue, Plaintiff filed a Motion

for Attorney's Fees and Costs Pursuant to Federal Rule of Civil Procedure 54(d) on August 4,

2005.  Following the completion of briefing on this motion, which was extended upon request by

the District, the Court referred the motion to Magistrate Judge Kay for a Report and

Recommendation pursuant to Federal Rule of Civil Procedure 72(b), 28 U.S.C. § 636(b)(1)(B),

and Local Rule of Civil Procedure 72.3(a).  On June 16, 2006, Magistrate Judge Kay issued his

Report and Recommendation, which concluded that Plaintiff's request should be granted-in-part

and denied-in-part.  According to Magistrate Judge Kay's studied evaluation, (1) Plaintiff was

entitled to the entire $71,013.36 in costs; but that (2) Goodwin Procter LLP was entitled to only

$577,258.20 in attorney's fees; (3) Stovall was entitled to only $15,300.00 in attorney's fees; and

(4) Jones was entitled to only $20,100.00 in attorney's fees.  Following the issuance of the

Report and Recommendation, Plaintiff filed an Objection to Magistrate Judge Kay's Report and

Recommendation on Plaintiff's Fee Petition, to which the District submitted an Opposition, and

Plaintiff entered a Reply.

## II: LEGAL STANDARDS

*A.       Reviewing a Magistrate Judge's Report and Recommendation*

Pursuant to Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1)(B), a United

States District Court is authorized to refer certain motions – such as motions for attorney's fees –

to a magistrate judge for proposed findings of fact and recommendations for the disposition.  The

Court reviews the Magistrate Judge's report and recommendation *de novo*, where a party has

raised objections.  *See* Fed. R. Civ. P. 54(d)(2)(D); Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1).

When a district court assigns a motion to a Magistrate Judge and the Magistrate issues a report, a

party dissatisfied with the report has a well-delineated obligation.

> A party objecting to the recommended disposition of the matter shall promptly
> arrange for the transcription of the record, or portions of it as all parties may agree
> upon or the magistrate judge deems sufficient, unless the district judge otherwise
> directs.  Within 10 days after being served with a copy of the recommended
> disposition, a party may serve and file specific, written objections to the proposed
> findings and recommendations.  A party may respond to another party's
> objections within 10 days after being served with a copy thereof.  The district
> judge to whom the case is assigned shall make a de novo determination upon the
> record, or after additional evidence, of any portion of the magistrate judge's
> disposition to which specific written objection has been made in accordance with
> this rule.  The district judge may accept, reject, or modify the recommended
> decision, receive further evidence, or recommit the matter to the magistrate judge
> with instructions.

Fed. R. Civ. P. 72(b).  "This rule does not permit a litigant to present new initiatives to the

district judge."  *Aikens v. Shalala*, 956 F. Supp. 14, 19 (D.D.C. 1997) (citing *Paterson-Leitch Co.*

*v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir. 1988)).  Moreover, failure to file

timely objections to either the legal or factual aspects of a Magistrate Judge's recommendations

waives the opportunity to challenge the district court's adoption of those recommendations.  *See*

*Thomas v. Arn*, 474 U.S. 140, 150-151, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) ("It does not

appear that Congress intended to require the district court review of a magistrate's factual or

legal conclusions, under a *de novo* or any other standard, when neither party objects to those

findings."); *Aikens*, 956 F. Supp. at 20 n.7 ("A majority of the circuits have a longstanding rule

that the failure of a party to object to either the factual or legal aspects of a Magistrate Judge's

recommendations waives the opportunity to challenge the district court's adoption of those

recommendations.") (citing cases); LCvR 72.3(b).

> B.      *Evaluation of Attorney's Fees Petitions*

The Civil Rights Attorney's Fee Awards Act of 1976 provides, *inter alia*:

> In any action or proceeding to enforce a provision of section 1981, 1982, 1983,
> 1985, and 1986 of this title . . . a court in its discretion may allow the prevailing
> party . . . a reasonable attorney's fee as part of the costs. . . .

42 U.S.C. § 1988.  The ADA and Rehabilitation Act provide for a similar recovery of attorney's

fees for prevailing parties.  *See* 42 U.S.C. § 12205 ("In any action or administrative proceeding

commenced pursuant to this chapter, the court or agency, in its discretion, may allow the

prevailing party, other than the United States, a reasonable attorney's fee, including litigation

expenses, and costs, and the United States shall be liable for the foregoing the same as a private

individual.") (ADA); 29 U.S.C. § 794a(b) ("In any action or proceeding to enforce or charge a

violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing

party, other than the United States, a reasonable attorney's fee as part of the costs.")

(Rehabilitation Act).

Accordingly, under each of the relevant statutes, a plaintiff must meet the definition of a

"prevailing party" to garner attorney's fees.  *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103

S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Hanrahan v. Hampton*, 446 U.S. 754, 758, 100 S.Ct. 1987, 64

L.Ed.2d 670 (1980) (*per curium*).  "[T]o qualify as a prevailing party, a civil rights plaintiff must

obtain at least some relief on the merits of his claim.  The plaintiff must obtain an enforceable

judgment against the defendant from whom fees are sought, or comparable relief through a

consent decree or settlement."  *Farrar v. Hobby*, 506 U.S. 103, 112, 113 S.Ct. 566, 121 L.Ed.2d

494 (1992).  Once a party is deemed to have "prevailed," the court must then determine whether

the fees sought are reasonable by calculating "the number of hours reasonably expended on the

litigation multiplied by a reasonable hourly rate" – the so-called "lodestar" fee.  *Hensley*, 461

U.S. at 433, 103 S.Ct. 1933; *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891

(1984).  A reasonable fee is one that is "adequate to attract competent counsel, but which do[es]

not produce windfalls to attorneys."  *Blum*, 465 U.S. at 894, 104 S.Ct. 1541 (quoting S. Rep. No.

94-1011, at 6 (1976); H.R. Rep. No. 94-1558, at 8 (1976)).  After calculating the lodestar figure,

in some cases the court – in its discretion – may adjust the fee upward or downward based on

other considerations, especially the degree of success that the plaintiff had in prevailing on his or

her claim.  *Farrar*, 506 U.S. at 114-15, 113 S.Ct. 566.

On the issue of reasonableness, the plaintiff must submit supporting documentation with

the motion for attorney's fees, "providing sufficient detail so that the Court can determine '*with a

high degree of certainty*' that the hours billed were actually and reasonably expended, that the

hourly rate charged was reasonable, and that the matter was appropriately staffed to do the work

required efficiently and without duplicative billing." *Watkins v. Vance*, 328 F. Supp. 2d 23, 26

(D.D.C. 2004) (quoting *In re Olson*, 884 F.2d 1415, 1428-29 (D.C. Cir. 1989) (emphasis in

original)).  "Where the documentation of hours is inadequate, the district court may reduce the

award accordingly." *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933.  At a minimum, the plaintiff must

provide some information about the attorneys' billing practices and hourly rate, the attorneys'

skill and experience (including the number of years that counsel has practiced law), the nature of

counsel's practice as it relates to this kind of litigation, and the prevailing market rates in the

relevant community. *Covington v. Dist. of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995).

In this undertaking, counsel for the prevailing plaintiff must demonstrate that they have

exercised "billing judgment." As the Supreme Court has emphasized,

> The district court also should exclude from this initial fee calculation hours that
> were not "reasonably expended." Cases may be overstaffed, and the skill and
> experience of lawyers vary widely. Counsel for the prevailing party should make
> a good faith effort to exclude from a fee request hours that are excessive,
> redundant, or otherwise unnecessary, just as a lawyer in private practice ethically
> is obligated to exclude such hours from his fee submission. In the private sector,
> "billing judgment" is an important component in fee setting. It is no less
> important here. Hours that are not properly billed to one's *client* also are not
> properly billed to one's *adversary* pursuant to statutory authority.

*Hensley*, 461 U.S. at 434, 103 S.Ct. 1933 (internal citations and quotation marks omitted)

(emphasis in original).

"Once the plaintiff has provided such information, there is a presumption that the number

of hours billed and the hourly rate are reasonable." *Watkins*, 328 F. Supp. 2d at 26; *see also*

*Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1326 (D.C. Cir. 1982).

> [T]he burden [then] falls on the Government to go forward with evidence that the
> rate is erroneous. And when the Government attempts to rebut the case for a
> requested rate, it must do so by equally specific countervailing evidence.
> Although there may be occasions in which the applicant's showing is so weak that
> the Government may without more simply challenge the rate as unsubstantiated,
> in the normal case the Government must either accede to the applicant's requested
> rate or provide specific contrary evidence tending to show that a lower rate would
> be appropriate.

*Covington*, 57 F.3d at 1109-10 (quoting *Concerned Veterans*, 675 F.2d at 1326); *cf. Am.*

*Petroleum Inst. v. Envtl. Prot. Agency*, 72 F.3d 907, 915 (D.C. Cir. 1996) (noting that the burdens of production and persuasion regarding the reasonableness of the number of hours spent on various tasks always remain with the plaintiff).

In determining the propriety of a plaintiff's request for attorney's fees, "district courts act with a real measure of discretion." *Covington*, 57 F.3d at 1110; *see also Blum*, 465 U.S. at 902 n.19, 104 S.Ct. 1541 ("A district court is expressly empowered to exercise discretion in determining whether an award is to be made and if so its reasonableness."); *Kattan by Thomas v. Dist. of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993) ("A district court's discretion as to the properly hourly rate to award counsel should not be upset absent clear misapplication of legal principles, arbitrary fact finding, or unprincipled disregard for the record evidence."); *Copeland v. Marshall*, 641 F.2d 880, 901 (D.C. Cir. 1980) (*en banc*) ("It is common learning that an attorney's fee award by the District Court will be upset on appeal only if it represents an abuse of discretion."). This limited standard of review is "appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters," *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933, and it has been commonly held that "[a] request for attorney's fees should not result in a second major litigation," *id.*

## III: DISCUSSION

Following Magistrate Judge Alan Kay's well-reasoned June 16, 2006 Report and Recommendation to this Court regarding Plaintiff's Motion for Attorney's Fees, Plaintiff objected to seven (7) of the specific billing criticisms identified by the Magistrate Judge – criticisms which led to the recommendation that a reduction of approximately 40% off Plaintiff's

original fee request was in order.  Plaintiff objects to Magistrate Judge Kay's findings that (1)

Plaintiff's original counsel – Stovall and Jones – are due only 25% of their fee request; and that

Plaintiff's current counsel, Goodwin Procter LLP, (2) overstaffed the case; (3) submitted a fee

petition filled with a variety of "vague" entries; (4) conducted excessive work on certain motions

and depositions; (5) has attempted to recover for ministerial work conducted by senior partners

that would have been best left to lower level staff; (6) performed excessive work in connection

with the settlement; and (7) performed excessive work in connection with the Fee Petition itself,

i.e., Plaintiff's Motion for Attorney's Fees and its attendant exhibits.  *See* Pl.'s Objections at 8-

13.  Given that the District has cabined its response to Plaintiff's Objections, and has not

challenged certain recommendations by Magistrate Judge Kay that cut against its initial

Opposition, the Court shall accept the unchallenged recommendations submitted by Magistrate

Judge Kay as reasonable and well-substantiated, *see Thomas*, 474 U.S. at 150-151, 106 S.Ct.

466; *Aikens*, 956 F. Supp. at 20 n.7; LCvR 72.3(b); and shall confine itself to the seven (7) issues

raised in Plaintiff's Objections to Magistrate Judge Kay's Report and Recommendation on

Plaintiff's Fee Petition.

   A.    *The Fees Requested by Plaintiff's Former Counsel – Stovall and Jones*

      In his review, Magistrate Judge Kay noted that the District did not challenge the hourly

rates employed by Plaintiff's former counsel, Stovall and Jones; as such, he recommended that

this Court accept their usual hourly rate of $200.00 as the basis for any award.  *See* 6/16/06 Kay

R & R at 11 (citing Pl.'s Mot. for Attn'y's Fees, Ex. E (Stovall Aff.) & F (Jones Aff.)).

However, Magistrate Judge Kay found fault with Plaintiff's suggestion that the Court simply

multiply this rate by the 306 hours allegedly spent by Stovall litigating this case and the 402

hours allegedly spent by Jones litigating this case to determine the proper fee award. *See id.* at

11-14 (citing Stovall Aff. ¶ 15; Jones Aff. ¶¶ 7-8).  Based on the failure of both Stovall and Jones

to submit contemporaneous time records of the hours they worked on behalf of Plaintiff, and

their failure to adequately reconstruct those records, Magistrate Judge Kay recommended that

this Court provide Stovall and Jones only 25% of their requested fees, or $15,300.00 and

$20,100.00 respectively. *See id.* at 13-14.  In his Objections, Plaintiff contends that this 75%

reduction is "unduly punitive."  *See* Pl.'s Objections at 13.  Citing *Action on Smoking and Health

v. Civil Aeronautics Board*, 724 F.2d 211, 221-222 (D.C. Cir. 1984), a decision in which the

D.C. Circuit affirmed a 1/3 cut in an attorney's fee request when the accompanying

documentation was "sorely deficient," Plaintiff contends that – at most – Stovall and Jones

should receive 66% of their requested fees, or approximately $40,800.00 and $53,600.00

respectively.  *See* Pl.'s Objections at 13.

> In terms of documentation of attorneys' fees petitions, this Circuit has stated that
>
> [c]ausal, after-the-fact estimates of time expended on a case are insufficient to support an award of attorneys' fees.  Attorneys who anticipate making a fee application *must* maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney.  As stated by the Court of Appeals for the Second Circuit, "any attorney who hopes to obtain an allowance from the court should keep accurate and current records of work done and time spent."

*Concerned Veterans*, 675 F.2d at 1327 (citations omitted) (emphasis added); *see also In re

Donovan*, 877 F.2d 982, 994 (D.C. Cir., Spec. Div., 1989) ("Turning to issues which generally

affect attorneys' fee requests, this court will require that fee applications include

contemporaneous time records of hours worked and rates claimed, plus a detailed description of

the subject matter of the work with supporting documents, if any.") (citing *Concerned Veterans*,

675 F.2d at1327).  Despite this strict language, the Circuit has instructed that

> the recordkeeping requirement should not be imposed in a draconian manner.  As this
> court recently stated in *Jordan v. Department of Justice*:
>
> > Total denial of requested fees as a purely prophylactic measure,
> > however, is a stringent sanction, to be reserved for only the most
> > severe of situations, and appropriately invoked only in very limited
> > circumstances.  Outright denial may be justified when the party
> > seeking fees declines to proffer any substantiation in the form of
> > affidavits, timesheets or the like, or when the application is grossly or
> > intolerably exaggerated, or manifestly filed in bad faith.
>
> In most cases, therefore, deficiencies in documentation are cause for reduction rather
> than outright denial of fees.

*Action on Smoking & Health*, 724 F.2d at 220 (footnotes omitted).[3]

Not only should fee petitions be based on contemporaneous records, they must also be

sufficiently documented.  Where the description of hours is inadequate, a "court may reduce the

award accordingly."  *In re Donovan*, 877 F.2d at 994 (quoting *Hensley*, 461 U.S. at 433); *see

also Concerned Veterans*, 675 F.2d at 1327 ("In the preparation of fee applications it is

insufficient to provide the District Court with very broad summaries of work done and hours

logged.").  Inadequate descriptions "fail[] to provide the court with any basis to determine with a

_____

[3] The Special Division of this Circuit has held that where "no contemporaneous records"
are maintained, such a "failure is controlling" and it is proper to "disallow [the fee] petition in its
entirety."  *In re North (Watson Fee Application)*, 32 F.3d 607, 608, 609 (D.C. Cir., Spec. Div.,
1994).  However, since this decision was made by the Special Division of this Circuit, it does not
create binding precedent in this Circuit.  *United States v. Hubbell*, 167 F.3d 552, 591 (D.C. Cir.
1999) (Tatel, J., dissenting); *but see Michigan v. Envtl. Prot. Agency*, 254 F.3d 1087, 1095 (D.C.
Cir. 2001) (stating "as we have done in similar circumstances in the past, after all other
deductions have been taken we will make a further deduction of 10% of the remaining billings,"
and citing to *In re Meese*, 907 F.2d 1192, 1204 (D.C. Cir., Spec. Div., 1990) (emphasis added)).
Furthermore, the case was decided under the Independent Counsel statute's attorney's fee
provision, under which courts are to "grant reimbursement of attorneys' fees sparingly."  *In re
Donovan*, 877 F.2d at 989.

high degree of certainty that the hours billed were reasonable." *In re Donovan*, 877 F.2d at 995

(quotation marks omitted).  This Circuit has approached inadequately documented time requests

in several ways.  In one case, vague descriptions led the D.C. Circuit Court of Appeals to

disallow some hours billed completely and others partially.  *Id*.  In other cases, the Circuit has

reduced the fee request by a certain percentage.  For example, in one case the D.C. Circuit

eliminated completely documented entries that were "wholly inadequate," and reduced the

remaining billing by 10 percent to account for numerous inadequately detailed descriptions.

*Michigan v. Envtl. Prot. Agency*, 254 F.3d 1087, 1094-95 (D.C. Cir. 2001) (citing *Abrams Fee*

*Application*, 190 F.3d 586, 594 (D.C. Cir., Spec. Div., 1999), and *In re Meese*, 907 F.2d 1192,

1204 (D.C. Cir., Spec. Div., 1990) (per curiam)); *see also Kennecott Corp. v. Envtl. Prot.*

*Agency*, 804 F.2d 763, 767 (D.C. Cir. 1986) (discounting fee by 15 percent for poor

documentation).

   A review of the attachments to Plaintiff's Fee Petition reveals that neither Stovall nor

Jones have attached *any* contemporary records to support their fee requests.  Stovall at least

provides some justification for this failure, indicating that on or about May 5, 2004, computers in

his "office became infected with an extreme virus, which erased all information.  Although

information technology technicians tried to recover or re-establish information, their efforts were

to bear no fruit.  All information was lost."  Stovall Aff. ¶ 12.  However, while Stovall indicates

that he performed a page-by-page review of hard-copy records in connection with the preparation

of his Affidavit, *id.* ¶ 15, he fails to attach such hard-copy records to his request.  In contrast,

Jones proffers no explanation for his failure to provide the court with contemporaneous time

records, and also provides no reconstructed records in connection with his request; instead, Jones

simply avers that "[t]he hours expended, by this Counsel, based on my records, conservatively totals [sic] 402 . . . ."  Jones Aff. ¶ 8.

In addition to the fact that neither Stovall nor Jones attach any records – whether contemporaneous or reconstructed – to support their fee claims, they are also quite unspecific as how they spent their claimed hours.  Stovall accounts for his claimed time, 306 hours, *see* Stovall Aff. ¶ 15, by noting:

> This counsel and associates, performed extensive investigation on and into this matter.  This counsel personally, performed, to include by not limited to investigation of all Superior Court of the District of Columbia records, Circuit Court for Prince George's County, records, St. Elizabeth Hospital records; interviews, with attorneys, who had represented Mr. Heard; interviews with his family and friends (Orlando, FL and District of Columbia); interviews and meetings with D.C. Department of Mental Health personnel; Maryland Department of Education, Department of Rehabilitative Services; Deaf Independent Living Association; Maryland Department of Mental Health; and the Social Security Administration.

> This counsel had Mr. Heard tested, by at least three professional doctors (psychologist, audiologist, optometrist); many hours of research, travel, meetings, and correspondence were incurred.

*Id.* ¶¶ 9-10.  Stovall offers no further explanation of how, and in what amounts, he spent the hours alleged.  Jones offers a similarly curt accounting of his time:

| | | |
|---|---|---|
| a. | Conferences, interviews | 60 hours |
| b. | Investigation, legal research, review of documents, local and federal laws research, analysis, and preparation of documents | 162 hours |
| c. | Review of Government documents | 60 hours |
| d. | Reviewed[,] researched[,] and responded to Government Motions | 120 hours |

Jones Aff. ¶ 7.  Plainly, the affidavits presented by Stovall and Jones are devoid of such basic information as the subject matter of research, the identities of persons who were interviewed, and

the amount of time that was spent on each task.  Consequently, with no hard-copy records to

cross-reference, the Court is left with insufficient information from which it can conclude with

the necessary "high degree of certainty" that the request is reasonable.  *See In re Donovan*, 877

F.2d at 995 (finding description of services rendered such as "legal issues," "conference re all

aspects," or "call re status" to be insufficient and disallowed; noting that "[w]e credit the specific

reference; we cannot credit the general reference").

Further problems are present with the fee requests submitted by Stovall and Jones.

Importantly, a plaintiff who has achieved only limited success is not always entitled to recover all

fees expended in the lawsuit.  As the United States Supreme Court has instructed:

> Where the plaintiff has failed to prevail on a claim that is distinct in all respects from
> his successful claims, the hours spent on the unsuccessful claim should be excluded
> in considering the amount of a reasonable fee.  Where a lawsuit consists of related
> claims, a plaintiff who has won substantial relief should not have his attorney's fee
> reduced simply because the district court did not adopt each contention raised.  But
> where the plaintiff achieved only limited success, the district court should award only
> that amount of fees that is reasonable in relation to the results obtained.

*Hensley*, 461 U.S. at 440, 103 S.Ct. 1933; *see also Thomas v. Nat'l Football League Players*

*Ass'n*, 273 F.3d 1124, 1128 (D.C. Cir. 2001) (quoting same).  Here, Stovall and Jones

represented Plaintiff in this litigation for approximately 1.75 years, from the filing of Plaintiff's

initial Complaint in February 2002 to late 2003.  During this time, a small amount of discovery

was informally exchanged, no depositions occurred, and Defendants had not yet filed an Answer

to Plaintiff's Complaint.  Rather, the litigation revolved almost entirely around a single motion:

Defendants' Motion to Dismiss, which was filed on April 19, 2002 and resolved by this Court on

September 29, 2003.  During this time, Stovall and Jones assisted Plaintiff in filing an

Opposition to Defendants' Motion to Dismiss on June 11, 2002, which was not particularly

18

lengthy, and a Notice on July 5, 2002 that withdrew Plaintiff's claim for punitive damages.

Plaintiff's Opposition proved largely ineffective, as this Court – in its September 29, 2003

Memorandum Opinion and Order – dismissed Counts I, II, III, IV, VIII, IX, X, and XI of

Plaintiff's Complaint.  Indeed, Goodwin Procter, Plaintiff's successor counsel, indicates that

Stovall and Jones appeared "overwhelmed" and that Plaintiff's case was substantially more

difficult following the dismissal of these counts.  *See* Pl.'s Mot. for Attn'y's Fees, Ex. D

(Moustakas Decl.) ¶¶ 134-138 ("As a result of the dismissal of the majority of his case –

including the most easily proved state law claims for negligence, false imprisonment, and

intentional infliction of emotional distress – plaintiff's advisors, including lawyers from the civil

rights and legal aid community, considered the momentum in the case to have shifted decidedly

in the District's favor.").

Ultimately, the Court is faced with a situation where Plaintiff's initial counsel – Stovall

and Jones – certainly were of value to Plaintiff.  For instance, following Plaintiff's release from

the D.C. Jail, Stovall invited Plaintiff to live at his home in Maryland (which he did, for the next

year) and enrolled Plaintiff in a school for the deaf.  Besides these magnanimous acts of human

kindness, Stovall and Jones were instrumental in bringing Plaintiff's claim before this Court and

doing much of the initial factual research related to his claims.  Moreover, Stovall and Jones

clearly had their client's best interest at heart, stepping aside when it was clear to them that

Plaintiff's case was in jeopardy and that a lack of resources necessitated finding a larger firm that

could act on Plaintiff's behalf and counter the District's litigation offensive, which contested

every aspect of liability.  However, much of the legal work done by Stovall and Jones was

unsuccessful, and related to dismissed claims.  Moreover, the value of some of their initial

factual investigation is questionable, as it appears that subsequent counsel Goodwin Procter did

not incorporate much of their efforts into its strategy.  *See* Moustakas Decl. ¶ 132.  Finally, the

affidavits submitted by both Stovall and Jones in support of their fee requests are sparse, general,

and insufficient – the Court has no way of separating out their "successful" work from their

"unsuccessful" work, nor does the Court having any real way to judge the reasonableness of their

requests through reference to any accompanying hard-copy records.

Based upon these considerations, the Court – in its discretion – concludes that Magistrate

Judge Kay's award of 25% of the fees requested by Stovall and Jones is appropriate.  This

percentage reflects the fact that Stovall and Jones were valuable to Plaintiff, but that much of

their work was ultimately unsuccessful.  This percentage further reflects the basic failings in

information provided with their requests – failings which could, and should, have been corrected.

Accordingly, the Court shall award Stovall $15,300.00 for his service on behalf of Plaintiff, and

Jones $20,100.00 for his work on behalf of Plaintiff.

> B.      *The Fees Requested by Plaintiff's Present Counsel – Goodwin Procter LLP*

As noted above, besides focusing his Objections on the award recommended by

Magistrate Judge Kay to his previous counsel, Plaintiff makes six (6) objections to the 40%

reduction recommended by the Magistrate vis-á-vis the fee request made by his current counsel,

Goodwin Procter.  The Court shall address each objection in turn.

> 1.      <u>Alleged Overstaffing</u>

Magistrate Judge Kay concluded that Goodwin Procter "overstaffed" Plaintiff's matter,

such that "the hours billed by Plaintiff's counsel need to be adjusted downward to reflect . . .

duplication of effort."  6/16/06 Kay R & R at 23-24.  According to Magistrate Judge Kay,

Goodwin Procter clearly overstaffed the case with lead attorneys.

> The case was litigated by three lead attorneys, billing at hourly rates ranging from $285 to $510, as well as four associates, five law clerks and a paralegal. While any one of the three counsel could have carried the lead on this matter, it is not unreasonable for two counsel to act as co-lead counsel, or to consult with other counsel on issues requiring specific expertise, and of course, to rely on junior associates and legal staff to perform tasks appropriate to their levels; i.e., legal research, document handling, and so forth.

*Id.* at 23. Magistrate Judge Kay focused on his belief that this overstaffing of lead counsel led to a duplication of effort, noting that

> [a] review of the billing records in this case evidences that all three lead counsel jointly handled the day-to-day administration of this case, which resulted in duplication of efforts and necessitated layers of approval before documents were filed with the Court or correspondence was exchanged with opposing counsel.

*Id.* Magistrate Judge Kay further emphasized that he considered Goodwin Procter's overall staffing to be excessive, pointing out that 34 attorneys and staff were listed on Goodwin Procter's billing records as having worked on this matter. *Id.* at 22-23.

Upon a review of Plaintiff's Fee Petition and its attachments, as well as the exhibits accompanying Plaintiff's Reply in support of his Motion for Attorney's Fees, the Court concludes that some of Magistrate Judge Kay's criticisms in this area are unsubstantiated. First, a review of the records indicates that rather than the "three lead attorneys" focused upon by Magistrate Judge Kay, Goodwin Procter only had one "partner" who worked on all aspects of this case – John Moustakas. *See* Pl.'s Mot. for Attn'y's Fees, Ex. M (Goodwin Procter LLP Invoice). Time billed by any other partner has been written off. *Id.* at 155-56. Paul Friedman, who is Of Counsel to the firm, also was brought in to assist Mr. Moustakas because of his deep experience with mental disability law and the litigation of medical malpractice cases. *See* Pl.'s

21

Mot. for Attn'y's Fees, Ex. D (Aldock Decl.) ¶¶ 6, 17-26.  Adam Chud, apparently the "third"

lead attorney identified by Magistrate Judge Kay, is actually not a partner; rather, at the time of

his entry in this action, Mr. Chud was a fifth-year associate, and was considered "the junior-most

lawyer capable of effectively managing the case day-to-day."  Aldock Decl. ¶¶ 7, 27-30.  It

appears that Mr. Chud was "responsible for responsive and affirmative discovery," "case

research," and supervision of "research conducted by more junior associates."  *Id.* ¶ 7.  A review

of Goodwin Procter's Invoice reveals that these three attorneys certainly carried the majority of

the burden in this case; however, it cannot be said that Goodwin Procter actually used three

partners to litigate this action.  Instead, it appears as though Goodwin Procter utilized a variety of

attorneys with different experience levels to complement and assist Mr. Moustakas in the general

prosecution of this action.  Indeed, a review of the Invoice indicates that much of the time

attributed to "legal research" was actually done by very junior associates and, in some instances,

summer law clerks – a move which certainly saved costs.

Second, while it is true that Goodwin Procter utilized – at one point or another – 34

attorneys and staff in support of Plaintiff, it is important, in all fairness, to note that the firm

chose to write off the time spent by approximately 19 of these individuals.  According to

Plaintiff,

> Apart from routine daily reductions, plaintiff has made further reductions in
> excess of $70,000.  Counsel for plaintiff has written off entirely the time of two
> senior attorneys who provided valuable advice on litigation and settlement
> strategy, all time expended by seventeen (17) separate timekeepers who worked
> on a variety of research assignments or other projects related to the case, and a
> portion of research time by various law clerks and associates.

Pl.'s Mot. for Attn'y's Fees at 7 (citing Moustakas Decl. ¶¶ 218-19).  Such a writeoff certainly

reflects the kind of "billing judgment" focused on by the Supreme Court.  *See Hensley*, 461 U.S. at 434, 103 S.Ct. 1933.

Third, in assessing the reasonableness of the Plaintiff's staffing, it is appropriate to also look the resources employed by opposing counsel.  *See, e.g.*, *ACLU Neb. Found. v. City of Plattsmouth*, 199 F. Supp. 2d 964, 969 (D. Neb. 2002).  Here, the District had more than a dozen attorneys, and a myriad of law clerks, who worked on this case at various stages of the litigation. The staffing of each party was quite similar:  more than one defense counsel appeared at every court proceeding, telephonic conference, and meet-and-confer, matching Goodwin Procter's attendance.

 Given these considerations, the Court concludes that the "overstaffing" problem identified by Magistrate Judge Kay is simply not as great as he feared.  *See* Aldock Decl. ¶¶ 37(a)-(i) (listing the individuals who worked on behalf of Plaintiff and their relevant rates). Accordingly, the "downward departure" recommended by Magistrate Judge Kay relating to "overstaffing" should correspondingly be revised upward.

> 2.    Allegedly Vague Entries

Magistrate Judge Kay also found, upon his review of Goodwin Procter's Invoice, that "some of the descriptions accompanying the fee entries involve . . . descriptive deficiencies." 6/16/06 Kay R & R at 20.  Magistrate Judge Kay singled out these entries as being so vague and general as to necessitate a "downward departure" in Plaintiff's fee request on behalf of Goodwin Procter:

> *See, e.g.*, fee entries by multiple attorneys dated:  6/11/04 "research re ADA claim" and "began research on ADA claim;" 6/12/04 "ADA/1983 research;" 6/14/04 and 6/15/04 "ADA research" and "Research on ADA damages;" 6/16/05

"ADA research" and "ADA damages research;" 6/18/04 "Began research on 1983
claims;" 6/23/04, 6/24/04, 6/25/04, and 6/27/04 "Research on 1983 damages" or
"Research on 1983 damages in analogous cases;" 8/3/04 "Research re: 1983 and
ADA claims;" 9/07/04 "Research re 1983 claims." *See also* fee entries dated
8/09/04 "meeting with PRFriedman and JMoustakas [AMC 1.0 hour] [no
description of subject];" 9/02/04 "Review deposition [PRF 1.0 hour] [no
identification of deposition];" 9/17/04 "Revise letter to W. Hall [AMC 1.0 hour]
[no subject matter indicated][;]" 9/23/04 "t/w JTR re possible issued raised [PRF
.7 hours] [no identification of issues]."

*Id.* at 20-21.

Goodwin Procter certainly has an obligation to specifically identify the work performed

by its attorneys, as "generic entries are inadequate to meet a fee applicant's 'heavy obligation to

present well-documented claims.'" *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 971 (D.C.

Cir. 2004) (quoting *Kennecott Corp.*, 804 F.2d at 767).  Indeed, in *Role Models*, the D.C. Circuit

noted that records containing identical one-line entries such as "[r]esearch and writing for

appellate brief," "research," or "writing," or entries that indicated attendance at a teleconference

with no reference to the topic at hand lacked adequate detail.  *Id.*; *see also In re Meese*, 907 F.2d

at 1204 (reducing an award because "[t]he time records maintained by the attorneys, paralegals,

and law clerks are replete with instances where no mention is made of the subject matter of a

meeting, telephone conference or the work performed during hours billed"); *In re Olson*, 884

F.2d at 1428 ("[T]here are multitudinous billing entries, included among other entries for a

particular day, that wholly fail to state, or to make any reference to the subject discussed at a

conference, meeting or telephone conference.").  However, upon a review of the challenged

entries and the Invoice as a whole, the Court believes that the "vagueness" concerns identified by

Magistrate Judge Kay are alleviated to a large degree by three considerations.

24

First, it is important to note that some of the entries are not necessarily impermissibly vague. For instance, the June 27, 2004 entry for "Research on 1983 damages in analogous cases" certainly provides much greater detail than the kind of generic entry found insufficient by the D.C. Circuit in *Role Models*. *Compare* 353 F.3d at 971 ("review research"); Ex. DD at 3 (7/2/02 Dodd entry) ("read research"); *id.* (7/3/02 Bonat entry) ("research and review documents"); *id.* at 5 (7/19/02 Dodd entry) ("research").

Second, billing records must be read in context, taking into account surrounding entries, the activities on a court's docket, and other clarifying entries, such as attorney affidavits. As the Seventh Circuit has explained:

> The entries that the defendants single out, although vague when read in isolation, are not impermissibly vague when viewed in the context of the surrounding documentation. For example, the entry listed as "notes of meeting" follows an entry for the same date identifying a three-hour meeting to discuss settlement with opposing counsel. The challenged entry obviously refers to the memorializing of the three-hour meeting. Taken in context, it is sufficient to identify the substance of the work done, and thus comports with the Supreme Court's observation that an attorney "is not required to record in great detail how every minute of his time is expended. But at least counsel should identify the general subject matter of his time expenditures."

*Berberena v. Coler*, 753 F.2d 629, 634 (7th Cir. 1985) (quoting *Hensley*, 461 U.S. at 436-37 n.12, 103 S.Ct. 1933); *see also Craig v. Christ*, No. IP 96-1570-C H/G, 1999 WL 1059704, at *17 (S.D. Ind. Sept. 10, 1999) ("Especially when read in context, with an eye on the calendar and the docket, the records provide a sufficient indication of the subject matter."). Here, certain of the entries questioned by Magistrate Judge Kay can be explained by their surrounding entries. For example, the Report and Recommendation points out that the entry by Mr. Chud from August 9, 2004 is vague because it records a "meeting with PRFriedman and JMoustakas" but

does not identify the subjects discussed.  *See* 6/16/06 Kay R & R at 20.  However, Mr.

Friedman's entry of the same day provides the necessary information:  "extended conference on

legal strategies, research, assignments w/ JM and AMC."  *See* Goodwin Procter LLP Invoice at

33.

      Third, and perhaps most importantly, Plaintiff attached to his Reply a detailed 27-page

spreadsheet identifying all entries that the District alleged to be impermissibly vague.  *See* Pl.'s

Reply, Ex. Y (Goodwin Procter's Resp. to DC's Chart of Allegedly "Vague" Billing Entries).

This chart captures many of the entries cited by Magistrate Judge Kay, and carefully explains

why those entries are not vague in light of the relevant circumstances and other records.  For

example, Magistrate Judge Kay identifies Mr. Chud's June 14 and 15, 2004 entries for "ADA

research" and "Research on ADA damages" as being too vague to describe the legal work for

which the client is being billed.  However, a reference to Exhibit Y explains that Mr. Chud's

ADA research was "[r]esearch conduct in preparation for [the] Second Amended Complaint, to

determine required pleading standards."  *Id.* at 8.  Given that Plaintiff filed a Second Amended

Complaint shortly after this research, on August 13, 2004, and that Complaint contained an ADA

claim, it is clear that a combination of the surrounding circumstances and Plaintiff's additional

effort in constructing Exhibit Y is sufficient to overcome initial vagueness concerns; that is,

Goodwin Procter has now adequately described the legal work it performed for Plaintiff.

      Accordingly, the Court concludes that the "vagueness" problems with Plaintiff's fee

request initially feared by Magistrate Judge Kay are not as serious upon further contemplation.

To begin with, many of the cited entries go beyond the minimal requirements set out by this

Circuit in *Role Models*.  Moreover, other entries may be adequately explained by reference to the

billing records of the other attorneys involved on behalf of Plaintiff, the Moustakas Declaration,

and the Court's docket.  Finally, Plaintiff's Exhibit Y alleviates most of the remaining vagueness

problems, as it makes an entry-by-entry attempt to provide further detail.  As such, the Court

finds that the "alleged vague entries" identified by Magistrate Judge Kay do not warrant as

drastic a "downward departure" from Plaintiff's fee request as initially believed.

3.   <u>Allegedly Excessive Entries</u>

In his review, Magistrate Judge Kay also concluded that "[c]ertain fee entries also

demonstrate duplication of effort and/or excessive billing."  6/16/06 Kay R & R at 21.

Magistrate Judge Kay singled out two particular projects for criticism.  First, the Magistrate

identified as excessive the 25.8 hours of total work by two attorneys (Messrs. Chud and

Moustakas) on a 17-page Motion to Compel Discovery, filed by Plaintiff on August 17, 2004,

with 13 attached exhibits, and 32.5 hours spent by the same two attorneys on the 19-page Reply

to the District's Opposition, which contained 27 pages-worth of exhibits and was filed on

September 14, 2004.  *See id.*  Work on the Motion to Compel Discovery stretched from August

8, 2004 to August 17, 2004, while work on the Reply in Support of the Motion to Compel

Discovery extended from September 7, 2004 to September 14, 2004.  *Id.*; *see also* Goodwin

Procter LLP Invoice at 32-37, 42-46.  Magistrate Judge Kay's primary critique of this work is

that "[a] review of the motion to compel indicates that it was primarily a factual recitation of

Defendant's deficiencies in responding to discovery," and that this amount of time was therefore

excessive.  *See id.* at 21 n.20.  Second, Magistrate Judge Kay criticized the fact that two attorneys

– again, partner Moustakas and senior associate Chud – "attended the Hicks deposition on

07/09/04, resulting in $5,440.00 in fees on that day alone [excluding additional fees attributable

27

to preparation by counsel] and the Shansky deposition on 10/07/04, resulting in $4,344[.]00 in fees that day [again excluding fees for preparation]." *Id.* at 22.

Upon its own review, the Court concludes that Magistrate Judge Kay's concerns regarding "excessive entries" are overstated.  Importantly, the District did not complain about any of the legal briefing in this case, nor did it single out the Motion to Compel as containing a surplus of effort by Plaintiff.  Indeed, Plaintiff's Motion to Compel actually was critical to this litigation, as it sought access to previously-denied pattern evidence within the District's possession that was essential to Plaintiff's Section 1983 *Monell* claims.  Moreover, having a senior associate and a partner work in collaboration on a brief during the week prior to its filing is not presumptively excessive, nor are the hours spent in furtherance of that briefing (25.8 and 32.5, respectively) particularly troublesome.  With respect to the presence of two attorneys at a deposition (a partner and a senior associate), the Court notes that (1) the District did not complain about the presence of another attorney; (2) the District itself had two attorneys attend certain depositions; and (3) having two attorneys attend a deposition is standard practice.  *See N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983) (prevailing party not barred from recovering fees for attendance of two lawyers at deposition); *Oberfelder v. City of Petaluma*, No. C-98-1470 (MHP), 2002 WL 472308, at *7 (N.D. Cal. Jan. 29, 2002) (same).

Accordingly, the Court finds that the "downward departure" suggested by the Magistrate from the fees requested by Plaintiff for "excessive entries" is unwarranted.  Simply, the District has not attempted to argue or prove that Plaintiff's legal briefing or deposition attendance was excessive, duplicative, and redundant.  A review of the Invoice instead reveals that Plaintiff's

28

counsel employed reasonable resources in response to significant pressure by the District, and did

so in a manner that ultimately provided substantial benefits to Plaintiff.

        4.    <u>Allegedly Ministerial Tasks</u>

      Magistrate Judge Kay also singled out some work done by more senior attorneys at

Goodwin Procter that could have been performed by more junior staff or charged out at reduced

rates. *See* 6/16/06 Kay R & R at 24-26. Magistrate Judge Kay specifically identified certain

work by Mr. Friedman "reviewing and annotating" certain medical records and some research

work done by Mr. Chud regarding the statute of limitations and deliberative process privilege as

being particularly problematic. *Id.* at 25-26. Based on these instances where apparently

ministerial tasks were charged at relatively high rates, Magistrate Judge Kay recommended that

"fees be adjusted downward to account for the ministerial work that was performed by lead

counsel and billed at their usual billing rates." *Id.* at 26.

      Courts have often found it "appropriate" when analyzing a fee petition

> to distinguish between legal work, in the strict sense, and investigation, clerical
> work, compilation of facts and statistics, and other work which can often be
> accomplished by non-lawyers but which a lawyer may do because he has no other
> help available. Such non-legal work may command a lesser rate. Its dollar value
> is not enhanced just because a lawyer does it.

*Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974), *abrogated on other*

*grounds by Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) ; *see also*

*Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001) (finding that it is not fair or

reasonable for lawyers to claim the same high reimbursement rate for tasks varying from

telephone calls with clients, legal research, letters concerning discovery requests, drafting of a

brief, and trial time, when many of these tasks could be effectively performed by administrative

assistants, paralegals, or secretaries).

Here, some of Magistrate Judge Kay's criticisms are well-taken.  While Mr. Friedman, for example, has now explained in extensive detail exactly why he – and not a more junior member of the firm – was doing work such as researching issues, making scheduling-related telephone calls, annotating depositions, reviewing a paralegal's work on spreadsheets, and making travel arrangements for members of Plaintiff's family, *see* Pl.'s Reply, Ex. P (Friedman Decl.) ¶¶ 9-15, Mr. Friedman fails to explain why this work would be billed out at his customary $485-$510 hourly rate, *see* Aldock Decl. ¶ 37(b).  However, even assuming that Mr. Friedman's rate should have been lowered for some of his work, the overall amount at issue is quite low. Indeed, using a flawed methodology that does not take into account Mr. Friedman's initial block-billing, the District itself challenged only $8,904.56 (or 24.7 hours) of Mr. Friedman's work that it believed could have been done by paralegals or secretaries.  *See* D.C.'s Opp'n at 21-23; *see also* Friedman Decl. ¶ 15.  Moreover, as noted previously by this Court, Mr. Chud was only a fifth-year associate at Goodwin Procter in 2004, not a partner.  *See* Aldock Decl. ¶¶ 27-30. While research is commonly done by lower-level associates in many cases, having a fifth-year associate conducting important legal research on a major case at $285/hr., *see id.* ¶ 37(c), is not unheard-of, nor is it particularly unreasonable or excessive.  As such, while the Court agrees that perhaps certain tasks undertaken by Mr. Friedman should have been billed at a lower rate, given the *de minimis* nature of this problem, certainly less than the $8,904.56 suggested by the District should be excluded from Plaintiff's fee award.

5.      Alleged Excessive Work Performed in Connection With Settlement

Magistrate Judge Kay, upon his initial review, also expressed concern and confusion

regarding the amount of work performed by Goodwin Procter in connection with the settlement

in this action.  *See* 6/16/06 Kay R & R at 26-28.  Magistrate Judge Kay noted surprise at the time

spent on settlement issues by Goodwin Procter between April 19, 2005, the date the parties filed

a Notice of Settlement Status, indicating that Plaintiff and the District had "agreed, in principle,

and with the approval of the guardian *ad litem*, to settle the case against the District . . . for an

amount of $1,100,000 . . . in compensatory damages and payment of Mr. Heard's reasonable

attorneys' fees and costs," Pl.'s Notice of Settlement at 1, and the August 5, 2005 approval of the

Stipulation for the Entry of Consent Judgment (dated June 16, 2005) by this Court.  *See* 6/16/06

Kay R & R at 27-28.  Magistrate Judge Kay found that "a review of the work performed after the

Plaintiff filed his Notice of Settlement Status reveals that all three lead counsel took an active

role in the settlement process even after there was a settlement in fact, and accordingly, there are

a number of duplicative time entries and many internal conferences."  *Id.* at 28.  According to the

Magistrate, "this repetition in work provides additional grounds for reducing fees."  *Id.*

The Court certainly realizes how an outside, objective observer such as Magistrate Judge

Kay could find that the hours spent regarding settlement issues following Plaintiff's April 19,

2005 Notice were both unusual and unwarranted.  Indeed, the Court commends the Magistrate

for his dedicated service on this case, as he was actively involved in adjudicating and mediating a

myriad of difficult and hotly-contested discovery issues, and was a vital cog in the ultimate

settlement between the parties.  However, following Plaintiff's April 19, 2005 Notice, the case

referral to the Magistrate concluded, and his remaining involvement in the case was minimal.

With a more full understanding of both the events immediately preceding and following the April

19, 2005 Notice, it is evident from Goodwin Procter's Invoice that the time spent by Messrs.

Moustakas, Friedman, and Chud regarding settlement issues during this time was reasonable.

Importantly, the basic offer that successfully settled this case was made on February 3, 2005, approximately one week after counsel for Plaintiff met with District of Columbia Attorney General Robert Spagnoletti.  *See* Moustakas Decl. ¶¶ 200-01.  However, this offer did not result in a concrete settlement until June 13, 2005.  *Id.* ¶ 201.  The District's first proposed an offer of judgment on February 3, 2005; then backtracked, sending Plaintiff a release in lieu of offer on March 7, 2005; then promised (but ultimately failed) to issue a new offer of judgment on April 4, 2005; then proposed a simultaneous offer of judgment and settlement agreement on April 6, 2005; then proposed that Plaintiff accept the original offer of judgment subject to a side letter on May 9, 2005; then proposed a consent judgment instead of a settlement or offer of judgment on May 17, 2005.  *Id.*  There was finally a meeting-of-the-minds on the form of the resolution on May 25, 2005, yet another three weeks passed after this date until the District finally settled all issues.  *Id.*; *see also* Pl.'s Reply, Ex. O (Chud Decl.) ¶¶ 27-32.  These significant changes, vacillations, debates, and shifts all created more work, meaning that Plaintiff's counsel had to work on "settlement issues" even after the April 19, 2005 Notice.

Moreover, the presence of other Defendants in this case necessitated greater care on the part of Plaintiff's counsel during this time period.  That is, Goodwin Procter had to guard against risks that set-off or contribution claims might diminish his potential recoveries against CCHPS or the other Defendants.  Additionally, and perhaps most importantly, Plaintiff's disabilities and needs drastically increased the time his attorneys spent on settlement issues.  Plaintiff's counsel had to identify and consult with economic experts and tax counsel to evaluate the structured annuity initially proposed by the District and to assess the tax consequences of any settlement.

32

At the same time, Plaintiff's counsel were preparing his fee petition, as well as researching

innovative Special Needs Trust issues and locating outside attorneys to aid in structuring what

ultimately became the Special Needs Trust governing Plaintiff's award.  Finally, Plaintiff's

counsel had to summarize all of this activity in a series of reports to this Court in an effort to

persuade this Court to accept the Stipulation for the Entry of Consent Judgment – further duties

which required the expenditure of time, attention, and effort on the part of Goodwin Procter.

Given this flurry of post-April 19, 2005 settlement-related activity, it is clear that the

frequent conferences and research by Plaintiff's three central attorneys in this matter were

warranted.  Plaintiff was in a tenuous position, lifted by the hope of settlement but in need of

counsel with strong foresight to cover all potential future issues.  A review of Goodwin Procter's

Invoice, *see id.* at 132-154, indicates that their settlement work during the April 19 - August 4,

2005 time frame was patently reasonable, and undertaken in a manner that produced great benefit

for Plaintiff in the end.  Much of this was complicated, innovative work that required a great deal

of care and attention – facts that would be outside the Magistrate's scope-of-knowledge in this

case.  Accordingly, the Court concludes that Goodwin Procter's settlement-related activities do

not provide "additional grounds for reducing fees."

6.     <u>Allegedly Excessive Work Performed in Connection with the Fee Petition</u>

It is "settled in this circuit" that "[h]ours reasonably devoted to a request for fees are

compensable."  *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*, 771 F.2d 521, 528 (D.C. Cir.

1985) (citations omitted).  However, "fees on fees" must be reasonable, and not excessive.  *Id.*

Courts have an "obligation to scrutinize the hours spent preparing the fee petitions to insure that

the total is reasonable and that it does not represent a windfall for the attorneys."  *Farris v. Cox*,

508 F. Supp. 222, 226 (N.D. Cal. 1981).   Upon his review, Magistrate Judge Kay noted several major concerns with the fees related to Plaintiff's fee petition, noting that he was "astonished" at the overall request.   *See* 6/16/06 Kay R & R at 14-15.   This Court, in analyzing Plaintiff's fee request relating to his fee petition, is equally astounded by the heft of Plaintiff's fee-related demand.

While there is some debate between the parties over the precise figures relating to the construction of Plaintiff's Motion for Attorney's Fees, and its attendant exhibits, the following is a safe estimate:

| | | |
|---|---|---|
| Research | 76.2 hours | $33.594.70 |
| Preparation of affidavits/declarations | 58 hours | $24,229.00 |
| Meetings and conferences re: petition | 42.2 hours | $18,159.00 |
| Review of invoice | 22.3 hours | $ 8, 618.00 |
| Preparation of brief | 53 hours | $24,229.00 |

Total Hours = 251.7
Total Amount Requested = $108,829.70

*See* Pl.'s Opp'n at 12; *see also generally* Goodwin Procter's Invoice.

These figures, especially in light of the end-product, are patently unreasonable.  Plaintiff attempts to justify these figures by noting that they represent only 8.7% of all fees sought, whereas this Court, in *New York v. Microsoft*, 297 F. Supp. 2d 15 (D.D.C. 2003) (Kollar-Kotelly, J.), approved an award of fees for work on a fee petition which represented 12.4% of the plaintiff's total fees.  However, this litigation – while contested and complex – pales in comparison to the *Microsoft* litigation; indeed, Goodwin Procter spent only approximately 20 months on this case before this Court entered the Consent Judgment, and this case never proceeded beyond the discovery phase.  Such a comparison is simply inapposite.

34

The product produced by allegedly $108,829 worth of work – Plaintiff's 10-page Fee Petition with its attached exhibits – is plainly deficient and excessive at the same time.  The Fee Petition itself is lacking in many areas:  (1) Plaintiff initially failed to attach any index for his 441 pages worth of exhibits, making review of the exhibits difficult at best; (2) certain problems were clearly left under-addressed by Plaintiff's 10-page initial motion, meaning that Plaintiff had to support his request through a 51-page Reply brief with 48 more attached exhibits; and (3) through it all, Plaintiff still failed to take the step perhaps most helpful to a court in reviewing his position – that is, grouping and summarizing the time entries on his Invoice by the nature of the activity or the stage of the case.  *See Am. Civil Liberties Union v. Barners*, 168 F.3d 423, 427 (11th Cir. 1999) ("A well-prepared fee petition also would include a summary, grouping the time entries by the nature of the activity or stage of the case.") (citation omitted).  Indeed, how $24,229 worth of work went into a 10-page brief that (1) does not contain anything that can be described as complex legal analysis or discussion, and (2) failed to anticipate most of the District's objections is beyond this Court's comprehension.

Moreover, the Fee Petition itself is also excessive.  Magistrate Judge Kay rightfully focused on the 29-page Moustakas Declaration, which he characterized as "excessive, redundant and otherwise unnecessary in light of the fact that counsel submitted detailed billing records with the Fee Petition."  6/16/06 Kay R & R at 16.  Magistrate Judge Kay "conservatively estimate[d] that at least $18,500.00 in legal fees is directly attributable to the preparation of the Moustakas Declaration," *id.* at 16 n.16, which certainly contains "unnecessary legal argument and unwarranted editorial commentary," *id.* (giving examples).  Given that Plaintiff already attached detailed Invoices listing every charge to his Fee Petition, the Moustakas Declaration – at most –

should have identified which firm members worked on the case, their backgrounds, and a summary of the amounts billed (both individually and collectively) for each major category of activity.  While additional factual information, if minimal, would certainly be understandable, Mr. Moustakas's 29-page, single-spaced opus went above-and-beyond what is reasonable.

An examination of the time spent in preparation of the Fee Petition produces even more questions.  For example, why did Plaintiff's counsel need to spend 76.2 hours, or $33,594.70, on "research" relating to the Fee Petition, when the structure of the motion was largely boilerplate and cited to only most obvious or familiar fee-related cases in this jurisdiction?  Further, why was 42.2 hours worth of conference time, along with 22.3 hours worth of invoice review time, necessary when Plaintiff had already provided a copy of its billing records to the District on March 1, 2005, and a "slightly updated version" on May 20, 2005 in an attempt to settle the matter?  *See* Pl.'s Reply at 1, n.2.

Ultimately, the Court is in agreement with Magistrate Judge Kay that "Plaintiff's counsel was overzealous in their preparation of the Fee Petition and, accordingly, it is recommended that fees related to preparation of the Fee Petition be adjusted downward."  6/16/06 Kay R & R at 18. Indeed, the Court is in accordance with the District's suggestion that "preparation of the fee petition should have been accomplished within 120 hours" and that the "amount awarded for preparation of the fee petition be reduced to $56,500.00."  Any further award relating to Plaintiff's Fee Petition would reward excessive, unreasonable work that was not particularly effective, necessitating Plaintiff's monumental Reply.

### IV: CONCLUSION

For the reasons set forth above, the Court adopts-in-part Magistrate Judge Kay's June 16,

2006 Report and Recommendation relating to Plaintiff's Motion for Attorney's Fees.

Specifically, the Court (1) adopts Magistrate Judge Kay's recommendations with respect to both

costs and the awards granted Plaintiff's former counsel, Stovall and Jones; and (2) adopts-in-part

Magistrate Judge Kay's recommendations with respect to Goodwin Procter.  Plaintiff is awarded

the complete $71,013.36 in costs, and Messrs. Stovall and Jones are awarded $15,300.00 and

$20,100.00, respectively.  Plaintiff's present counsel, Goodwin Procter LLP, which initially

requested $962,097, shall have that figure reduced by $52,329.70 due to the significant problems

with the fees relating to Plaintiff's Fee Petition itself, with a further reduction of $20,500.00 for

*de minimis* issues identified by Magistrate Judge Kay but not completely warranted.  As such,

Goodwin Procter is due $889,267.30 in reasonable attorney's fees from the District.

Accordingly, the Court grants-in-part and denies-in-part Plaintiff's Motion for Attorneys Fees.

An appropriate Order accompanies this Memorandum Opinion.


Date:   September 5, 2006


                    _____*/s/*_____

                    COLLEEN KOLLAR-KOTELLY
                    United States District Judge